No. 24-10231

# In the United States Court of Appeals for the Eleventh Circuit

COAKLEY PENDERGRASS, et al.,

*Plaintiffs-Appellants*,

v.

SECRETARY OF STATE OF GEORGIA,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:21-cv-05339—Steve C. Jones, Judge

## BRIEF FOR APPELLANTS

Joyce Gist Lewis
Adam M. Sparks
**KREVOLIN & HORST, LLP**
One Atlantic Center
1201 W. Peachtree St. NW,
Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700

Abha Khanna
Makeba Rutahindurwa
**ELIAS LAW GROUP LLP**
1700 Seventh Ave,
Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Plaintiffs-Appellants certify that Coakley Pendergrass, Triana Arnold James, Elliott Hennington, Robert Richards, Jens Rueckert, and Ojuan Glaze are individuals. Plaintiffs-Appellants further certify that no publicly held corporation or company has an interest in the outcome of this case.

Plaintiffs-Appellants certify that the following have an interest in the outcome of this case:

1. Allen, Erick, *Witness for Plaintiffs*

2. Bokat-Lindell, Noah B., *Counsel for Intervenor*

3. Boyle Jr., Donald P., *Counsel for Defendant*

4. Carr, Christopher, *Counsel for Defendant*

5. Carter, Jason J., *Witness for Plaintiffs*

6. Duffey Jr., Hon. William S., *Former Defendant*

7. Georgia Department of Law, *Counsel for Defendant*

8. Elias Law Group LLP, *Counsel for Plaintiffs*

9. Flynn, Erin H., *Counsel for Intervenor*

10. Ford, Christina A., *Counsel for Plaintiffs*

11. Freeman, Daniel J., *Counsel for Intervenor*

12. Ghazal, Sara Tindall, *Former Defendant*

13.   Glaze, Ojuan, *Plaintiff*

14.   Hamilton, Kevin J., *Former Counsel for Plaintiffs*

15.   Hawley, Jonathan P., *Former Counsel for Plaintiffs*

16.   Hennington, Elliott, *Plaintiff*

17.   Ivey, Marvis McDaniel, *Amicus Curiae*

18.   Jacoutot, Bryan F., *Counsel for Defendant*

19.   James, Triana Arnold, *Plaintiff*

20.   Johnston, Janice W., *Former Defendant*

21.   Jones, Michael B., *Former Counsel for Plaintiffs*

22.   Jones, Hon. Steve C., *U.S. District Court Judge*

23.   Khanna, Abha, *Counsel for Plaintiffs*

24.   Krevolin & Horst LLC, *Counsel for Plaintiffs*

25.   LaRoss, Diane, *Counsel for Defendant*

26.   Le, Anh, *Former Defendant*

27.   Lewis, Joyce Gist, *Counsel for Plaintiffs*

28.   Lindsey, Edward, *Former Defendant*

29.   Mashburn, Matthew, *Former Defendant*

30.   McGowan, Charlene, *Former Counsel for Defendant*

31.   Osher, Daniel C., *Former Counsel for Plaintiffs*

32.   Paradise, Loree Anne, *Former Counsel for Defendant*

33.   Pendergrass, Coakley, *Plaintiff*

34.   Perkins Coie LLP, *Former Counsel for Plaintiffs*

35.   Petrany, Stephen J., *Counsel for Defendant*

36.   Raffensperger, Brad, *Defendant*

37.   Richards, Robert, *Plaintiff*

38.   Rueckert, Jens, *Plaintiff*

39.   Rutahindurwa, Makeba, *Counsel for Plaintiffs*

40.   Sparks, Adam M., *Counsel for Plaintiffs*

41.   Stewart, Michael Elliot, *Counsel for Intervenor*

42.   Strickland, Frank B., *Counsel for Defendant*

43.   Taylor English Duma LLP, *Counsel for Defendant*

44.   Tyson, Bryan P., *Counsel for Defendant*

45.   United States, *Intervenor*

46.   Vaughn, Elizabeth Marie Wilson, *Former Counsel for Defendant*

47.   Webb, Bryan K., *Counsel for Defendant*

48.   Weigel, Daniel H., *Counsel for Defendant*

49.   White, Graham W., *Former Counsel for Plaintiffs*

50.   Willard, Russell D., *Counsel for Defendant*

## STATEMENT REGARDING ORAL ARGUMENT

Because this appeal concerns serious flaws in Georgia's statewide congressional districting map, Appellants respectfully request oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ..................................................................... iii

JURISDICTIONAL STATEMENT .............................................................. vi

STATEMENT OF THE ISSUES .................................................................. 1

INTRODUCTION ................................................................................... 1

STATEMENT OF THE CASE ..................................................................... 3

I.    The district court struck down Georgia's congressional plan and required the State to enact a remedial plan consistent with its order........... 3

II.    The General Assembly adopted a congressional plan that failed to adequately remedy the violation. ................................................... 6

III.   The district court approved SB 3EX. ....................................... 8

STANDARD OF REVIEW .......................................................................... 9

SUMMARY OF THE ARGUMENT ................................................................ 10

ARGUMENT .......................................................................................... 11

I.    SB 3EX is not an adequate remedy because it unnecessarily fails to provide relief to thousands of Black voters in the proven vote dilution area. ....................................................................... 13

II.    The court erred by adopting a remedial plan that failed to provide an additional Black-opportunity district ..................................... 20

CONCLUSION ....................................................................................... 27

CERTIFICATE OF COMPLIANCE ............................................................... 28

CERTIFICATE OF SERVICE ....................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan*,
  599 U.S. 1 (2023)...........................................................................3, 4

*Alley v. U.S. Dep't of Health & Hum. Servs.*,
  590 F.3d 1195 (11th Cir. 2009) .......................................................9

*Arbor Hill Concerned Citizens v. County of Albany*,
  357 F.3d 260 (2d Cir. 2004)............................................................20

*Bartlett v. Strickland*,
  556 U.S. 1 (2009)............................................................................25

*Burns v. Richardson*,
  384 U.S. 73 (1966)..........................................................................12

*Cave v. Singletary*,
  84 F.3d 1350 (11th Cir. 1996).....................................................22, 23

**Dillard v. Crenshaw County*,
  831 F.2d 246 (11th Cir. 1987)..........................................10, 12, 26

*Haaland v. Brackeen*,
  599 U.S. 255 (2023).......................................................................11

*Harper v. City of Chi. Heights*,
  223 F.3d 593 (7th Cir. 2000)............................................................9

**Jacksonville Branch of NAACP v. City of Jacksonville*,
  No. 3:22-CV-493-MMH-LLL, 2022 WL 17751416 (M.D. Fla.
  Dec. 19, 2022), *appeal dismissed*, No. 22-14260-HH, 2023 WL
  4161697 (11th Cir. June 6, 2023)......................................15, 20, 26

*Johnson v. De Grandy*,
  512 U.S. 997 (1994)........................................................................26

**League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006)........................................................12, 14, 21

*McGhee v. Granville County*,
   860 F.2d 110 (4th Cir. 1988) ............................................................19

*North Carolina v. Covington*,
   581 U.S. 486 (2017) .....................................................................9, 18

**Shaw v. Hunt*,
   517 U.S. 899 (1996) .................................... 10, 13, 16, 17, 18, 19

*Singleton v. Allen*,
   No. 2:21-cv-1291-AMM, 2023 WL 6567895
   (N.D. Ala. Oct. 5, 2023) ...................................................................23

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ........................................................................4, 23

*United States v. Brown*,
   561 F.3d 420 (5th Cir. 2009) ..............................................................9

***United States v. Dall. Cnty. Comm'n*,
   850 F.2d 1433 (11th Cir. 1988) ........................... 2, 10, 11, 14, 18, 24

*United States v. Osceola County*,
   474 F. Supp. 2d 1254 (M.D. Fla. 2006) ...........................................26

*Voinovich v. Quilter*,
   507 U.S. 146 (1993) ..........................................................................25

*White v. Alabama*,
   74 F.3d 1058 (11th Cir. 1996) ..........................................................10

*Whitest v. Crisp Cnty. Sch. Dist.*,
   No. 22-11826, 2023 WL 8627498 (11th Cir. Dec. 13, 2023) .............9

*Williams v. City of Dothan*,
   818 F.2d 755 (11th Cir.), *op. modified on denial of reh'g*,
   828 F.2d 13 (11th Cir. 1987). ...........................................................22

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
   979 F.3d 1282 (11th Cir. 2020) .....................................................9, 23

iv

**Statutes**

28 U.S.C. § 1291......................................................................................vi

28 U.S.C. § 1331......................................................................................vi

28 U.S.C. § 1343......................................................................................vi

28 U.S.C. § 1357......................................................................................vi

42 U.S.C. § 1983......................................................................................vi

42 U.S.C. § 1988......................................................................................vi

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1357. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because Plaintiffs-Appellants are appealing from the final order of the district court in this matter that disposed of all parties' claims. This appeal is timely because the district court entered its final order on December 28, 2023, *see* Doc. 334, and Plaintiffs-Appellants filed their notice of appeal on January 22, 2024, *see* Doc. 336.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in finding that the General Assembly's remedial plan completely remedied the prior dilution of Black voting strength where its new majority-Black district draws in Black voters residing *outside* the area in which Plaintiffs proved their vote dilution claim who *already* had the opportunity to elect their preferred candidate, leaving tens of thousands of Black voters within the vote dilution area without relief.

2.     Whether the district court erred in finding that the General Assembly's remedial plan completely remedied the prior dilution of Black voting strength when it eliminated a minority-opportunity district, leaving Black voters in Georgia with the same number of opportunity districts as the enjoined plan, in contravention of the district court's instructions.

## INTRODUCTION

On October 26, 2023, the district court ruled that Georgia's 2021 congressional redistricting map, in which Black voters had an opportunity to elect their preferred candidates in five districts, resulted in the unlawful dilution of Black voting power in west-metro Atlanta. In order to remedy the violation of Section 2 of the Voting Rights Act, the district court ordered the creation of an "*additional* [] district[] in which Black voters have a demonstrable opportunity to elect their candidates of choice." Doc. 286 at 510 (emphasis added). But the General Assembly

enacted a replacement map—remedial in name only—that maintained only five districts where Black voters have that electoral opportunity. As a result, the new map fails to comply with both the district court's liability order and the State's obligations to completely remedy the Section 2 violation.

The General Assembly concocted this supposed loophole by conditioning the creation of any new electoral opportunities for some Black voters on the retraction of existing electoral opportunities for others. Toward that end, the replacement map (1) creates a "new" majority-Black district in the Atlanta region by reaching *outside* the vote dilution area to pull Black voters out of a majority-Black district in which they *already* had the opportunity to elect candidates of their choice, and (2) dismantles a neighboring majority-minority district in which Black voters *had* the opportunity to elect their candidates of choice but no longer do. Far from remedying the vote dilution that Plaintiffs proved below, the new map perpetuates the Section 2 violation by imposing an effective ceiling on minority opportunity in Georgia. And rather than hold the General Assembly to account for this ongoing Section 2 violation, the district court failed its duty to ensure that Georgia's new congressional map "*completely* remedies the prior dilution of minority voting strength and *fully* provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *United States v. Dall. Cnty. Comm'n*, 850 F.2d 1433, 1442 (11th

Cir. 1988) (quoting S. Rep. No. 97-417, at 31 (1982)). This legal error requires reversal.

## STATEMENT OF THE CASE

**I.    The district court struck down Georgia's congressional plan and required the State to enact a remedial plan consistent with its order.**

On December 30, 2021, Georgia enacted a new congressional redistricting map, SB 2EX. Doc. 97 at 14. Shortly thereafter, Plaintiffs—Black Georgia voters—filed suit and moved for a preliminary injunction, challenging the map as violative of Section 2 of the Voting Rights Act. *See* Docs. 1, 32. The district court subsequently held a six-day preliminary injunction hearing. Doc. 286 at 16, 514–16.

On February 28, 2022, the district court found that Plaintiffs satisfied their burden under the well-established *Gingles* standard for adjudicating Section 2 vote dilution claims. Doc. 97 at 220. But the court denied relief after weighing the equities, concluding that, as of the date of its order, "there [wa]s insufficient time to effectuate remedial relief for purposes of the 2022 election cycle." *Id.* at 236–37; *id.* at 21–27 (citing *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring)).

Following discovery, the parties filed cross-motions for summary judgment. While those motions were pending, the Supreme Court issued its decision in *Allen v. Milligan*, 599 U.S. 1 (2023), reaffirming that plaintiffs alleging Section 2 vote dilution claims may prove a violation according to the test first articulated in

*Thornburg v. Gingles*, 478 U.S. 30 (1986). Doc. 286 at 18–19. Applying the appropriate standard reaffirmed in *Allen*, the district court found material issues of fact to be in dispute and denied the parties' motions. *Id.* at 19.

On October 26, 2023, following a two-week trial, the district court found that SB 2EX violated Section 2. Doc. 286 at 273–74. The court made several careful and critical determinations in reaching its conclusion. *First*, based on the illustrative map submitted by Plaintiffs' expert Bill Cooper, the district court found that Georgia's Black population is sufficiently large and geographically compact to constitute a majority in an additional congressional district in west metro Atlanta, and that such a district could be drawn while adhering to traditional redistricting principles (*Gingles* 1). *Id*. at 174–75.

*Second*—relying on the analysis of Plaintiffs' expert Dr. Maxwell Palmer and concessions from Defendant's expert Dr. John Alford—the district court found that "Black voters in Georgia are extremely politically cohesive" (*Gingles* 2), *id*. at 204, and that "white voters were highly cohesive in voting in opposition to the Black candidate of choice" (*Gingles* 3), *id.* at 206. The court concluded that there was "'very clear' evidence of racially polarized voting" across the focus area and in each individual congressional district Dr. Palmer examined. *Id.* at 207–08 (*quoting Allen*, 599 U.S. at 22).

*Third*, in finding that the totality of the circumstances demonstrates that the political process is not currently equally open to Black Georgians, the court endorsed Plaintiffs' expert Dr. Vernon Burton's observation of an ongoing "historical pattern that following an election, the General Assembly responsively passes voting laws that disproportionately impact Black voters in Georgia." *Id*. at 230. The court observed that, "[d]espite the growth in the Black population in the affected areas and the voter polarization between white and Black Georgians . . . the Enacted Congressional Plan did not increase the number of majority-Black districts in the Atlanta metro area . . . [which] in effect dilutes and diminishes the Black population's voting power in that area of the State." *Id.* at 272.

Based on the well-established legal standard, the district court concluded that "SB 2EX violates Section 2 of the Voting Rights Act as to the following districts/areas: Enacted Congressional Districts 3, 6, 11, 13, and 14." *Id.* at 514. The court provided the General Assembly more than six weeks to adopt a remedial congressional plan "consistent with[ its] Order." *Id.* at 510; *see also id.* at 508–09 ("[T]he parameters and the instructions around what the State of Georgia is supposed to do to comply with Section 2 of the VRA is a critical part of this Court's order."). In doing so, the court instructed that an appropriate remedy "involves an additional majority-Black congressional district in west-metro Atlanta." *Id.* at 509. It further cautioned that the "State cannot remedy the Section 2 violation[] described herein

by eliminating minority opportunity districts elsewhere in the plan[].” *Id.* at 509–10. The court “retain[ed] jurisdiction to determine whether the remedial plan[] adopted by the General Assembly remed[ies] the Section 2 violation[] by incorporating [an] additional [] district[] in which Black voters have a demonstrable opportunity to elect their candidates of choice.” *Id.* at 510; *see also id.* at 511 (“This will require the Court to evaluate a remedial proposal under the *Gingles* standard to determine whether it provides Black voters with an additional opportunity district.”).

## II. The General Assembly adopted a congressional plan that failed to adequately remedy the violation.

On December 8, 2023, Georgia enacted purported remedial plan SB 3EX. Doc. 312 at 1. SB 3EX created a new majority-Black CD 6 encompassing parts of Cobb, Fulton, Douglas, and Fayette Counties. *See* Doc. 317-1 ¶ 8 (Cooper Remedial Report). But although the district was purportedly designed to remedy the Section 2 violation found in old CDs 3, 6, 11, 13, and 14, Doc. 286 at 514, more than a quarter of new CD 6 draws from old CD 5, a majority-Black district located wholly outside the Section 2 violation area. Doc. 317-1 ¶ 21. In so doing, SB 3EX provides a Section 2 “remedy” for 51,717 Black Georgians of voting age from an *existing* majority-Black district *outside* the vote dilution area—and who thus needed no remedy at all—and *fails* to remedy the Section 2 injury of at least the same number of Black Georgians of voting age *within* the vote dilution area. *See id.* ¶ 22.

6

In addition, SB 3EX drastically reconfigures CD 7, which under the old map lies entirely outside the vote dilution area. While new CD 6 reaches outside the vote dilution area, new CD 7 stretches into the vote dilution area, which supplies nearly three-quarters of the district's population. *See id.* ¶ 20. In so doing, new CD 7 cuts the minority citizen voting age population (CVAP) by more than half, transforming it from a majority-minority district (with a minority CVAP of 57.81%, Doc. 318-3) to a majority-white district, Doc. 318-2.

The effect of this reconfiguration was to eliminate a district in which Black voters previously had an opportunity to elect their candidates of choice. Under the 2021 plan's CD 7, minority-preferred candidates would have been "able to win 76% of the elections from 2012 to 2022, . . . and every statewide election after 2016, with an average of 56.4% of the vote." Doc. 317-2 ¶ 17 & fig.4, tbl.3 (Palmer Remedial Report). This includes the 2022 congressional election, the only election actually conducted under the old CD 7. *Id.* But under SB 3EX, minority-preferred candidates would not have prevailed in *any* of the elections analyzed. *Id.* As a result, rather than creating "an additional opportunity district" as instructed by the lower court, Doc. 286 at 511, SB 3EX maintains the same number of districts in which Black voters have an opportunity to elect their preferred candidates as the previous map.

The net result of the reconfiguration of districts is virtually no gains in electoral opportunity for Black Georgian voters. Under the 2021 plan, 56.4 percent

of Black voters lived in districts in which they could elect their preferred candidates. Doc. 318-3 (adding the adult any-part Black (18+AP Black) numbers of those in CDs 2, 4, 5, 7, and 13). Under the 2023 remedial plan, that number is virtually unchanged—57.5 percent of Black voters now live in districts in which they can elect their preferred candidates. Doc. 318-2 (adding the 18+ AP Black numbers of those in CDs 2, 4, 5, 6, and 13).

### III.    The district court approved SB 3EX.

Plaintiffs filed their objections to SB 3EX and Defendant Secretary of State responded in support of the plan. *See* Doc. 317; Doc. 327; Doc. 328. After holding an evidentiary hearing on the remedial plan, Doc. 329, the court overruled Plaintiffs' objections and approved SB 3EX. Doc. 334. Specifically, the court found the General Assembly created an additional majority-Black district in west metro Atlanta, notwithstanding that tens of thousands of Black voters in the vote dilution area will continue to lack relief. *Id*. at 9–11. And it excused the dismantling of CD 7 because that district was a majority-minority district rather than a majority-Black district, *id.* at 13, notwithstanding that it was a district in which Black voters had the opportunity to elect their preferred candidates, Doc. 286 at 468–69.

Plaintiffs timely appealed.

## STANDARD OF REVIEW

This Court reviews a district court order approving a legislative remedy to a Section 2 violation for abuse of discretion. *Whitest v. Crisp Cnty. Sch. Dist.*, No. 22-11826, 2023 WL 8627498, at *2 (11th Cir. Dec. 13, 2023). The Court also reviews "a district court's interpretation of its own order[]" for abuse of discretion. *Alley v. U.S. Dep't of Health & Hum. Servs.*, 590 F.3d 1195, 1202 (11th Cir. 2009). Under the familiar abuse-of-discretion standard, the Court "review[s] the district court's factual findings regarding a Section 2 violation for clear error and its legal conclusions *de novo*." *Harper v. City of Chi. Heights*, 223 F.3d 593, 599–600 (7th Cir. 2000). The deferential nature of the abuse of discretion standard thus "does nothing to inhibit" the Court's "power to correct errors of law." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1301 (11th Cir. 2020) (quoting *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1227 (11th Cir. 2000)).

"Relief in redistricting cases is fashioned in the light of well-known principles of equity. A district court therefore must undertake an equitable weighing process to select a fitting remedy for the legal violations it has identified, taking account of what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (cleaned up). The district court's discretion to approve an appropriate remedy to a Section 2 violation "is not without limit." *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009). Section 2 violations require relief that

"completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *Dall. Cnty. Comm'n*, 850 F.2d at 1442 (emphases omitted) (quoting S. Rep. No. 97-417, at 31 (1982)); *see also White v. Alabama*, 74 F.3d 1058, 1069 n.36 (11th Cir. 1996) (same). Thus, "[t]his Court cannot authorize an element of an election proposal that will not with certitude *completely* remedy the Section 2 violation." *Dillard v. Crenshaw County*, 831 F.2d 246, 252–53 (11th Cir. 1987).

## SUMMARY OF THE ARGUMENT

The district court misapplied Section 2 when it permitted Georgia to craft a "new" Black-opportunity district that gratuitously swept in tens of thousands of Black voters who already enjoyed the opportunity to elect their candidates of choice while shutting out tens of thousands of Black voters who remain stranded in the vote dilution area with no such opportunity. As a matter of law, new majority-Black CD 6 is not "remedial in nature" because it is not "designed as nearly as possible to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Shaw v. Hunt*, 517 U.S. 899, 915 (1996) (cleaned up). To the contrary, new CD 6 accomplishes the very opposite: it relegates the victims of proven vote dilution to another decade of electoral oblivion where they will lack any meaningful opportunity to elect their candidates of choice.

10

The new map's disregard for Georgia's Section 2 obligations—and the district court's own order—is also apparent from a plan-wide analysis. The General Assembly purported to remedy the defect in the 2021 plan by adopting a new plan that confines Black voters to the same number of opportunity districts as the enjoined plan. What the General Assembly made a show of giving with one hand—new majority-Black CD 6—it immediately took with the other by dismantling old majority-minority CD 7 without any justification. After the district court ordered the creation of an "*additional* [congressional] district[]" in which Black voters have a demonstrable opportunity to elect their candidates of choice," Doc. 286 at 510 (emphasis added), Black voters had a right to expect exactly that. They looked to the General Assembly, and then again to the district court, for justice, "only to leave with bowed heads and empty hands." *Haaland v. Brackeen*, 599 U.S. 255, 333 (2023) (Gorsuch, J., concurring).

This Court should reverse and remand.

## ARGUMENT

Contrary to the district court's conclusion, SB 3EX fails to "completely remed[y] the prior dilution of minority voting strength" or "fully provide[] equal opportunity for minority citizens to participate and to elect candidates of their choice." *Dall. Cnty. Comm'n*, 850 F.2d at 1442. The court incorrectly "authorize[d]"

at least two "element[s]" of the replacement map "that will not with certitude *completely* remedy the Section 2 violation." *Dillard*, 831 F.2d at 252–53.

First, the district court erred by authorizing a map in which the "additional" Black-opportunity district is only *partially* located in the area found to be in violation of Section 2—and thus at best only *partially* remedies the vote dilution injury of the previous map. Because Section 2 forbids states from "trad[ing] off the rights of some members of a racial group against the rights of other members of that group," *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 437 (2006) ("*LULAC*"), it cannot sanction remedies that provide "relief" to Black Georgians who already had the opportunity to elect at the expense of Black Georgians who suffered—and continue to suffer—unlawful vote dilution.

Second, the district court failed to analyze the remedial "scheme as a whole," *Burns v. Richardson*, 384 U.S. 73, 83 (1966), which reveals that the elimination of majority-minority CD 7 results in continued dilution of Black voting strength by maintaining the same hard cap on Black opportunity districts as the previous map that the court found to violate Section 2. This Court should vacate the lower court's opinion and order the adoption of a remedial plan that *completely* cures the unlawful vote dilution.

**I.**    **SB 3EX is not an adequate remedy because it unnecessarily fails to provide relief to thousands of Black voters in the proven vote dilution area.**

Tasked with remedying the Section 2 violation in a defined area with an "additional" Black-opportunity district, Doc. 286 at 511, the General Assembly chose instead to reach outside the area found to be in violation, incorporating in its new majority-Black CD 6 tens of thousands of Black voters who suffered no vote dilution injury to the exclusion of tens of thousands of Black voters who did. In so doing, it failed to heed the Supreme Court's admonition that "[t]he vote-dilution injuries suffered" by voters in one area "are not remedied by creating a safe majority-black district somewhere else in the state." *Shaw*, 517 U.S. at 917. By endorsing a remedial plan that trades away the voting rights of some Black voters to provide a remedy for other Black voters who suffered no injury, the district court guaranteed that tens of thousands of Black voters within the vote dilution area will continue to lack a meaningful opportunity to elect their candidates of choice.

The district court specified the precise location of the Section 2 violation, giving the General Assembly a clear roadmap for implementing an appropriate remedy: "Enacted CDs 3, 6, 11, 13, and 14." Doc. 286 at 514. Yet the new majority-Black CD 6 draws only partially from the vote dilution area, and instead pulls more than a *quarter* of the district's population from old CD 5—a majority-Black district that lies entirely outside the location of the Section 2 violation, *id.*, and in which

13

Black voters *already* had the opportunity to elect their preferred congressional candidates under the previous map, *see* Doc. 286 at 468–69; Doc. 317-2 ¶ 20 & fig.5. Consequently, SB 3EX purports to remedy the Section 2 violation by ignoring Black Georgians whose voting strength was—and still is—unlawfully diluted, instead populating the new CD 6 with Black voters who required no remedy at all. As the Supreme Court stated in *LULAC*, "the State's creation of an opportunity district for those without a § 2 right offers no excuse for its failure to provide an opportunity district for those with a § 2 right." 548 U.S. at 430.

SB 3EX also reconfigures CD 7 in a manner antithetical to the vote dilution found in west metro Atlanta. Under the 2021 plan, old CD 7, like CD 5, fell entirely outside the area found to require a Section 2 remedy. Doc. 317-1 ¶¶ 9, 12. New CD 7, by contrast, reaches into west metro Atlanta to grab a majority of the area of old CD 6 that the court ruled diluted Black voting strength. *Id.* ¶¶ 15–16 & fig.2. As a result, Black voters in old CD 6 who proved they suffered a Section 2 violation are now placed in a newly fabricated majority-white district where they are still denied the opportunity to elect their candidates of choice. *Id.* ¶ 20. Thus, rather than "*completely* remed[ying] the prior dilution of minority voting strength," *Dall. Cnty. Comm'n*, 850 F.2d at 1438 (emphasis added), SB 3EX fails to fully remedy the "significant harm" suffered by those Black voters in Georgia "whose voting rights have been injured by the violation of Section 2." Doc. 286 at 510.

In this way, SB 3EX resembles the remedial map struck down by the district court in *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 3:22-CV-493-MMH-LLL, 2022 WL 17751416 (M.D. Fla. Dec. 19, 2022), *appeal dismissed*, No. 22-14260-HH, 2023 WL 4161697 (11th Cir. June 6, 2023). There, the court preliminarily enjoined city council and school board redistricting maps as unconstitutional racial gerrymanders because the plans packed Black voters into four districts. 2022 WL 17751416, at *2. The city council's remedial plans failed to remedy the violation, the court subsequently held, because it failed to unpack most of the Black voters living in the challenged districts. *Id.* at *10, 12. As the court explained:

> [T]he data shows that the City redrew the lines in a manner that kept White voters in Districts 2, 12, and 14, and reshuffled the Black voters <u>within</u>, <u>but not out of</u>, Districts 7, 8, 9, and 10, such that the overall percentage of Black voters in the Packed Districts fell by only 1.71 percentage points. Thus, while the City is correct that it made <u>extensive</u> revisions to Districts 7, 8, 9, and 10, it appears that the City failed to make <u>meaningful</u> ones—it failed to actually remedy the effects of the racial gerrymandering discussed in the Court's Preliminary Injunction Order. The voice of Black voters largely remains unchanged in that it is still confined to the Packed Districts that were the four historically majority-minority districts. It is exceedingly difficult to see how repacking the same Black voters into a new configuration of the same four districts <u>corrects</u>, much less completely corrects, the harmful effects of the City's decades-long history of racial gerrymandering.

*Id.* at *14. So too here. When the General Assembly redrew the congressional lines, it made extensive revisions to the Atlanta districts, but it failed to make meaningful changes to actually cure the Section 2 violation.

Because SB 3EX fails to fully remedy the 2021 plan's Section 2 violation, the district court was required to reject the plan. Instead, the district court determined that because the General Assembly adopted a plan with an additional majority-Black congressional district in west metro Atlanta, it complied with the court's order. Doc. 334 at 9–10. This conclusion was erroneous for several reasons.

To start, the district court failed to ensure that the Section 2 remedy coincided with the Section 2 wrong. Both the district court and the Secretary agreed that the State "cannot remedy vote dilution by creating a safe majority-Black district somewhere else in the State." Doc. 334 at 8–10; *see also id.* at 5. For good reason: the Supreme Court has squarely considered and rejected the notion that the demonstration of a Section 2 violation somewhere in the state gives the General Assembly license to "draw a majority-minority district anywhere, even if the district is in no way coincident with the compact *Gingles* district." *Shaw*, 517 U.S. at 916–17. While the district court satisfied itself that new CD 6 was not *entirely* outside the vote dilution area, however, it underestimated both the extent and the effect of the General Assembly's decision to draw a remedial district that only *partially* overlaps with the vote dilution area, and concluded that a federal court "could not[] confine the General Assembly to working only within the enumerated districts to create the additional majority-Black district." Doc. 334 at 8. But the "remedial authority of a federal court" is not confined only to flagrant violations where the Section 2 remedy

is wholly divorced from the Section 2 violation. *Shaw*, 517 U.S. at 915, 918 (striking down map even though purported remedial district encompassed 20 percent of the vote dilution area and included "the heavy concentration of African Americans" in the "same urban component" of the area). Instead, federal courts are required to ensure that the remedy is, in fact, "remedial in nature, that is, it must be designed as nearly as possible to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Id*. at 915 (cleaned up).

Georgia's new majority-Black CD 6 does no such thing. Plaintiffs established a Section 2 violation "for a particular area," *id.* at 917, covering five congressional districts and over 3.8 million people, Doc. 286 at 514; Doc. 318-12 at 4. This violation "flows from the fact that individuals in this area 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Shaw*, 517 U.S. at 917 (quoting 42 U.S.C. § 1973(b)). But rather than designing the remedial district to restore the Section 2 rights of voters in that area, the General Assembly bypassed tens of thousands of those voters and chose instead to reach outside the vote dilution area to provide a "remedy" to voters who had suffered no injury at all—because they already had the electoral opportunity Section 2 requires. *See* Doc. 286 at 468–69; Doc. 317-1 ¶ 21. As a result, the Black voters of old CD 6 carved out of the remedial district are "still [] suffering precisely the same injury that they suffered before [new CD 6] was

drawn." *Shaw*, 517 U.S. at 917. In tying its own hands, the district court abdicated both its authority and obligation to ensure that the new map "*completely* remedies the prior dilution of minority voting strength." *Dall. Cnty. Comm'n*, 850 F.2d at 1442.

The district court further dismissed Plaintiffs' objections to SB3X as little more than a preference for their own illustrative maps. *See* Doc. 334 at 11 (equating Plaintiffs' objections to an "invitation to compare the 2023 Remedial Congressional Plan with a plan preferred by Plaintiffs and crown the illustrative plan the winner"). But Plaintiffs' illustrative map is not a mere policy preference; instead, it demonstrates the adopted plan's ineffectiveness at remedying the vote dilution Plaintiffs fought long and hard to prove.

Unlike SB 3EX's CD 6, Plaintiffs' illustrative majority-Black CD 6 drew entirely from the vote dilution area. *See* Doc. 317-1 ¶ 21. As such, Plaintiffs showed that the General Assembly's choice to bypass broad swaths of Black voters in the vote dilution area was neither "necessary" nor "fair," *Covington*, 581 U.S. at 488. The district court concluded that its discretion was fettered by the fact that "the inevitably rough-hewn, approximate redistricting remedy' will result in some members of the minority group residing outside of the minority-controlled districts." Doc. 334 at 11 (quoting *McGhee v. Granville County*, 860 F.2d 110, 119 (4th Cir. 1988)). But while it is true that not *all* Black voters within the vote dilution area are

18

entitled to reside in a Black-opportunity district upon a showing of a Section 2 violation, *see Shaw*, 517 U.S. at 917 n.9, there can be no *complete* remedy where the General Assembly needlessly excluded tens of thousands of injured Black voters from any relief, choosing instead to swap in tens of thousands of Black voters from an existing majority-Black district. *See McGhee*, 860 F.2d at 118 ("A restructuring to the maximum extent permitted by the[] constraints [of size, compactness, and cohesion of Black population] is a 'complete' and legally adequate remedy for such a dilution violation."). The court in *McGhee* understood that the Section 2 "right and remedy are inextricably bound together, for to prove vote dilution by districting one must prove the specific way in which dilution may be remedied by redistricting." *Id*. at 120. Here the right and the remedy do not align.

Finally, the district court failed altogether to address Plaintiffs' argument that the shuffling of voters from old CD 6 to new CD 7 perpetuates unlawful vote dilution. Doc. 334 at 12 (discussing CD 7 only in the context of Plaintiffs' argument related to the dismantling of a majority-minority district, *not* as a basis to find that the plan continues to dilute Black voting strength within the vote dilution area). It is bad enough that new majority-Black CD 6 reaches outside the vote dilution area, but the unnecessary restructuring of new CD 7 to reach *into* the vote dilution area to subsume Black voters who were proven to suffer a Section 2 violation into a newly created majority-white district only adds insult to ongoing injury. Where the "courts'

19

power to remedy apportionment violations is defined by principles of equity," *Arbor Hill Concerned Citizens v. County of Albany*, 357 F.3d 260, 262 (2d Cir. 2004) (per curiam), the court should have considered all of the ways in which SB 3EX reconfigures Georgia's congressional districts to needlessly perpetuate the vote dilution injury of so many Black Georgians.

While the district court chalked up the redrawing of the districts as a "legislative choice of policy" to "politically protect[] the majority party," Doc. 334 at 14–15, the court "should not, in the name of legislative policy, refrain from providing remedies fully adequate to redress [federal law] violations which have been adjudicated and must be rectified," *Jacksonville Branch of NAACP*, 2022 WL 17751416, at *11 (cleaned up) (quoting *White v. Weiser*, 412 U.S. 783, 795 (1973)). Here, the Section 2 violation remains ongoing. This Court should find that the district court erred in rejecting Plaintiffs' objections and remand for further proceedings to adequately remedy the Section 2 violation.

## II.    The court erred by adopting a remedial plan that failed to provide an additional Black-opportunity district.

When the district court gave the General Assembly the first opportunity to right the wrong inflicted by the previous map, it made clear that "the State cannot remedy the Section 2 violation[]" identified in SB 2EX "by eliminating minority opportunity districts elsewhere in the plan[]." Doc. 286 at 509–10. This makes sense: the opportunity afforded a legislature to remedy a Section 2 violation by increasing

minority voting strength is not an invitation to punish minority voters in other parts of the state. Rather than heed the court's direction, however, the General Assembly "chose to break apart" old CD 7, *LULAC*, 548 U.S. at 441–42, a majority-minority district anchored in majority-minority Gwinnett County, Doc. 317-1 ¶ 16, where Black voters had enjoyed the opportunity to elect their preferred candidates, Doc. 317-2 ¶ 17 & fig.4, tbl.3; *see LULAC*, 548 U.S. at 441–42 (finding Section 2 violation where "[t]he State chose to break apart a Latino opportunity district to protect the incumbent congressman from the growing dissatisfaction of the cohesive and politically active Latino community" and "then purported to compensate for this harm by creating an entirely new district" elsewhere). Put differently, rather than create an "*additional* [congressional] district[] in which Black voters have a demonstrable opportunity to elect their candidates of choice," Doc. 286 at 510 (emphasis added), the General Assembly chose to offset the creation of a new opportunity for Black voters to elect their preferred candidates with the elimination of a previous opportunity for Black voters to elect their preferred candidates, thereby ensuring no net gains in Black voting strength statewide. This Court must not tolerate such gamesmanship.

As an initial matter, the General Assembly's elimination of the minority opportunity district in CD 7 flatly violates the district court's order and injunction on the Section 2 violation. "It is beyond question that obedience to judicial orders is

an important public policy. An injunction issued by a court acting within its jurisdiction must be obeyed until the injunction is vacated or withdrawn." *Williams v. City of Dothan*, 818 F.2d 755, 760 (11th Cir.) (quotation omitted), *op. modified on denial of reh'g*, 828 F.2d 13 (11th Cir. 1987). Here, the district court's order stressed that any remedy must "provide[] Black voters with an additional opportunity district" without "eliminating minority opportunity districts elsewhere in the plans." Doc. 286 at 510–11. In defending SB 3EX, the Secretary read the word "opportunity" right out of the court's order, arguing that the district court's references to "opportunity districts" actually meant "majority-Black districts." Doc. 327 at 54.

Rather than hold the State to the letter of its previous ruling, the district court failed to follow through on the additional "opportunity" that that ruling—and Section 2—required. In fact, while the district court made a point of clarifying that "minority" in this case refers to "Black," *see* Doc. 334 at 12 (noting that "this case has been about Black voters" and not other minority groups), it failed to "evaluate" and "determine whether [SB 3EX] provides *Black* voters with an additional opportunity district" as it was "require[d]" to do under the remedial standard, Doc. 286 at 511 (emphasis added). Accordingly, the district court abused its discretion in failing to enforce the requirements of its own order. *See Cave v. Singletary*, 84 F.3d

1350, 1354 (11th Cir. 1996) (holding that a "district court's interpretation of its own order" is accorded deference on appeal only "when its interpretation is reasonable").

In fact, any reading that supplants "Black opportunity" with "majority-Black" contravenes the legal standard for Section 2 remedies. Section 2, after all, asks "whether the use of a contested electoral practice or structure results in members of a protected group having less *opportunity* . . . to participate in the political process and to elect representatives of their choice." *Gingles*, 478 U.S. at 63 (emphasis added). "[C]ontrolling precedent" requires that the "appropriate remedy" in a Section 2 redistricting case "is a congressional redistricting plan that includes either an *additional* majority-Black congressional district, or an *additional* district in which Black voters otherwise have an opportunity to elect a representative of their choice." *Singleton v. Allen*, No. 2:21-cv-1291-AMM, 2023 WL 6567895, at *1 (N.D. Ala. Oct. 5, 2023) (per curiam) (three-judge court) (internal citation omitted); *see also, e.g.*, *Wright*, 979 F.3d at 1309 (affirming Section 2 remedy that included "one more" minority opportunity district than afforded by the previous plan).

Nor does the Secretary's distinction between "Black opportunity districts" and "majority-Black districts" make any sense. Both the district court and the Secretary appear to agree that the General Assembly could *not* have dismantled a majority-Black district in the State, regardless of whether it had been subjected to *Gingles* scrutiny during trial or was otherwise required by Section 2. *See, e.g.*, Doc. 286 at

508–09; Doc. 327 at 54–55; *see also* Doc. 327-6 at 11:14–16, 15:8–10 (Senator Shelly Echols: "This plan increases the number of majority black districts from the prior plan based on the numbers. . . . This congressional plan does not eliminate any existing majority black districts.").

The assumption behind that undisputed prohibition on eliminating majority-Black districts is that majority-Black districts provide Black voters an opportunity to elect their candidates of choice. After all, Section 2 remedies must "fully provide[] equal opportunity"—not *less* opportunity or *fewer* opportunities—"for minority citizens to participate and to elect candidates of their choice." *Dall. Cnty. Comm'n*, 850 F.2d at 1442. Anything less does not "*completely* remed[y] the prior dilution of minority voting strength." *Id.*

Here, there is no dispute that SB 3EX maintains the same number of districts (five) in which Black voters have the opportunity to elect their preferred candidate as the 2021 plan that was found to violate Section 2. Doc. 327-2 § 2.2 (Defendant's remedial expert Dr. Michael Barber Report); *cf.* Doc. 286 at 9–10 (in determining that the political process is not equally open to Black voters, district court noting that the number of majority-Black congressional districts remained the same under SB 2EX even though all of Georgia's population growth was attributable to the minority population). In fact, the Secretary presented expert testimony at the remedial phase demonstrating that the 2021 congressional plan had five majority-minority districts

that were "effective" for Black-preferred candidates, and the 2023 congressional plan simply swaps out one majority-minority district for another to achieve the same effect. Doc. 372-2 at tbl.4. Thus, whether the district eliminated is majority-Black or majority-minority, the effect on Black opportunity is the same. SB 3EX is nothing more than a shell game, shuffling Black voters among districts to minimize their voting power statewide and avoid a full and complete remedy of the Section 2 violation.[1]

The court therefore erred by failing to consider the impact of eliminating majority-minority CD 7 on the plan's overall ability to remedy the Section 2 violation by providing *additional* opportunity for Black voters to elect their candidates of choice. *Voinovich v. Quilter*, 507 U.S. 146, 155 (1993) ("[T]he District Court was required to determine the consequences of Ohio's apportionment plan before ruling on its validity; the failure to do so was error."). It did not even attempt to explain how the General Assembly could have completely remedied the Section 2 violation by essentially zeroing out Black voting strength. SB 3EX slightly increases by just *one percent* the percentage of Black voters who live in districts in

---

[1] The elimination of CD 7 also raises serious constitutional concerns. *See Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality op.) ("[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover [or majority-minority] districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments."). But the Court need not make a finding of an independent constitutional violation in order to determine that SB 3EX is not a lawful Section 2 remedy.

which they can elect their preferred candidates: from 56.4 percent to 57.5 percent. Docs. 318-2, 318-3. Thus, the "voice of Black voters largely remains unchanged." *Jacksonville Branch of NAACP*, 2022 WL 17751416, at *14 (striking down remedial map where "overall percentage of Black voters in the Packed Districts fell by only 1.71 percentage points"). Because the plan simply "perpetuates the vote dilution that this case seeks to resolve," *United States v. Osceola County*, 474 F. Supp. 2d 1254, 1256 (M.D. Fla. 2006), the district court should have rejected SB 3EX as an inadequate remedy to the Section 2 violation.

*     *     *

Section 2 "springs from the demonstrated ingenuity of state and local governments in hobbling minority voting power" and was designed to combat states' increasingly creative means of voting discrimination. *Johnson v. De Grandy*, 512 U.S. 997, 1018 (1994). The General Assembly's attempt to maintain a hard ceiling on Black voting opportunity in a purported "remedy" to the State's Section 2 violation is precisely the sort of gamesmanship that Section 2 was designed to stamp out. "This Court cannot authorize an element of an election proposal that will not with certitude *completely* remedy the Section 2 violation." *Dillard*, 831 F.2d at 252–53. Because SB 3EX does not completely remedy the Section 2 violation found by the district court, the district court erred by failing to enjoin SB 3EX as an unlawful and insufficient remedy to the Section 2 violation.

26

## CONCLUSION

For the foregoing reasons, the district court's order approving SB 3EX should be reversed and this case should be remanded for further proceedings.

Dated: May 3, 2024

Respectfully submitted,

By *Abha Khanna*

Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
KREVOLIN & HORST, LLC
One Atlantic Center
1201 W. Peachtree St. NW,
Suite 3250
Atlanta, GA 30309
(404) 888-9700
JLewis@khlawfirm.com
Sparks@khlawfirm.com

Abha Khanna
Makeba Rutahindurwa
ELIAS LAW GROUP LLP
1700 Seventh Ave.,
Suite 2100
Seattle, WA 98101
(206) 656-0177
AKhanna@elias.law
MRutahindurwa@elias.law

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 27(d)(2), as it contains 6,653 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as the brief has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: May 3, 2024

*Joyce Gist Lewis*
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that, on May 3, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: May 3, 2024

*Joyce Gist Lewis*
*Counsel for Plaintiffs-Appellants*