IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

COAKLEY PENDERGRASS, et al.,

Plaintiffs-Appellants

v.

SECRETARY, STATE OF GEORGIA,

Defendant-Appellee

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF NEITHER PARTY AND URGING REMAND
ON THE ISSUES ADDRESSED HEREIN

———————————

RYAN K. BUCHANAN
  United States Attorney
  Northern District of Georgia

AILEEN BELL HUGHES
  Georgia Bar No. 375505
  Assistant U.S. Attorney
  Office of the United States Attorney
  600 U.S. Courthouse
  75 Ted Turner Drive, SW
  Atlanta, GA  30303
  (404) 581-6000

KRISTEN CLARKE
  Assistant Attorney General

ERIN H. FLYNN
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 to 26.1-3 and 29, counsel for amicus curiae United States hereby certifies that in addition to those identified in the brief filed by appellants, the following individuals have an interest in the outcome of this case:

1. Buchanan, Ryan K., U.S. Attorney's Office, Northern District of Georgia, counsel for United States;

2. Clarke, Kristen, U.S. Department of Justice, Civil Rights Division, counsel for United States;

3. Hughes, Aileen Bell, U.S. Attorney's Office, Northern District of Georgia, counsel for United States.

The United States further certifies that no publicly traded company or corporation has an interest in the outcome of this case.

s/ Noah B. Bokat-Lindell
Noah B. Bokat-Lindell
Attorney

Date: May 10, 2024

**TABLE OF CONTENTS**

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT

INTEREST OF THE UNITED STATES ................................................................. 1

STATEMENT OF THE ISSUES............................................................................. 1

STATEMENT OF THE CASE................................................................................ 2

SUMMARY OF ARGUMENT .............................................................................4

ARGUMENT

       I.      The district court's "new evidence" rule was improper........................5

      II.     This Court should remand for reconsideration of both
                standing and the merits........................................................................14

CONCLUSION ................................................................................................... 21

CERTIFICATE OF COMPLIANCE

# TABLE OF CITATIONS

**CASES:**                                                                                          **PAGE**

*Abbott v. Perez*, 585 U.S. 579 (2018) ................................................................ 12, 18

*Abrams v. Johnson*, 521 U.S. 74 (1997) ...................................................... 9, 12, 16

*Agee v. Benson*, No. 1:22-cv-272,
    2024 WL 1298018 (W.D. Mich. Mar. 27, 2024) (three-judge court) ..........15

*Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254 (2015) ................... 17, 20

*Burke v. Ocwen Fin. Corp.*, 833 F. App'x 288 (11th Cir. 2020)............................20

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267 (2022)...............19

*Commissioner, Ala. Dep't of Corr. v. Advance Loc. Media, LLC*,
    918 F.3d 1161 (11th Cir. 2019) ............................................................... 18-19

*Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs*,
    906 F.2d 524 (11th Cir. 1990) ........................................................................11

*Covington v. North Carolina*, 283 F. Supp. 3d 410 (M.D.N.C.),
    *aff'd in part, rev'd in part*, 585 U.S. 969 (2018)...........................................9

*Dillard v. Baldwin Cnty. Bd. of Educ.*, 686 F. Supp. 1459 (M.D. Ala. 1988)...........7

*Dillard v. Baldwin Cnty. Comm'n*, 694 F. Supp. 836 (M.D. Ala.),
    *amended by* 701 F. Supp. 808 (M.D. Ala.),
    *aff'd*, 862 F.2d 878 (11th Cir. 1988) ...............................................................7

*Dillard v. City of Greensboro*, 74 F.3d 230 (11th Cir. 1996)................................7

*Dillard v. Crenshaw Cnty.*, 831 F.2d 246 (11th Cir. 1987)........................ 6-7, 10

*Edge v. Sumter Cnty. Sch. Dist.*, 775 F.2d 1509 (11th Cir. 1985)..........................16

*Evenwel v. Abbott*, 578 U.S. 54 (2016)................................................................14

**CASES (continued):**                                                     **PAGE**

*Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of
   Registration & Elections*, 36 F.4th 1100 (11th Cir. 2022) .................... 14, 20

*\*Gill v. Whitford*, 585 U.S. 48 (2018) ................................. 14

*Harper v. City of Chicago Heights*, 223 F.3d 593 (7th Cir. 2000) .......... 8

*Harris v. Garner*, 216 F.3d 970 (11th Cir. 2000) (en banc) ................. 18

*Harvell v. Blytheville Sch. Dist. No. 5*, 126 F.3d 1038 (8th Cir. 1997) ........ 8

*Hines v. Mayor & Town Council of Ahoskie*, 998 F.2d 1266 (4th Cir. 1993) ......... 8

*Large v. Fremont Cnty.*, 670 F.3d 1133 (10th Cir. 2012) ..................... 8

*Lawyer v. Department of Just.*, 521 U.S. 567 (1997) ........................ 6

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) ............. 6, 14

*Mississippi State Chapter, Operation Push, Inc. v. Mabus*,
   932 F.2d 400 (5th Cir. 1991) .......................................... 5, 8

*\*North Carolina v. Covington*, 581 U.S. 486 (2017) ...................... 5, 16

*Personhuballah v. Alcorn*, 155 F. Supp. 3d 552 (E.D. Va. 2016) .......... 12

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ................................. 13

*Singleton v. Allen*, No. 21-cv-1291, 2023 WL 5691156
   (N.D. Ala. Sept. 5, 2023) (three-judge court), *stay denied sub nom.*
   *Allen v. Milligan*, 144 S. Ct. 476 (2023), *appeal dismissed*
   *sub nom. Milligan v. Co-Chairs of Ala. Permanent Legis. Comm.*
   *on Reapportionment*, No. 23-12922,
   2023 WL 6568350 (11th Cir. Oct. 3, 2023) ...................... 7, 11-12

*Straw v. Barbour Cnty.*, 864 F. Supp. 1148 (M.D. Ala. 1994) ................ 7

*Thompson v. Kemp*, 309 F. Supp. 3d 1360 (N.D. Ga. 2018) (three-judge court) .... 15

**CASES (continued):** PAGE

\*_United States v. Dallas Cnty. Comm'n_, 850 F.2d 1433 (11th Cir. 1988)..........7, 19

\*_United States v. Hays_, 515 U.S. 737 (1995) ............................................. 9, 15, 18

_Upham v. Seamon_, 456 U.S. 37 (1982) ...................................................16

_White v. Weiser_, 412 U.S. 783 (1973) ....................................................6

_Whitest v. Crisp Cnty. Sch. Dist._, 601 F. Supp. 3d 1338 (M.D. Ga. 2022),
    _aff'd_, No. 22-11826, 2023 WL 8627498 (11th Cir. Dec. 13, 2023)...............7

_Williams v. City of Texarkana_, 32 F.3d 1265 (8th Cir. 1994) ..................................8

_Winter v. Natural Res. Def. Council, Inc._, 555 U.S. 7 (2008) ................................16

_Wisconsin Legis. v. Wisconsin Elections Comm'n_, 595 U.S. 398 (2022) .......... 9-10

_Wright v. City of Houston_, 806 F.2d 634 (5th Cir. 1986)........................................8

**STATUTES:**

52 U.S.C. 10301 .................................................................................1

52 U.S.C. 10308(d) .............................................................................1

**RULES:**

Fed. R. App. P. 29(a) ..........................................................................1

Fed. R. Civ. P. 15(a)(2).......................................................................17

Fed. R. Civ. P. 15(b) ..........................................................................17

Fed. R. Civ. P. 15(d) ..........................................................................17

Fed. R. Civ. P. 24 .............................................................................18

**LEGISLATIVE HISTORY:** PAGE

S. Rep. No. 417, 97th Cong., 2d Sess. (1982) ..........................................................19

## INTEREST OF THE UNITED STATES

This appeal concerns, in part, how to assess the validity of maps passed to remedy violations of Section 2 of the Voting Rights Act (VRA), 52 U.S.C. 10301. The Attorney General has statutory authority to enforce the VRA on behalf of the United States, *see* 52 U.S.C. 10308(d), and therefore has a substantial interest in delineating the proper procedure for examining remedial maps to ensure they cure existing Section 2 violations and do not introduce new federal-law violations.

The United States files this brief under Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUES

The United States addresses the following issues and takes no position on any other question presented in this appeal:

1. After finding Georgia liable under Section 2 of the VRA for enacting a congressional map that dilutes Black voting strength, whether the district court erred by failing to examine plaintiffs' objection that the State's remedial map eliminated a preexisting opportunity for a coalition of minority voters to elect their preferred candidates in violation of Section 2.

2. Whether this Court should remand for the district court to determine whether plaintiffs have standing to object to the dismantling of this alleged

opportunity district or should be permitted to supplement their complaint to add newly injured parties.

## STATEMENT OF THE CASE

Plaintiffs sued Georgia Secretary of State Brad Raffensperger, challenging Georgia's 2021 congressional district map as impermissibly diluting minority voting strength under Section 2 of the VRA. *See* Doc. 120, at 1-8, 28-29.[1]

*Pendergrass*, along with two other cases challenging Georgia's state house and state senate maps—*Alpha Phi Alpha Fraternity v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. filed Dec. 30, 2021), and *Grant v. Raffensperger*, No. 1:22-cv-122 (N.D. Ga. filed Jan. 11, 2022), respectively—proceeded before a single district judge. After a bench trial, the district court found Georgia liable for Section 2 violations as to all three maps. Doc. 286. The State appealed from those liability determinations, and the United States is an intervenor-appellee in those consolidated cases to defend Section 2's constitutionality and address certain issues regarding Section 2's interpretation. *See Alpha Phi Alpha Fraternity, Inc. v. Secretary, State of Ga.*, No. 23-13914 (11th Cir. docketed Nov. 28, 2023); *Pendergrass v. Secretary, State of Ga.*, No. 23-13916 (11th Cir. docketed Nov. 28,

---

[1] "Doc. __, at __," refers to the docket entry and page number of documents filed in the district court in *Pendergrass v. Raffensperger*, No. 1:21-cv-5339 (N.D. Ga.).

2023); *Grant v. Secretary, State of Ga.*, No. 23-13921 (11th Cir. docketed Nov. 28, 2023).

Following the district court's merits rulings, Georgia enacted remedial maps. As to the congressional map, the district court had previously found in its merits ruling that the 2021 map diluted the voting power of Black voters in the west-metro Atlanta region. *See* Doc. 286, at 272-274. Among other objections to the remedial map, the *Pendergrass* plaintiffs argued that Georgia's new congressional map violates Section 2 because it needlessly dismantled preexisting Congressional District (CD) 7, anchored in Gwinnett County (east of Atlanta). Plaintiffs claimed that CD 7 was a minority opportunity district for a coalition of Black, Latino, and Asian-American voters and that the new map removes an electoral opportunity for those voters. Doc. 317, at 8-25.

The district court rejected both this and the *Pendergrass* plaintiffs' other objections, thereby permitting the new map to take effect unaltered. Doc. 334, at 7-15. In so doing, and as relevant here, the court refused to determine whether the new map violated Section 2 by eliminating CD 7, which was not at issue earlier in the litigation. *Id.* at 12-14 & n.4. The court stated that plaintiffs presented the data needed to decide the objection for the first time at the remedial stage, and that the objection required plaintiffs to prove a distinct claim from the one included in the complaint. *Id.* at 12-13. Viewing itself as under no obligation to examine the

objection, the court told plaintiffs that they would need to file a new lawsuit to argue that the remedial map violated Section 2 on this basis. *Id.* at 13.

Plaintiffs timely appealed from the district court's remedial order. Doc. 336.

## SUMMARY OF ARGUMENT

The district court erred by failing to address plaintiffs' Section 2 objection to Georgia's remedial congressional map merely because doing so would require it to consider a new theory of Section 2 liability or evaluate new evidence. When a federal court strikes down a challenged map as violating Section 2 of the VRA, and the jurisdiction implements a remedial map to cure the violation, parties before the court may claim to be injured by the new map. When this occurs, principles of equity and this Court's precedent require district courts to determine on the merits whether the remedial map violates federal rights. Courts routinely perform this duty even when resolving the objection entails considering a new legal theory or evaluating significant new evidence.

This requirement to assess an enacted remedial map for new federal-law violations, however, assumes that some party before the court is injured by the newly asserted violation. Because neither the Secretary nor the district court raised this issue below, it is not clear whether any existing plaintiff was injured by the map's alleged dismantling of minority voting strength in CD 7. To ensure procedural fairness, this Court should remand to the district court to determine

whether any party has standing to raise the Section 2 objection as to CD 7 and, if so, to address the merits in the first instance. The district court should give the plaintiffs the chance to provide information concerning their standing to challenge the dismantling of CD 7 or to add voters or organizations who have been newly injured by Georgia's remedial map to their complaint.

## ARGUMENT

## I. The district court's "new evidence" rule was improper.

The district court erred in refusing to adjudicate the plaintiffs' CD 7-based Section 2 objection on the ground that it would require examining "significant new evidence" beyond that presented at the liability phase. Doc. 334, at 13.

1. At the remedial stage of a redistricting case, a court must determine both whether the State's remedial map fully remedies the plaintiffs' original harm and, if so, whether the map nevertheless should be enjoined because it introduces a new violation of a party's federal rights. This principle flows from the nature of remedial proceedings in redistricting cases. "Relief in redistricting cases is fashioned in the light of well-known principles of equity." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (citations and internal quotation marks omitted). One such principle is that the remedy should not itself "violate [federal] statutory provisions or the Constitution." *Mississippi State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 407 (5th Cir. 1991) (*Operation Push*) (citation

omitted) (examining voter registration statute enacted to remedy Section 2 violation in prior statute); *see also, e.g.*, *Lawyer v. Department of Just.*, 521 U.S. 567, 577 (1997) (stating that when a jurisdiction passes its own remedial map, "the [remedial] discretion of the federal court is limited *except to the extent that the plan itself runs afoul of federal law*" (emphasis added)); *White v. Weiser*, 412 U.S. 783, 797 (1973) (holding that courts "should not, in the name of state policy," defer to a State's redistricting choices unless "that policy is consistent with constitutional norms and is not itself vulnerable to legal challenge").

Applying these equitable principles, a jurisdiction cannot replace one federal-law injury with another. While "States retain broad discretion in drawing districts to comply with the mandate of § 2[,] . . . . [t]his principle has limits." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006) *(LULAC)* (citation omitted). If a party before the court asserts that the remedial map inflicts a new injury on them in violation of federal law, the district court must address that assertion on the merits. Otherwise, the jurisdiction's remedy could not be said to "*completely* remed[y] the prior dilution" and "*fully* provide[] equal opportunity." *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 250 (11th Cir. 1987) (citation omitted).

The district court's refusal to assess plaintiffs' CD 7-based Section 2 objection, solely because evaluating that allegation required examining new evidence, violates these principles. This Court repeatedly has admonished that,

"[w]hen evaluating whether [a] proposed plan provides an adequate remedy for the section 2 violation, the district court must determine that the remedy itself satisfies section 2." *Dillard v. City of Greensboro*, 74 F.3d 230, 233 (11th Cir. 1996); *accord, e.g.*, *Crenshaw Cnty.*, 831 F.2d at 249. "This principle coincides with legislative intent that when devising election plans to remedy section 2 violations, federal courts 'should exercise . . . traditional equitable powers to fashion the relief so that it . . . fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice.'" *United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1438 (11th Cir. 1988) (first alteration in original; citation omitted). The district court's decision here departs from the clear requirement to examine the merits of a party's objection that the enacted remedial map fails to cure the original Section 2 violation or injures the party anew by introducing a new federal statutory or constitutional violation.[2]

---

[2]  Courts in this circuit routinely have followed this requirement. *See, e.g.*, *Singleton v. Allen*, No. 21-cv-1291, 2023 WL 5691156, at *44 (N.D. Ala. Sept. 5, 2023) (three-judge court), *stay denied sub nom. Allen v. Milligan*, 144 S. Ct. 476 (2023), *appeal dismissed sub nom. Milligan v. Co-Chairs of Ala. Permanent Legis. Comm. on Reapportionment*, No. 23-12922, 2023 WL 6568350 (11th Cir. Oct. 3, 2023); *Whitest v. Crisp Cnty. Sch. Dist.*, 601 F. Supp. 3d 1338, 1345 (M.D. Ga. 2022), *aff'd*, No. 22-11826, 2023 WL 8627498 (11th Cir. Dec. 13, 2023); *Straw v. Barbour Cnty.*, 864 F. Supp. 1148, 1153-1154 (M.D. Ala. 1994); *Dillard v. Baldwin Cnty. Comm'n*, 694 F. Supp. 836, 838, 840 (M.D. Ala.), *amended by* 701 F. Supp. 808 (M.D. Ala.), *aff'd*, 862 F.2d 878 (11th Cir. 1988); *Dillard v. Baldwin Cnty. Bd. of Educ.*, 686 F. Supp. 1459, 1469 (M.D. Ala. 1988).

Other circuits also instruct district courts to assess injured parties' objections to defendants' proposed or enacted remedial maps, to ensure that the maps do not themselves violate constitutional or statutory requirements. *See, e.g.*, *Large v. Fremont Cnty.*, 670 F.3d 1133, 1135 (10th Cir. 2012) (county-passed map); *Harper v. City of Chicago Heights*, 223 F.3d 593, 599 (7th Cir. 2000) (interim consent decree adopted by city referendum); *Harvell v. Blytheville Sch. Dist. No. 5*, 126 F.3d 1038, 1040 (8th Cir. 1997) (school district's proposed map); *Williams v. City of Texarkana*, 32 F.3d 1265, 1268-1269 (8th Cir. 1994) (city-passed map); *Hines v. Mayor & Town Council of Ahoskie*, 998 F.2d 1266, 1272 (4th Cir. 1993) (town's proposed map); *Wright v. City of Houston*, 806 F.2d 634, 635 (5th Cir. 1986) (per curiam) (city's proposed map); *cf. Operation Push*, 932 F.2d at 406 (state-passed remedial registration law originally found to violate VRA Section 2). Each of these cases bolsters the conclusion that the district court here should not have instructed plaintiffs to go file a new lawsuit, but rather should have examined whether the dismantling of an alleged minority opportunity district injured plaintiffs' federal statutory or constitutional rights and proceeded accordingly.

2. The district court cannot avoid its responsibility to ensure that the State's map complies with Section 2 simply because doing so would require it to analyze new data or consider a "new basis for a Section 2 violation." Doc. 334, at 13.

Courts repeatedly have rejected claims from redistricting defendants "that th[e court's] review of a remedial redistricting plan" is limited to "the particular legal theory that was the basis for invalidating the original plan." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 426-427 (M.D.N.C.) (citing cases), *aff'd in part, rev'd in part*, 585 U.S. 969 (2018). And while addressing objections to remedial maps often requires evaluating significant new evidence—particularly when the objections involve new legal theories—this does not absolve courts of their duty to adjudicate the federal statutory and constitutional rights of the parties in front of them. *See, e.g.*, *Abrams v. Johnson*, 521 U.S. 74, 90-101 (1997) (addressing on the merits whether a map ordered as a remedy for a racial gerrymandering violation ran afoul of the VRA or was malapportioned, evaluating evidence before the lower court on each claim); *United States v. Hays*, 515 U.S. 737, 741 (1995) (noting that lower court had conducted two-day hearing to consider constitutionality of state-passed remedial map that included a new majority-minority district "considerably different from that in" the original challenged map).

The Supreme Court's most recent such case, *Wisconsin Legislature v. Wisconsin Elections Commission*, 595 U.S. 398 (2022) (per curiam), is illustrative. There the Court reviewed the Wisconsin Supreme Court's decision to adopt the governor's proposed state legislative maps after a political impasse prevented the

State from replacing its decade-old, malapportioned maps. *Id.* at 399-400. The United States Supreme Court summarily reversed because the Wisconsin Supreme Court, in an original action, had not properly analyzed whether the intentional creation of an additional majority-minority district (by either the governor or the Wisconsin Supreme Court) was necessary to comply with Section 2 of the VRA. *Id.* at 400-401. The Supreme Court reversed even though the racial gerrymandering argument the petitioners raised involved a different legal theory and distinct evidence from the malapportionment theory on which the plaintiffs had challenged the prior maps. And it did so despite the Wisconsin Supreme Court's determination that "no Equal Protection Clause or VRA claim was before it" and "that adjudicating such claims would require a fuller record and a closer assessment." *Id.* at 407 (Sotomayor, J., dissenting).

Moreover, the district court's rationale for declining to undertake the necessary review proves far too much. After all, *any* objection that a remedial map violates Section 2 would require plaintiffs to put forward evidence "*for the first time* in conjunction with their objections" (Doc. 334, at 13), if only because the objections would involve a new map with different concentrations of voters than the one originally challenged. "The evidence showing a violation in an *existing* election scheme may not be completely coextensive with a *proposed* alternative," even if the two are similar. *Crenshaw Cnty.*, 831 F.2d at 250. Indeed, plaintiffs

must put forward new evidence as part of their objections to a remedial plan even if they assert only that the plan fails to fully remedy the initial violation. *See, e.g.*, *Singleton v. Allen*, No. 21-cv-1291, 2023 WL 5691156, at \*52 (N.D. Ala. Sept. 5, 2023) (three-judge court) (relying on new evidence, including "Legislature's own performance analysis" of remedial map, to find that State-passed map did not remedy Section 2 violation), *stay denied sub nom. Allen v. Milligan*, 144 S. Ct. 476 (2023), *appeal dismissed sub nom. Milligan v. Co-Chairs of Ala. Permanent Legis. Comm. on Reapportionment*, No. 23-12922, 2023 WL 6568350 (11th Cir. Oct. 3, 2023).

True, adjudicating the objection here would require the district court to consider evidence of cohesion between different racial groups in CD 7. And true, this is a more fine-grained analysis than if the court had to examine only cohesion among Black voters, as it did at the merits stage. Doc. 334, at 13; *see, e.g.*, *Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990) ("Two minority groups . . . may be a single section 2 minority if they can establish that they behave in a politically cohesive manner."). However, the court's inquiry is not all that different than if it were adjudicating a claim that the remedial map dismantled (or failed to create) a majority-minority district in which the majority consisted solely of Black voters. For instance, the three-judge court examining Alabama's 2023 remedial congressional map had to

examine new evidence about racial cohesion and polarization in "District 2 and District 7 of the 2023 Plan," to determine whether candidates preferred by Black voters would perform the same in these new districts as they did under the old versions of these districts in the plan the court preliminarily enjoined. *Singleton*, 2023 WL 5691156, at *68.

Even if the inquiry could be described as involving "significant new evidence" (Doc. 334, at 13), the question is ultimately the same as at the merits stage: Whether Georgia's congressional map violates Section 2. Courts are routinely called upon to adjudicate claims at the remedial stage that are far more analytically distinct from the initial claimed violation and that rely on evidence even more dissimilar to that presented at the liability stage. *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 620-622 (2018) (among other issues, discussing new evidence and affirming lower court's holding that district that had been "substantially modified" from prior court-imposed interim map was a racial gerrymander); *Abrams*, 521 U.S. at 90-101 (evaluating new evidence to determine whether map ordered as a remedy for an impermissible racial gerrymander violated Sections 2 and 5 of the VRA or one person, one vote doctrine); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 564 (E.D. Va. 2016) (considering "the requirements of Section 2" in fashioning a map to remedy a racial gerrymandering violation, even though "no Section 2 claim was raised" at the merits stage).

At bottom, when facing an objection that the map enacted to cure a violation of the plaintiffs' rights has not fully remedied that violation or has violated a party's federal rights in a different way, the district court must adjudicate that claim. It cannot simply instruct the parties to litigate the alleged violation in a new lawsuit; rather, the court has the authority and the obligation to adjudicate the rights of the parties before it. Abdicating that authority also has real practical implications. The district court's "new evidence" rule incentivizes gamesmanship, invites serial lawsuits of significant time and expense, and improperly delays across multiple election cycles the implementation of a legally valid map. *See Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam) (cautioning courts to hesitate before ordering relief too close to an election).

This Court should remand for the district court to address plaintiffs' claim that the State's remedial congressional map violates Section 2. After confirming whether a party before the court has standing to raise the CD 7-based objection, *see* Argument II, *infra*, the court would need to analyze the parties' proffered evidence to determine whether CD 7 performed as a minority opportunity district in the preexisting map and could have continued as such in the new map even after the creation of the new majority-Black CD 6. If so, then the State's remedial plan likely would violate Section 2, for a State may "use one majority-minority district

- 13 -

to compensate for the absence of another only when the racial group in each area had a § 2 right and both could not be accommodated." *LULAC*, 548 U.S. at 429.

## II. This Court should remand for reconsideration of both standing and the merits.

To be sure, the requirement that a court determine whether a State-passed map violates federal rights presupposes that at least one party before the court has alleged injury from any newly asserted violation. Under Article III and fundamental principles of equity, "a plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (alteration in original; citation omitted). "The Supreme Court has long recognized that a person's right to vote is individual and personal in nature and voters who allege facts showing disadvantage to themselves as individuals have standing to sue as they have alleged a concrete and particularized injury." *Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022) (citation and internal quotation marks omitted). Typically, however, when parties' "alleged harm is the dilution of their votes, that injury is district specific" and any party bringing a vote-dilution claim must establish that they themselves live or have members in a diluted district. *Gill*, 585 U.S. at 66; *see also Evenwel v. Abbott*, 578 U.S. 54, 72 n.12 (2016) (noting that "standing in one-person, one-vote cases has rested on plaintiffs' status as voters whose votes were diluted," though leaving open possibility of

standing for injured nonvoters); *United States v. Hays*, 515 U.S. 737, 745 (1995) (stating that a plaintiff suffers a cognizable injury when she "resides in a racially gerrymandered district").

In some circumstances, someone living outside a directly affected district can establish standing via "specific evidence tending to support th[e] inference" of discrimination or dilution. *Hays*, 515 U.S. at 745. For Section 2 claims, the dilution occurs in an area that may not correspond to district lines; plaintiffs thus can show injury-in-fact as long as they live "in a reasonably compact area that could support additional majority-minority districts." *Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1365 (N.D. Ga. 2018) (three-judge court) (citation omitted); *accord* Doc. 327, at 26 (arguing, in Secretary's response to plaintiffs' remedial objections, that Section 2 "plaintiffs must only live in a region that could support an additional majority-minority voting district because the harm is vote dilution, not necessarily the boundaries of individual districts").

Plaintiffs who raise a new objection to a State's remedial map likewise must have standing to make the new claim. *See, e.g.*, *Agee v. Benson*, No. 1:22-cv-272, 2024 WL 1298018, at *4-5 (W.D. Mich. Mar. 27, 2024) (three-judge court) (rejecting objections that racial gerrymandering plaintiffs raised regarding three districts in a remedial state legislative map because none of the plaintiffs resided in those districts). To object to a State's remedial map based on an asserted Section 2

violation, then, at least one objecting party must establish that their vote would be diluted by, or that they have members whose votes would be diluted by, whatever aspect of the State's remedial map they claim violates Section 2.[3]

Here, it is not clear whether any of the *Pendergrass* plaintiffs resided in the old CD 7 by the time the State passed its remedial congressional map, or whether

---

[3] The same is not true, however, if the defendant jurisdiction refuses to adopt a remedial map or simply proffers a remedial map to the court without passing it into law. In such circumstances, the inquiry is not whether to enjoin an otherwise-valid state or local law, but rather whether to approve a party's proposed map or to adopt a map of the court's own making as the remedy for the violation. A court evaluating which map to choose in the first instance "must undertake an 'equitable weighing process' to select a fitting remedy for the legal violations it has identified, taking account of 'what is necessary, what is fair, and what is workable.'" *Covington*, 581 U.S. at 488 (citations omitted). And as with any exercise of equitable powers, courts should consider whether a particular remedy "is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Covington*, 581 U.S. at 488 (emphasizing that courts must consider the "'collective interests' at stake" (citation omitted)).

It is not in the public interest, nor is it consistent with basic federalism principles, for a federal court to order a state or local government to use an unlawful map. Hence, both the analysis of parties' proposed maps and the drafting of court-created maps "should be guided by the legislative policies underlying the existing plan," but only "to the extent those policies do not lead to violations of the Constitution or the [VRA]." *Abrams v. Johnson*, 521 U.S. 74, 79 (1997); *Upham v. Seamon*, 456 U.S. 37, 43 (1982) (per curiam) (holding that courts may reject parts of a State's proposed map beyond the original violations to the extent of any constitutional or statutory violation, as determined "on the basis of the substantive legal standards applicable to the State's submission"). Indeed, a "district court *could not validly adopt a reapportionment plan* without determining whether the plan complied with Section 2 of the Voting Rights Act," *Edge v. Sumter Cnty. Sch. Dist.*, 775 F.2d 1509, 1510 (11th Cir. 1985) (emphasis added), and therefore courts adopting a remedial map in the first instance must address all VRA objections.

any of them has any other basis for asserting standing to raise this Section 2 objection to the 2023 Map. *See* Doc. 286, at 23-24 (noting that plaintiffs at the time of pretrial stipulations all lived in old CDs 3, 11, 13, and 14). Neither the Secretary nor the district court raised any such standing concerns during the remedial proceedings. *See* Doc. 327, at 60-73; Doc. 334, at 12-15. As a result, plaintiffs had no opportunity either to establish their standing to raise the CD 7-based Section 2 claim or to add newly injured plaintiffs at the remedial stage. "[I]n these circumstances, elementary principles of procedural fairness require[]" a remand to "give the [plaintiffs] an opportunity to provide evidence of" their standing. *Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 270-271 (2015). The district court on remand should address standing in the first instance and—if any plaintiff should be found to have standing or if any new plaintiff with standing were to join the case—the district court must address the merits of the CD 7-based Section 2 objection to the 2023 congressional map.

Upon remand, the district court should give the plaintiffs a reasonable period in which to either establish standing based on their current residence or to cure any remedial-stage standing defects. Plaintiffs could, for instance, amend their complaint to include the new objection along with any newly injured voters or new information about the existing plaintiffs. *See* Fed. R. Civ. P. 15(a)(2) and (b). Alternatively, they could file a supplemental complaint. *See* Fed. R. Civ. P. 15(d)

(providing that a "court may permit supplementation even though the original pleading is defective in stating a claim or defense").  Or else residents of the preexisting CD 7, or other injured people, entities, or organizations, could intervene at the remedial stage.  *See* Fed. R. Civ. P. 24; *Commissioner, Ala. Dep't of Corr. v. Advance Loc. Media, LLC*, 918 F.3d 1161, 1171 (11th Cir. 2019) ("Intervention may be timely filed even if it occurs after a case has concluded; timeliness depends on the circumstances of each case.").  Courts commonly authorize such actions when parties assert that a State's remedial map violates the Constitution or the VRA.  *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 591 (2018) (noting that "the Texas court allowed the plaintiffs to amend their complaints to challenge the 2013 [state-passed remedial] plans"); *Hays*, 515 U.S. at 742 (noting that "the District Court allowed appellees to amend their complaint to challenge [the state-passed remedial map's] constitutionality").

In such situations, the traditional "liberal allowance of amendments or supplements to the pleading under Rule 15" is consistent with, and would further, "the statutory purpose involved."  *Harris v. Garner*, 216 F.3d 970, 983-984 (11th Cir. 2000) (en banc).  In amending Section 2, Congress insisted that courts "should exercise [their] traditional equitable powers to fashion the relief so that it *completely remedies* the prior dilution of minority voting strength *and fully provides equal opportunity for minority citizens* to participate and to elect

candidates of their choice."  S. Rep. No. 417, 97th Cong., 2d Sess. 31 (1982) (emphases added); *see United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1438 (11th Cir. 1988) (stating that requirement to address new Section 2 violations "coincides" with this legislative purpose).

Likewise, allowing directly injured parties to intervene under Rule 24 would be an appropriate way to address any Article III concerns.  Here, those living in the asserted minority opportunity area would have been injured only after Georgia dismantled CD 7, and they would no longer be protected by the existing parties in the case if it turned out that the current plaintiffs lacked standing to raise the related Section 2 claim.  *See, e.g.*, *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 279-280 (2022); *Commissioner, Ala. Dep't of Corr.*, 918 F.3d at 1171.

Allowing amendment or admitting newly injured plaintiffs into the existing case, rather than requiring plaintiffs to file new cases, best serves the interests of judicial efficiency and economy.  Whatever complications such a procedure may create for the court at the remedial stage are more than outweighed by the streamlining effects of having new objections heard by a court already familiar with the case and avoiding chaotic parallel litigation in different courts.  *Compare, e.g.*, Notice of Appeal and Mot. to Stay (Docs. 200, 201), *Callais v. Landry*, No. 3:24-cv-122 (W.D. La. May 1, 2024) (appealing to Supreme Court and seeking

stay of new three-judge court's ruling enjoining as a racial gerrymander a Louisiana congressional map enacted as a remedy to a Section 2 violation found by another court, in notice and motion filed by intervenor-defendants who were plaintiffs in the original Section 2 case), *with Galmon* Pls.' Mot. to Reconsider (Doc. 372), *Robinson v. Ardoin*, No. 3:22-cv-211 (M.D. La. May 1, 2024) (seeking to reopen original Section 2 case, in motion from a plaintiff group, arguing that new court's racial gerrymandering decision reestablished their Section 2 injury and required a new remedial proceeding).

Here, the district court should make any standing determinations in the first instance. That court is the traditional first forum for raising such issues, and it is best positioned to decide, after additional evidence and motions practice, whether any existing plaintiffs have standing to raise the CD 7-based objection or whether additional voters or organizations should be added to the case. *See, e.g.*, *Alabama Legis. Black Caucus*, 575 U.S. at 270-271 (remanding for determination of standing when nobody had contested standing below); *Georgia Ass'n of Latino Elected Offs.*, 36 F.4th at 1126 ("The decision whether to grant a motion for leave to file supplemental pleadings is generally within the discretion of the district court."); *Burke v. Ocwen Fin. Corp.*, 833 F. App'x 288, 293 (11th Cir. 2020) ("[I]t is wholly discretionary with the court whether to allow intervention under Rule 24(b).").

## CONCLUSION

For the foregoing reasons, this Court should vacate the remedial order as to

plaintiffs' CD 7-based objection and remand for further proceedings.

Respectfully submitted,

RYAN K. BUCHANAN
  United States Attorney
  Northern District of Georgia

AILEEN BELL HUGHES
  Georgia Bar No. 375505
  Assistant U.S. Attorney
  Office of the United States Attorney
  600 U.S. Courthouse
  75 Ted Turner Drive, SW
  Atlanta, GA  30303
  (404) 581-6000

KRISTEN CLARKE
  Assistant Attorney General

s/ Noah B. Bokat-Lindell
ERIN H. FLYNN
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 5042 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date: May 10, 2024