No. 24-10231

In the

# United States Court of Appeals
## for the Eleventh Circuit

Coakley Pendergrass, et al.,

*Plaintiff-Appellants*,

v.

Secretary of State of Georgia,

*Defendant-Appellee*.

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:21-cv-05339 — Steve C. Jones, *Judge*

## BRIEF OF THE SECRETARY OF STATE OF GEORGIA

Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
 *Special Asst. Att'ys General*

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249
btyson@taylorenglish.com

Christopher M. Carr
 *Attorney General of Georgia*
Stephen J. Petrany
 *Solicitor General*
Paul R. Draper
 *Deputy Solicitor General*

Office of the Georgia
 Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the Secretary of State of Georgia*

*Pendergrass v. Sec'y of State of Ga.*, No. 24-10231

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Albert M. Pearson LLC, Counsel for Amicus;

Allensworth, Robert M., Attempted Amicus;

Alpha Phi Alpha Fraternity, Inc., *APA* Plaintiff;

Adegbile, Debo, Counsel for *APA* Plaintiffs;

Allen, De'Ericka, Counsel for *APA* Plaintiffs;

American Civil Liberties Union Foundation, Inc., Counsel for *APA* Plaintiffs;

American Civil Liberties Union Foundation of Georgia, Inc., Counsel for *APA* Plaintiffs;

Arbuthnot, Jacqueline Faye, *Grant* Plaintiff;

Bokat-Lindell, Noah B., Counsel for Intervenor U.S. Department of Justice;

Boone, Robert, Counsel for *APA* Plaintiffs;

Bowles, Jasmine, Amicus;

Boyle, Jr., Donald P., Counsel for Defendant;

Brown, Phil, *APA* Plaintiff;

Brown, Theron, *Grant* Plaintiff;

Bush, Jacquelyn, *Grant* Plaintiff;

*Pendergrass v. Sec'y of State of Ga.*, No. 24-10231

Calvo-Friedman, Jennessa, Former Counsel for *APA* Plaintiffs;

Carr, Christopher M., Counsel for Defendant;

Cheung, Ming, Counsel for *APA* Plaintiffs;

Common Cause, Amicus;

Conner, Mary Nell, *Grant* Plaintiff;

Crowell & Moring LLP, Counsel for Amicus;

Data, Sonika, Counsel for *APA* Plaintiffs;

DiGiuseppe, Marisa A., Counsel for *APA* Plaintiffs;

Douglas, Maura, Counsel for *APA* Plaintiffs;

Draper, Paul, Assistant Solicitor General, Counsel for Defendant;

Georgia Department of Law, Counsel for Defendant;

Davis, Alexander S., Counsel for Amicus;

Dechert LLP, Counsel for Amicus;

DiGiuseppe, Marisa A., Counsel for *APA* Plaintiffs;

Dixit, Anuj, Counsel for *APA* Plaintiffs;

Douglas, Maura, Counsel for *APA* Plaintiffs;

Duffey, Jr., William S., Former Defendant in *Grant* and *Pendergrass*;

Election Law Clinic at Harvard Law School, Amicus;

Elias Law Group LLP, Counsel for *Grant* and *Pendergrass* Plaintiffs;

*Pendergrass v. Sec'y of State of Ga.*, No. 24-10231

Fair Districts GA, Amicus;

Flynn, Erin H., Counsel for Intervenor;

Ford, Christina Ashley, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Freeman, Daniel J., Counsel for Intervenor;

GALEO Latino Community Development Fund, Inc., Amicus;

Garabadu, Rahul, Former Counsel for *APA* Plaintiffs;

Geaghan-Breiner, Charlotte, Counsel for *APA* Plaintiffs;

Genberg, Jack, Counsel for Amicus;

Georgia Coalition for the People's Agenda, Amicus;

Georgia State Conference of the NAACP, Amicus;

Ghazal, Sara Tindall, Former Defendant in *Grant* and *Pendergrass*;

Glaze, Ojuan, *Pendergrass* Plaintiff;

Glenn, Katie Bailey, *APA* Plaintiff;

Grant, Annie Lois, *Grant* Plaintiff;

Graves, Cheryl, Amicus;

Greenbaum, Jon, Counsel for Amicus;

Greenwood, Ruth M., Counsel for Amicus;

Hamilton, Kevin J., Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Harrison, Keith, Counsel for Amicus;

*Pendergrass v. Sec'y of State of Ga.*, No. 24-10231

Hawley, Jonathan Patrick, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Heard, Bradley E., Counsel for Amicus;

Heaven, Astor H.L., Counsel for Amicus;

Hennington, Elliott, *Pendergrass* Plaintiff;

Hessel, Daniel J., Counsel for Amicus;

Houk, Julie M., Counsel for Amicus;

Howell, Quentin T., *Grant* Plaintiff;

Isaacson, Cory, Counsel for *APA* Plaintiffs;

Ivey, Marvis McDaniel, Amicus;

Jacoutot, Bryan F., Counsel for Defendant;

Jackson, Toni Michelle, Counsel for Amicus;

James, Triana Arnold, *Grant* and *Pendergrass* Plaintiff;

Jamieson, Nathan, Counsel for Amicus;

Johnston, Janice W., Former Defendant in *Grant* and *Pendergrass*;

Jones, Michael Brandon, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Jones, Steve C., Judge, U.S. District Court, Northern District of Georgia;

Kastorf Law LLP, Counsel for Amicus;

Kastorf, Kurt, Counsel for Amicus;

*Pendergrass v. Sec'y of State of Ga.*, No. 24-10231

Khanna, Abha, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Kim, Eliot, Former Counsel for *APA* Plaintiffs;

Kim, Taeyoung, Counsel for *APA* Plaintiffs;

Krevolin & Horst LLC, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Lakin, Sophia Lin, Counsel for *APA* Plaintiffs;

LaRoss, Diane F., Counsel for Defendant;

Lawyers' Committee for Civil Rights Under Law, Counsel for Amicus;

Le, Anh, Former Defendant in *Grant* and *Pendergrass*;

League of Women Voters of Georgia, Amicus;

Lee, Theresa J., Counsel for Amicus;

Lewis, Joyce Gist, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Lindsey, Edward, Former Defendant in *Grant* and *Pendergrass*;

Love-Olivo, Cassandra Nicole, Counsel for Amicus;

Mashburn, Matthew, Former Defendant in *Grant* and *Pendergrass*;

May, Caitlyn Felt, Counsel for *APA* Plaintiffs;

McGowan, Charlene, Former Counsel for Defendant;

Miller, Alex W., Counsel for *APA* Plaintiffs;

Miller, Kelsey A., Counsel for *APA* Plaintiffs;

Mitchell, Cassandra, Counsel for *APA* Plaintiffs;

*Pendergrass v. Sec'y of State of Ga.*, No. 24-10231

O'Donnell, Courtney, Counsel for Amicus;

Osher, Daniel C., Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Paradise, Loree Anne, Former Counsel for Defendant;

Pearson, III, Albert Matthews, Counsel for Amicus;

Pendergrass, Coakley, *Pendergrass* Plaintiff;

Perkins Coie LLP, Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Perkins, Brianne, Amicus;

Petrany, Stephen J., Solicitor General, Counsel for Defendant;

Raffensperger, Brad, Defendant in his official capacity as Secretary of State of Georgia;

Reynolds, Garrett, *Grant* Plaintiff;

Richards, Roberts, *Pendergrass* Plaintiff;

Rollins-Boyd, David, Counsel for Amicus;

Rosenberg, Ezra D., Counsel for Amicus;

Rueckert, Jens, *Pendergrass* Plaintiff;

Ruiz Toro, Juan M., Counsel for *APA* Plaintiffs;

Rutahindurwa, Makeba, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Savitsky, Ari J., Counsel for *APA* Plaintiffs;

Shaw, Abigail, Former Counsel for *APA* Plaintiffs;

*Pendergrass v. Sec'y of State of Ga.*, No. 24-10231

Sivaram, Anuradha, Former Counsel for *APA* Plaintiffs;

Sixth District of the African Methodist Episcopal Church, *APA* Plaintiff;

Smith, Casey Katherine, Counsel for *APA* Plaintiffs;

Solomon, Elbert, *Grant* Plaintiff;

Southern Poverty Law Center, Counsel for Amicus;

Sparks, Adam M., Counsel for *Grant* and *Pendergrass* Plaintiffs;

Steiner, Neil, Counsel for Amicus;

Stewart, Janice, *APA* Plaintiff;

Stewart, Michael Elliot, Counsel for Intervenor;

Strickland, Frank B., Counsel for Defendant;

Sullivan, Rebecca N., Former Defendant in *Grant* and *Pendergrass*;

Sykes, Eunice, *Grant* Plaintiff;

Taylor English Duma LLP, Counsel for Defendant;

Thomas, Ursula, Amicus;

Tolbert, Elroy, *Grant* Plaintiff;

Tsai, Denise, Counsel for *APA* Plaintiffs;

Tyson, Bryan P., Counsel for Defendant;

United States Department of Justice, Intervenor;

Varghese, George P., Counsel for *APA* Plaintiffs;

*Pendergrass v. Sec'y of State of Ga.*, No. 24-10231

Vaughan, Elizabeth Marie Wilson, Former Counsel for Defendant;

Webb, Bryan K., Counsel for Defendant;

Weigel, Daniel H., Counsel for Defendant;

Weitzman, Samuel, Former Counsel for *APA* Plaintiffs;

White, Graham, Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Willard, Russell D., Former Counsel for Defendant;

Williams, Ayana, Former Counsel for *APA* Plaintiffs;

Williams, H. Benjamin, Amicus;

Williams, Edward Henderson, Former Counsel for *APA* Plaintiffs;

Wilmer Cutler Pickering Hale and Dorr LLP, Counsel for *APA* Plaintiffs;

Wimbish, Dexter, *Grant* Plaintiff;

Woods, Eric T., *APA* Plaintiff;

Young, Sean Jengwei, Former Counsel for *APA* Plaintiffs;

Zabel, Joseph D., Former Counsel for *APA* Plaintiffs

Respectfully submitted this 2nd day of August, 2024.

/s/ Bryan P. Tyson
Bryan P. Tyson

## STATEMENT REGARDING ORAL ARGUMENT

The Secretary requests oral argument.  Though the issues should not be difficult, the record is extensive and oral argument could help the Court in resolving the appeal.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ................................................. i

Table of Authorities ................................................................ iv

Introduction ........................................................................ 1

Statement of the Case .............................................................. 4

    A.  Factual background ........................................................ 5

        1.  Georgia enacts new redistricting maps in the wake of the 2020 census. ..................................................... 5

        2.  Plaintiffs challenge Georgia's maps. ............................... 6

        3.  The legislature adopts a remedial map. .......................... 7

    B.  The district court determines that the remedial map "fully complied" with its order. ................................................. 10

    C.  Standard of review. ...................................................... 12

Summary of Argument .............................................................. 13

Argument ............................................................................ 17

    I.  The new congressional map satisfies the State's remedial obligations. ............................................................... 17

        A.  The district court correctly found that remedial District 6 complied with its order and certainly did not abuse its discretion. ........................................................ 18

        B.  Plaintiffs' counterarguments hold no weight. .............. 25

            1.  Nothing in § 2 limits the State to creating majority-black districts within the unlawful, prior district lines. .......................................................... 26

# TABLE OF CONTENTS
## (continued)

**Page**

2. States need not adopt a plaintiff's preferred remedial map. .................................................................. 33

3. Regardless, the district court did not order the relief Plaintiffs now seek. ................................................ 35

II. Section 2 does not recognize claims based on "coalition districts," and Plaintiffs did not establish such a claim. ... 37

A. The district court did not order the State to preserve coalition districts. ......................................... 38

B. The district court correctly rejected Plaintiffs' claim that District 7 was a protected coalition district. ................. 41

1. Text, history, and precedent confirm that § 2 does not reach coalition districts. .................................... 41

2. Even if § 2 did reach coalition districts, Plaintiffs offered no evidence to prove that § 2 would reach previous District 7. ................................................... 49

Conclusion ..................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Legislative Black Caucus v. Alabama,*
  575 U.S. 254 (2015) ................................................................. 28

*Alexander v. S.C. State Conf. of the NAACP,*
  144 S. Ct. 1221 (2024) ...............................................1, 13, 18, 19

*Allen v. Milligan,*
  599 U.S. 1 (2023) .............................................................. 18, 34

*Alley v. United States HHS,*
  590 F.3d 1195 (11th Cir. 2009) ........................................... 13, 24

*Baird v. Indianapolis,*
  976 F.2d 357 (7th Cir. 1992) ..................................................... 55

*Bartlett v. Strickland,*
  556 U.S. 1 (2009) ...................................................................... 45

*BedRoc Ltd., LLC v. United States,*
  541 U.S. 176 (2004) .................................................................. 42

*Bethune-Hill v. Va. State Bd. of Elecs.,*
  580 U.S. 178 (2017) .................................................................. 19

*Bone Shirt v. Hazeltine,*
  461 F.3d 1011 (8th Cir. 2006) ................................................... 12

*Bridgeport Coal for Fair Representation v. City of Bridgeport,*
  26 F.3d 271 (2d Cir. 1994) ........................................................ 46

*Bush v. Vera,*
  517 U.S. 952 (1996) ..........................................................*passim*

*Cave v. Singletary,*
  84 F.3d 1350 (11th Cir. 1996) ....................................... 13, 24, 39

*Clark v. Calhoun County*,
   88 F.3d 1393 (5th Cir. 1996) ...................................................... 21

*Concerned Citizens of Hardee County v. Hardee County Bd. of Elections*,
   906 F.2d 524 (11th Cir. 1990) .............................................. 44, 53

*Covington v. North Carolina*,
   283 F. Supp. 3d 410 (M.D.N.C. 2018) ....................................... 50

*Dillard v. City of Greensboro*,
   74 F.3d 230 (11th Cir. 1996) ...................................................... 50

*Gingles v. Edmisten*,
   590 F. Supp. 345 (E.D.N.C. 1984) ............................................. 51

*Godfrey v. BellSouth Telecoms.*,
   89 F.3d 755 (11th Cir. 1996) ...................................................... 12

*Hall v. Virginia*,
   385 F.3d 421 (4th Cir. 2004) ............................................... 43, 44

*Jacksonville Branch of NAACP v. City of Jacksonville*,
   No. 3:22-cv-00493, 2022 WL 17751416 (M.D. Fla. Dec. 19, 2022)
   ...................................................................................................... 28

*Johnson v. De Grandy*,
   512 U.S. 997 (1994) ...........................................................*passim*

*Justice for All v. Faulkner*,
   410 F.3d 760 (5th Cir. 2005) ...................................................... 37

*Large v. Fremont County*,
   670 F.3d 1133 (10th Cir. 2012) ................................................. 12

*League of United Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006) ...........................................................*passim*

*LULAC v. Clements*,
   999 F.2d 831 (5th Cir. 1993) ............................................... 43, 46

*Luna v. County of Kern*,
    291 F.Supp.3d 1088 (E.D. Cal. 2018) ........................................ 27

*McGhee v. Granville County*,
    860 F.2d 110 (4th Cir. 1988) ........................................ 14, 20, 35

*Miller v. Johnson*,
    515 U.S. 900 (1995) ........................................ 13, 19

*Nixon v. Kent County*,
    76 F.3d 1381 (6th Cir. 1996) ................................*passim*

*Petteway v. Galveston County*,
    2024 U.S. App. LEXIS 19210,
    Case No. 23-40582 (5th Cir. Aug. 1, 2024) ........................ 44, 47

*Rodriguez v. Bexar County*,
    385 F.3d 853 (5th Cir. 2004) ...................................... 12

*Rucho v. Common Cause*,
    588 U.S. 684 (2019) ...................................... 19

*Seastrunk v. Burns*,
    772 F.2d 143 (5th Cir. 1985) ................................ 19, 20

*Shaw v. Hunt*,
    517 U.S. 899 (1996) ........................................*passim*

*Shaw v. Reno*,
    509 U.S. 630 (1993) .................................... 30

*Tallahassee Branch of NAACP v. Leon County*,
    827 F.2d 1436 (11th Cir. 1987) .................................. 20

*Thompson v. Kemp*,
    309 F. Supp. 3d 1360 (N.D. Ga. 2018) ...................................... 27

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ............................................ 29, 38

*United States v. Dallas County Comm'n*,
    850 F.2d 1433 (11th Cir. 1988) ........................................... 23, 50

*United States v. Euclid City Sch. Bd.*,
    632 F. Supp. 2d 740 (N.D. Ohio 2009) ...................................... 34

*United States v. Hays*,
    515 U.S. 737 (1995) ................................................................... 27

*Voinovich v. Quilter*,
    507 U.S. 146 (1993) ............................................................ 20, 32

*Wise v. Lipscomb*,
    437 U.S. 535 (1978) ............................................................ 18, 36

*Wright v. Sumter County Bd. of Elections & Registration*,
    979 F.3d 1282 (11th Cir. 2020) ................................................. 50

**Statutes**

52 U.S.C. § 10301....................................................................*passim*

## INTRODUCTION

The Supreme Court recently cautioned that "we must be wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare' that will deliver victories that eluded them 'in the political arena.'" *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1236 (2024) (quotation omitted). This is exactly what Plaintiff-Appellants seek in this appeal—to commandeer the Voting Rights Act to achieve their political goals through the courts.

This case arises out of Plaintiffs' challenge to Georgia's 2021 congressional redistricting. After the 2020 census, Georgia adjusted the electoral lines for its state and federal offices. Plaintiffs challenged those maps claiming they diluted black votes, in violation of § 2 of the VRA. The district court agreed, holding that black voters were entitled to additional majority-black districts in both state and federal maps. The district court granted the State of Georgia time to produce a remedial congressional map, provided it include a new majority-black congressional district in west metro Atlanta. Doc. 334 at 2–3.

Georgia did just that, producing a map with an additional majority-black district in west metro Atlanta. Plaintiffs challenged that map as well, but the district court—which, of

course, had just a month earlier held that Georgia's original congressional map violated § 2—found that the remedial map "fully complied with [its] order." Doc. 334 at 15.

The district court's decision was plainly correct, as Plaintiffs cannot even assert that Georgia failed to draw the required additional majority-black district. Instead, Plaintiffs complain that Georgia did not draw the district in the way *they* would have preferred—which, not coincidentally, would have been beneficial to Democrats, as opposed to Republicans. Indeed, Plaintiffs' primary argument is that Georgia was somehow required to produce not just an additional majority-black district but also an additional majority-Democrat district. The district court ordered no such thing, and Plaintiffs cannot circumvent that basic point: if Plaintiffs wanted a different order for Georgia to follow, they should have cross-appealed.

But even taking their argument head on, it fails. Plaintiffs assert, for instance, that the remedial district was supposed to be drawn entirely within the lines of the former districts where the district court found vote dilution. But there is no requirement in § 2 that a remedial map create additional majority-minority districts using only population from the specific districts challenged. Vote dilution claims are based on regions, not district

2

lines, and indeed, it would make no sense to limit a state legislature to drawing within lines that were just held to be illegal.  Regardless, as the district court found, the additional majority-black district is contained largely within the districts that Plaintiffs challenged.

Plaintiffs also argue, buoyed by the Department of Justice, that they should have been allowed to assert a distinct § 2 claim on the basis of the elimination of a so-called "coalition district," where black voters were not the majority but could combine with other minorities to elect Democrats.  In its remedial map, the State rearranged District 7, which will no longer reliably elect Democrats.  Plaintiffs' basic claim is that the State could not touch this district (which elects candidates from their preferred political party) even though it was not a majority-black district at all.

This argument fails on multiple levels.  To start, § 2 vote dilution claims cannot be based on "coalition districts" as a matter of law.  The text of § 2, *Gingles*, *Strickland*, and common sense all make this clear.  Section 2 protects individuals on the basis of their *race*, not combined classes of people on the basis of their shared political preference.  Moreover, even if such a claim were theoretically possible, Plaintiffs did not provide remotely sufficient evidence to establish such a claim as a matter of law.

3

Plaintiffs' arguments here do little more than establish that, much as the Secretary has maintained throughout, their real concern is *partisanship*, not actual racial vote dilution.  At one point, Plaintiffs accuse the State of "ensuring no net gains in Black voting strength statewide," and they assert that the Court "must not tolerate such gamesmanship."  Pendergrass.Br.21.  But Georgia produced the additional majority-black district just as the district court required, without removing any majority-black districts, so of *course* there was a "net gain" in black voting strength.  What Plaintiffs are after is a net gain in *Democrat* strength.  That is the fundamental "gamesmanship" at issue here.  The State complied with the district court's order, the district court found as much, but Plaintiffs did not get the *partisan* victory they were hoping for, and now they complain to this Court to obtain what no law requires.  Plaintiffs cannot use the Voting Rights Act to further their partisan political interests, and this Court should affirm.

## STATEMENT OF THE CASE

Following the 2020 census, Georgia enacted new electoral district maps.  Plaintiffs challenged those maps under § 2 of the Voting Rights Act, arguing vote dilution.  As relevant here, the district court agreed and ordered the State to create an additional

4

majority-black congressional district in west metro Atlanta. The state legislature adopted a remedial map that did exactly that. After the district court found the 2023 remedial plan "fully complied with [its] order," Plaintiffs filed this appeal.

### A.  Factual background.

#### 1.  Georgia enacts new redistricting maps in the wake of the 2020 census.

On August 21, 2021, the Census Bureau released the population counts that Georgia and other states use to redraw their legislative districts. Doc. 217 at 44. Georgia then enacted new plans for federal and state legislative districts to comply with the new population requirements. That process included adopting guidelines before plans were drawn, public input through hearings and an online portal for voter comments, and education from a variety of groups. Doc. 286 at 40–44. The state's mapdrawer drew an initial plan as requested by legislators, which was then adjusted at the request of various legislators and members of the public. *Id*. at 45–46. The adopted 14-member congressional plan splits 15 counties. *Id*. at 50–51. It included two districts with a black voting-age population of greater than 50%. *Id*. at 51.

## 2.  Plaintiffs challenge Georgia's maps.

Plaintiffs, a group of Georgia voters, challenged Georgia's new congressional map under § 2, arguing that the congressional district lines in west metro Atlanta diluted their votes.  Plaintiffs claimed that Georgia failed to draw an additional majority-black congressional district in the metro Atlanta area, focusing on Districts 3, 6, 11, 13, and 14 to identify that area.  Doc. 120 at ¶¶ 35–37.

After years of litigation and a trial, the district court issued an order in October 2023 deciding that the configuration of several regions in the 2021 legislative and congressional plans violated § 2.[1]  The court enjoined the use of those plans in their entirety and gave the Georgia General Assembly until December 8, 2023, to enact remedial plans.  Doc. 286 at 510.

The district court gave specific instructions on how to comply with its order: the new congressional plan had to include, as relevant here, "an additional majority-Black congressional district in west-metro Atlanta."  Doc. 286 at 509.  It also ordered that Georgia not "eliminat[e] minority opportunity districts elsewhere

---

[1] That order is on appeal before this Court in the consolidated cases 23-13914, 23-13916, and 23-13921.

6

in the plan[.]" *Id.* at 510.  Beyond that, the court imposed no other "parameters [or] instructions."  *Id.* at 508.

### 3.    The legislature adopts a remedial map.

Governor Brian Kemp immediately called a special session of the state legislature to consider updated district boundaries.  Both houses of the legislature followed a detailed process that aimed to comply with the district court's order while respecting traditional redistricting criteria like geography, keeping counties and municipalities whole, minimizing changes to existing district boundaries, and maintaining the existing partisan balance of the state legislature.  *See, e.g.*, Doc. 327-6 at 6–17 (testimony of Senate Reapportionment and Redistricting Committee Chair).  Ultimately, the legislature adopted a remedial map that created an additional majority-black congressional district in west metro Atlanta.

Specifically, the congressional remedial plan increased the number of majority-black districts by one when using total black population and by two when using the black voting-age population.  Doc. 327-2, § 2.2.  The new majority-black district based on total population is remedial District 6, which moves from 9.91% to 51.75% black voting-age population.  Doc. 327-2, § 2.2, Table 1.  In creating the new District 6, the legislature drew

boundaries that utilized those created by Plaintiffs' expert, Mr. Cooper.  Doc. 327-2, § 2.4; Doc. 327-6 at 6–8.

District 6 is located in west metro Atlanta—the region specified by the district court—and includes portions of Cobb, Douglas, and Fulton Counties.  Doc. 327-1, ¶ 17.  Indeed, the new district is mostly set within the borders of the previous districts that the district court found problematic.  Doc. 334 at 9–10.  The new district also closely resembles the illustrative district submitted by Plaintiffs.  It contains more than 70% of the total population, and more than 80% of the black voting-age population, that was included in the illustrative District 6 drawn by Plaintiffs' expert, Mr. Cooper.  *See* Doc. 286 at 78–88; Doc. 327-2, § 2.4.  As shown below, the new district (on the left) is in the same location as the Cooper illustrative District 6 (on the right):



Doc. 327-1 at Ex. 1; Doc. 313-1 at 82.

Overall, the congressional remedial plan increases the number of black individuals of voting age who live in majority-black districts. Doc. 327-2, § 2.3. Under the 2021 congressional plan, 27% of black individuals of voting age in Georgia lived in a majority-black district. *Id*. Under the congressional remedial plan, 46.4% of black individuals of voting age in Georgia now live in a majority-black district. *Id*. When focusing just on the area highlighted by the district court as containing the Section 2 violation (i.e. previous Congressional Districts 3, 6, 11, 13, and 14), 50% of black individuals of voting age lived in a majority-black district. *Id*. Under the congressional remedial plan, that number increased to 57.2%. *Id*.

Redrawing District 6 naturally required adjustments to adjoining districts, including District 7. *See* Doc. 327-6 at 9–12. But the legislature took care to ensure that it did not eliminate *any* existing minority opportunity districts in the remedial map. *Id.* at 12–17.

## B. The district court determines that the remedial map "fully complied" with its order.

Although the remedial map produced exactly what the district court ordered—an additional majority-black congressional district in west metro Atlanta—Plaintiffs nevertheless challenged this map as well.

Plaintiffs made two primary objections. First, they claimed that the new majority-black congressional district included voters from outside of the list of districts the district court identified in its merits order. Doc. 317 at 6. Plaintiffs specifically took issue with the legislature's decision to include voters from previous District 5 in the revised version of District 6. *Id.* Their expert explained that Georgia did not "limit[] the bulk of the changes in the congressional map to the Section 2 violation area defined by the Court." Doc. 317-1 at ¶ 7.

Second, Plaintiffs claimed the "dismantling" of the prior District 7 was both an elimination of an existing "minority

10

opportunity district" in violation of the district court's order and an independent violation of § 2. Doc. 317 at 9, 12. This argument was based on an alleged political coalition of black, Latino, and Asian voters in the prior District 7. *Id.* at 13.

At the hearing, Plaintiffs pressed both arguments, despite the district court explaining that the term "minority opportunity district" in its order referred only to majority-black districts and Plaintiffs had never presented evidence of any political cohesiveness by minority groups. Doc. 330 at 7–8. Plaintiffs presented maps showing the new District 6 drew from the prior District 5, which they claimed was improper because District 5 was already electing a Democrat. *Id.* at 13–15. Plaintiffs specifically rooted their objections in the concept that "in both maps there are five congressional districts that are likely to be solidly Democratic in future elections." *Id.* at 19.

The district court rejected both objections and issued its remedial order, which is the subject of this appeal., It found "that the General Assembly fully complied with [its] order requiring the creation of a majority-Black congressional district in the region of the State where vote dilution was found." Doc. 334 at 15. The district court further found that Georgia was not limited to the list of districts in its order and refused to specifically compare the

remedial plan to Plaintiffs' preferred plan. *Id*. at 11. It found that the new majority-black District 6 was located "squarely within the geographic area of the state specified by the Court's order." *Id*. at 9–10.

The district court further explained that Plaintiffs' challenge had only been about black voters and Plaintiffs could not establish a political coalition only at the remedial phase, especially after the merits phase of the case took years to resolve. *Id*. at 12–13. This informed both the definition of "minority opportunity district," which did not mean a district where minority voters vote in a coalition, and the need for a "separate proceeding" to consider coalition claims. *Id*.

## C. Standard of review.

The district court's order on a remedial redistricting plan is reviewed for abuse of discretion. *Godfrey v. BellSouth Telecoms*., 89 F.3d 755, 757 (11th Cir. 1996); *see also Large v. Fremont County*, 670 F.3d 1133, 1139 (10th Cir. 2012); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1017 (8th Cir. 2006); *Rodriguez v. Bexar County*, 385 F.3d 853, 870 (5th Cir. 2004). This is especially true when evaluating a legislatively enacted redistricting plan because it is the product of a "complex interplay of forces," such that "the

good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915–16 (1995).

Further, the order on the remedial redistricting plan involves a district court interpreting its own order, which is also reviewed for abuse of discretion. *Alley v. United States HHS*, 590 F.3d 1195, 1202 (11th Cir. 2009) (citing *Cave v. Singletary*, 84 F.3d 1350, 1354–55 (11th Cir. 1996)).

## SUMMARY OF ARGUMENT

The question on appeal is whether the district court abused its discretion when it found that Georgia's remedial congressional map complied with the district court's own order. It plainly did not. Georgia unquestionably produced an additional majority-black district in west metro Atlanta, precisely where the district court required it. Nor did Georgia violate § 2 (or the district court's order) by dismantling previously enacted District 7. It was not a majority-black district when Plaintiffs first brought their claims, and that remains true today.

**I.** "Redistricting constitutes a traditional domain of state legislative authority." *Alexander*, 144 S. Ct. at 1233; *see also Bush v. Vera*, 517 U.S. 952, 978 (1996). Striking the right balance in this "complex interplay of forces" is a fundamentally legislative task. *Miller*, 515 U.S. at 915–16. And "[i]nherent in any

13

redistricting remedy" is the reality that some voters will be in districts where they are part of a political minority. *McGhee v. Granville County*, 860 F.2d 110, 118 n.9. (4th Cir. 1988)  The State certainly need not "draw the precise compact district that a court would impose in a successful § 2 challenge." *Vera*, 517 U.S. at 977–78 (quotation omitted).

That is why, here, the district court ordered the creation of a majority-black district in south metro Atlanta but *did not* order any particular lines or limit the State's ability to otherwise draw the district as it saw fit.  The district court identified the *region* where the additional black majority district must be, but it did not purport to go any further.  Doc. 286 at 509.

Georgia's remedial map plainly satisfies the district court's order.  The order required the State, as relevant here, to create an additional majority-black congressional district in the west metro Atlanta area, without removing any majority-black districts.  Doc. 286 at 509.  That is what Georgia did: Congressional District 6 is a new majority-black district in the west metro Atlanta area, and Georgia did not remove any majority-black districts.  The remedial congressional plan dramatically increases the percentage of black voters in Georgia that reside in majority-black districts.  And a quick eyeball test shows that the district court was correct: the

14

new majority-black remedial congressional district "falls squarely within the geographic area of [the] state specified by the Court in its order…." Doc. 334 at 10.

If nothing else, the district court did not *abuse its discretion* in making that finding. Even if it were debatable whether the district is in west metro Atlanta (although it is), this is exactly the sort of on-the-ground factual question that is within the ken of the district court.

**II.** Ultimately, Plaintiffs' argument collapses into the assertion that Georgia was not allowed to dismantle previous District 7, a plurality-white district that tended to elect Democrats. Pointing to the district court's admonition that Georgia was not to "eliminat[e] minority opportunity districts," Doc. 286 at 510, Plaintiffs argue that District 7 was such a district and so immune from meaningful alteration.

But previous District 7 was *not* a majority-black district, and the district court held only that Georgia could not eliminate majority-black districts: "opportunity district" means "majority-black district." That much was obvious from the district court's order—a 500-page tome that never so much as mentioned any definition for opportunity district other than majority-black district—and confirmed by the district court at the remedial

15

hearing and in its remedial orders.  So Georgia could and did revise District 7 without contravening the district court's order.

To the extent Plaintiffs argue that dismantling District 7 was an *independent* § 2 violation—an argument that *amicus* DOJ supports—that argument fails for two reasons.  First, § 2 does not reach so-called "coalition districts."  That black voters, combined with Latino voters and Asian voters, constituted a majority in District 7, does not make it a majority-minority district protected by § 2.  Section 2 protects individuals based on their *race*, not their potentially shared partisan preferences with members of other races.

Second, Plaintiffs provided insufficient evidence to prove a coalition-district claim even if such a thing existed.  The only relevant evidence that Plaintiffs introduced was that black, Latino, and Asian voters tend to prefer Democrats in general elections in District 7, along with some minor socioeconomic indicators.  But evidence that various minorities prefer the same party in *general* elections says nothing about whether they are cohesive—in primaries they might all have wildly different preferences.  And the socioeconomic evidence, minimal as it was, tended to show that the purported minority "coalition" was *not*

similar, as Asian voters are far more similar to the white plurality than black or Latino voters.

At the end of the day, this entire dispute comes down to partisan preferences.  Plaintiffs wanted the State to shift district lines in ways that would benefit Democrats, and the State instead chose to benefit Republicans.  Plaintiffs got what they were entitled to (a new majority-black district) and they have no claim to what they want (a new majority-Democrat district).  This Court should affirm.

## ARGUMENT

## I.  The new congressional map satisfies the State's remedial obligations.

The district court's remedial instructions in this case were simple.  It ordered the State to create an additional majority-black congressional district in west metro Atlanta.  Doc. 286 at 509. And it ordered that Georgia not "eliminat[e] minority opportunity districts elsewhere in the plan[]."  *Id.* at 510.  Beyond that, the court imposed no other "parameters [or] instructions."  *Id.* at 508.

The State's remedial map plainly satisfies the district court's order.  Remedial District 6 is a new majority-black congressional district in west metro Atlanta.  Doc. 334 at 9–10; *see also id.* (finding that the new "CD6 falls squarely within the geographic

17

area of the state specified by the Court's order"). And the State did not eliminate any majority-black districts "elsewhere in the plan[]" to reach that result. Doc. 286 at 510.

Of course, Plaintiffs may prefer a different remedial map. But States have broad discretion in crafting remedial districts, and federal courts should not "conduct a beauty contest between plaintiffs' maps and the State's." *Allen v. Milligan*, 599 U.S. 1, 21 (2023) (internal quotations and alterations omitted). As long as the State's remedial map complies with the district court order and § 2, it is sufficient. *See Wise v. Lipscomb*, 437 U.S. 535, 540 (1978). The State's congressional map does so.

### A. The district court correctly found that remedial District 6 complied with its order and certainly did not abuse its discretion.

**1.** As the Supreme Court reiterated this past term, "[r]edistricting constitutes a traditional domain of state legislative authority." *Alexander*, 144 S. Ct. at 1233; *see also Vera*, 517 U.S. at 978 (the State has a "sovereign interest in implementing its redistricting plan"). Drawing electoral districts is a complicated process that requires balancing a wide array of sometimes conflicting factors: among them are preserving county and municipal boundaries, adhering to natural geography, keeping

communities of interest intact, and designing compact and contiguous districts. *See, e.g.*, *Bethune-Hill v. Va. State Bd. of Elecs.*, 580 U.S. 178, 183 (2017) (describing some of these "traditional redistricting factors"); *Vera*, 517 U.S. at 1048 (Souter, J., dissenting) (collecting cases that "accorded substantial respect" to the States' reliance on such factors). It is also "an inescapably political enterprise." *Alexander*, 144 S. Ct. at 1233. Legislatures are "almost always aware of the political ramifications of the maps they adopt," and they are free to consider partisan interests—protecting incumbents or conferring advantages to one party over another—when redistricting. *Id.* at 1233, 1235; *see also Rucho v. Common Cause*, 588 U.S. 684, 706–07 (2019).

Striking the right balance in this "complex interplay of forces" is a fundamentally legislative task. *Miller*, 515 U.S. at 915–16; *Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir. 1985) ("It is the legislature's function to make decisions of basic political policy."). Federal courts, by contrast, have no "legal standards" to evaluate such policy-laden judgments. Doc. 334 at 14–15 (citing *Rucho*, 139 S. Ct. at 2507; *Seastrunk*, 772 F.2d at 151). Which is why, "time and again," the Supreme Court has instructed that, absent a violation of federal law, federal courts must defer to a state legislature's redistricting choices. *Voinovich v. Quilter*, 507 U.S.

19

146, 156 (1993); *see also, e.g.*, *Tallahassee Branch of NAACP v. Leon County*, 827 F.2d 1436, 1438 (11th Cir. 1987); *Seastrunk*, 772 F.2d at 151. States, in other words, are entitled to "broad discretion in drawing districts to comply with the mandate of § 2." *Shaw v. Hunt*, 517 U.S. 899, 917 n.9. (1996)

That is especially true when, as here, the parties do not dispute *whether* a new district must be drawn, only what the precise boundaries of that new district should be. Redistricting, after all, is an "inevitably rough-hewn" and "approximate" process. *McGhee,* 860 F.2d at 119. Creating new districts necessarily requires adjustments to adjacent districts. And the competing factors at play in the redistricting calculus (geography, local government boundaries, partisan interests) mean that some voters will invariably be left in districts where they are part of the political minority. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 503–04 (2006) (Roberts, C.J., concurring) (*LULAC*). That is "[i]nherent in any redistricting remedy." *McGhee*, 860 F.2d at 118 n.9. The district court made that same observation in this case. *See* Doc. 334 at 11 (Some "members of the minority group" will inevitably end up "outside of the [new] minority-controlled districts.").

Federal courts, therefore, do not delineate the specific boundaries of the remedial districts States must create to cure a § 2 violation. *See Vera*, 517 U.S. at 977–78 (the State need not "draw the precise compact district that a court would impose in a successful § 2 challenge" (quotation omitted)); *Clark v. Calhoun County*, 88 F.3d 1393, 1407 (5th Cir. 1996) ("[The State] is free … to develop a different remedial plan from those proposed by the plaintiffs."). Of course, the district court must identify the region in which vote dilution has been found and the remedial district should be located, but it cannot "confine the General Assembly to working only within [certain] enumerated districts." Doc. 334 at 8.

In sum, then, upon a finding of vote dilution, States are free to adopt *any* reasonable remedial map, as long as that map creates the required majority-black districts in the region identified by the district court.

**2.** The State's remedial congressional map plainly satisfies that standard. To reiterate, the district court's order, as relevant here, required Georgia to create an additional majority-black congressional district in west metro Atlanta. Doc. 286 at 509. And that is *all* it required. It did not specify exactly where in west metro Atlanta the new district must be placed or exactly which of

21

the existing districts must be adjusted to accommodate the new district.

Remedial District 6 is located squarely within the west metro Atlanta area. It is based in counties—Cobb, Douglas, Fayette and Fulton—in the west metro Atlanta area. Docs. 327-1, ¶ 17; 317-1, ¶ 8. Notably, although the General Assembly was not required to create the new district within the specific districts identified by Plaintiffs in their complaint, the remedial district largely overlaps with those boundaries. Even Plaintiffs' own expert agreed that District 6 is "a new majority-Black district in western Metro Atlanta." Doc. 317-1, ¶ 8. A review of the relevant plans confirms the district largely overlaps with the Plaintiffs' expert's plan—the 2023 District 6 is on the left and the Plaintiffs' expert's illustrative version of District 6 is on the right:



Doc. 327-1 at Ex. 1; Doc. 313-1 at 82.

There is nothing else the legislature was required to do. The district court's initial order found that the State's 2021 congressional map diluted the votes of black voters because the west metro Atlanta area could, but did not, include an additional majority-black congressional district. Doc. 286 at 509. The remedial map "completely remedies" that issue by adding the required majority-black district. *United States v. Dallas County Comm'n*, 850 F.2d 1433, 1437–38 (11th Cir. 1988).

**3.** Even if the correct finding were arguable, the Secretary prevails anyway because the district court *found* that the State's remedial map "fully complied" with its order. Doc. 334 at 15. Its instruction to create a new majority-black district in "west-metro

23

Atlanta," explained the court, "did not … confine the General Assembly to working only within the" districts identified by the district court as vote-dilutive. *Id.* at 8. Rather, that instruction was "geographic guidance" indicating the general area in which the new district should be placed. *Id.* at 8. And the remedial map followed that guidance. *Id.* at 15 (finding the State created the new districts "in the region of the State where vote dilution was found").

A district court's interpretation of its own order is reviewed with substantial deference. Its decision will be reversed only if its interpretation constituted an abuse of discretion. *Alley v. United States HHS*, 590 F.3d 1195, 1202 (11th Cir. 2009). The district court, after all, "is in the best position to interpret its own orders." *Id.* As long as its reading is "reasonable," the decision will stand. *Cave,* 84 F.3d at 1354. And no one—Plaintiffs included—could seriously maintain that it was unreasonable for the district court to interpret "west-metro Atlanta," Doc. 286 at 509, to mean the "regio[n]" of "west-metro Atlanta" rather than an arbitrary collection of specific, unlawful legislative districts within that region, especially when the list was created by Plaintiffs in their complaint, Doc. 334 at 8–10.

24

Plaintiffs briefly argue that Georgia failed to create an additional majority-black district in west metro Atlanta, Pendergrass.Br.16–17, but that is nonsense.  The district court (and Plaintiffs' own expert) specifically *found the opposite*.  Doc. 334 at 10, Doc. 317-1, ¶ 8.  And the question whether a district is in fact located in a particular area is precisely the sort of factual question where the district court receives deference.  That is particularly true when the district court identified the region in the first place.  Even if someone might disagree about *precisely* where west metro Atlanta is (and here there should not be much disagreement), the district court's finding on that point must be respected.

Simply put, Georgia complied with the district court's order, the district court found that Georgia complied with the order, and even if one disagreed with those conclusions, it was not an abuse of discretion for the district court to so find.

## B.   Plaintiffs' counterarguments hold no weight.

Plaintiffs, for their part, argue that Georgia's remedial discretion should be much more limited.  They would require the State to create an additional majority-black congressional district using *only* the population from the specific districts identified in the district court's initial order.  *See, e.g.*, Pendergrass.Br.12

25

(arguing that the district court erred in authorizing a map where the additional majority-black district is "only *partially* located in the area found to be in violation"); *id.* at 13 (the State erred by "reach[ing] outside the area found to be in violation"). And they would compel the State to adopt whichever remedial map places the greatest number of black voters in majority-black districts. *See, e.g.*, Doc. 317 at 8–9. But as the district court explained, there is "no relevant authority to support this view," Doc. 334 at 7–8, and regardless, it is not what the district court ordered.

### 1. Nothing in § 2 limits the State to creating majority-black districts within the unlawful, prior district lines.

Plaintiffs erroneously insist that the new majority-black district created by the General Assembly is insufficient because it is not contained entirely within the five-district so-called "vote dilution area" identified by the district court in its initial order. *See, e.g.*, Pendergrass.Br.12–13. On Plaintiffs' view, a vote dilution remedy is "complete" only if the new majority-black district is comprised exclusively of voters who previously resided in the challenged districts. Doc. 317 at 8–9. Plaintiffs are wrong.

That § 2 is concerned with *regions* and not particular *districts* is inherent in how § 2 vote dilution claims work. Unlike racial

26

gerrymandering claims, which challenge specific district boundaries, *see United States v. Hays*, 515 U.S. 737, 745 (1995), vote dilution claims do not challenge the boundaries of any particular electoral district.  Instead, they challenge the lack of majority-minority districts in the "area *as a whole*."  *LULAC*, 548 U.S. at 504 (Roberts, C.J., concurring in part and dissenting in part) (emphasis added).  Unlike a racial gerrymandering plaintiff, a vote dilution plaintiff doesn't even have to live in a particular district to bring such a claim; he need only live in "a reasonably compact *area* that could support additional majority-minority districts."  *Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1364–65 (N.D. Ga. 2018) (three-judge court) (emphasis added); *see also Luna v. County of Kern*, 291 F.Supp.3d 1088, 1122 n. 14 (E.D. Cal. 2018) (collecting cases).  By the same token, to *remedy* vote dilution, the State need not adjust or be confined to the boundaries of any particular districts; it simply must ensure that the identified *area* has the required number of majority-minority districts.

Plaintiffs' argument to the contrary lacks authority or even common sense.  They insist that the State must confine its remedial district to the boundaries of the dilutive districts identified in its order.  Doc. 317 at 6.  But those boundaries were

27

set by a map that the district court held to be illegal—at Plaintiffs' own insistence. Doc. 286 at 511–14. Why should the State, or any remedial map-drawer, be required to use, as a template for designing a new district, an unlawful map?

Likewise, all of the cases on which Plaintiffs rely for their sweeping new standard are inapposite or support the Secretary. They place the most emphasis on *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 3:22-cv-00493, 2022 WL 17751416 (M.D. Fla. Dec. 19, 2022), a non-binding district court decision. *See* Pendergrass.Br.15. But that was "not a VRA case"—it was a racial gerrymandering case in which the district court found that the State had intentionally packed black voters into a single district. 2022 WL 17751416 at *6 n.7. Necessarily, the only remedy for a racially gerrymandered, packed district is to break apart *that specific district*. *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262–63 (2015). In this case, by contrast— which is about vote dilution in a given area, not racially gerrymandered packing—the district court did not order changes to any particular district. Doc. 334 at 8. It ordered the creation of an additional black-majority congressional district in west metro Atlanta. Doc. 286 at 509. And the new District 6 is exactly that.

Next, Plaintiffs erroneously rely on *Shaw*, 517 U.S. at 899. Plaintiffs argue that *Shaw* requires States to remedy vote dilution by adjusting the particular electoral districts identified by a district court. *See* Pendergrass.Br.13, 15, 17–19. But the decision says nothing of the sort. For one thing, *Shaw*, like *Jacksonville*, was not even a § 2 case; it was a racial gerrymandering case. The Department of Justice refused to preclear North Carolina's redistricting map under § 5 of the Voting Rights Act. The proposed map, said DOJ, diluted minority voting strength in the south-central to southeastern portions of North Carolina, in violation of § 2. North Carolina responded by revising the proposed map to include a new, plainly gerrymandered majority-black district. 517 U.S. at 917. The Court rejected the argument that this supposed attempt at compliance with § 2 could justify the obvious racial gerrymander. For one, the district was not remotely compact, and § 2 requires creation of majority-minority districts only where they could be compact. *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). For another, its proposed district was nowhere near the area of supposed vote dilution concern, nor could it be because it was so strung out it was not limited to any particular region at all:

29



APPENDIX
NORTH CAROLINA CONGRESSIONAL PLAN
Chapter 7 of the 1991 Session Laws (1991 Extra Session)

*Reproduced at Shaw v. Reno*, 509 U.S. 630, 659 (1993) (red line added for emphasis); Doc. 327 at 35. So the "black voters of the south-central to southeastern region would still be suffering precisely the same injury that they suffered before District 12 was drawn." 517 U.S. at 917. That, explained *Shaw*, was not a valid remedy; the State could not address supposed vote dilution in one part of the State by creating a new majority-minority district on the other side of the State. *Id.*

This case is the polar opposite of *Shaw*. The remedial district adopted by the General Assembly here, District 6, does not stretch to the other side of the State. Quite the opposite: it is compact and contained entirely within west metro Atlanta (not to mention, in a

location very similar to Plaintiffs' expert's illustrative District 6). And that is exactly the kind of remedy *Shaw* says § 2 requires. *See id.* at 917–18 (explaining that vote dilution is cured when the remedial district includes a "substantial portion" of the affected minority voters).

Next, Plaintiffs border on misleading when they cite *LULAC*, 548 U.S. at 399; *see, e.g.*, Pendergrass.Br.12, 14.  Plaintiffs cite *LULAC* for the proposition that "the State's creation of an opportunity district for those without a § right offers no excuse for its failure to provide an opportunity district for those with a § 2 right."  Pendergrass.Br.14 (quotation omitted).  But the opinion in *LULAC* said as much in the context of explaining that a state cannot create a *non-compact* majority-minority district in one part of the state to offset the loss of a *compact* majority-minority district elsewhere in the state.  *LULAC*, 548 U.S. at 430–31.  The majority's point was that "since there is no § 2 right to a district that is not reasonably compact," the "creation of a noncompact district does not compensate for the dismantling of a compact opportunity district."  *Id.*  In other words, Georgia could not create a non-compact majority-black district in Augusta to justify "dismantling" a compact majority-black district in Atlanta.

31

Unlike *LULAC*, Georgia did not dismantle *any* majority-black districts, much less compact majority-black districts. The General Assembly created the additional district Plaintiffs wanted, in the area the district court required, while not removing any majority-black districts elsewhere. Plaintiffs have not offered any alternative remedial plans with more majority-black districts in west metro Atlanta.

*LULAC* instead rebuts Plaintiffs' argument. Drawing on its earlier opinion in *Shaw,* the Court rejected the idea that "a § 2 plaintiff has the right to be placed in a majority-minority district once a violation of the statute is shown." *LULAC*, 548 U.S. at 429 (quotation omitted). And it explained that "[i]f the inclusion of the plaintiffs would necessitate the exclusion of others, then the State cannot be faulted for its choice." *Id.* at 429–30. Yet that is precisely what Plaintiffs argue here: they "fault[]" the State for choosing to put certain black voters in majority-black districts as opposed to others. But *LULAC* confirms that where the State creates the required number of compact majority-black districts, Plaintiffs are entitled to no more.

Absent a choice that is either unconstitutional or otherwise illegal under federal law, States have broad discretion to craft new remedial districts. *Voinovich,* 507 U.S. at 156. Here, the State

placed the new majority-black district where the district court ordered it, and that should be the end of it.

### 2. States need not adopt a plaintiff's preferred remedial map.

Plaintiffs alternatively argue that the State's chosen remedy is incomplete because it does not place as many black voters from the "vote dilution area" as possible in the new majority-black congressional district. *See* Pendergrass.Br.17–19. In other words, Plaintiffs would prefer that the State have adopted their proposed map because it moves the black voters they would prefer to be moved into the new majority-black district. *See id.* at 18 (arguing that "Plaintiffs' illustrative map is not a mere policy preference").

The fundamental assumption of Plaintiffs' argument is wrong. In their view, the State included additional black voters in the new majority-minority district "without a § 2 right," to the exclusion of black voters who did. Pendergrass.Br.14, 17–18; Doc. 317 at 8. That is because, to Plaintiffs' way of thinking, many of the voters the State included in District 6 came from previous District 5, where they supposedly "already had the electoral opportunity Section 2 requires." Pendergrass.Br.17. But that is simply wrong: previous District 5 was *not* a majority-black

district: it leaned *Democrat*, but § 2 is concerned with majority-black districts, not majority-Democrat districts.

Again, "[i]f the inclusion of the plaintiffs would necessitate the exclusion of others, then the State cannot be faulted for its choice." *LULAC*, 548 U.S. at 429–30. And States' broad redistricting discretion would mean nothing if they must choose whichever map places the *most* minority voters from challenged districts into majority-minority districts. Plaintiffs' argument would also invite federal courts to engage in exactly the kind of "beauty contest"—comparing a State's remedial map and a plaintiff's proposed map—that the Supreme Court rejected just last term in *Milligan*, 599 U.S. at 21. That is simply not the right question to ask at the remedial stage: "a court is not to inquire whether the defendants have proposed the very best available remedy, or even … an appealing one." *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 750 (N.D. Ohio 2009).

The Supreme Court has repeatedly rejected Plaintiffs' argument that § 2 requires placing specific voters in majority-minority districts. In *Shaw*, for instance, the Court explained that no one, including a successful § 2 plaintiff, "has the right to be placed in a majority-minority district once a violation of the statute is shown." 517 U.S. at 917 n.9. And that makes sense

34

because *no map* could place every voter in a district where their preferred candidate is guaranteed to win.  Inevitably, some voters will be left in districts where they are part of the political minority.  *LULAC*, 548 U.S. at 503–04 (Roberts, C.J., concurring); *see also Johnson v. De Grandy*, 512 U.S. 997, 1015 (1994) ("[S]ome dividing by district lines … is virtually inevitable and befalls any population group of substantial size."); *McGhee*, 860 F.2d at 118 n.9 ("Inherent in any redistricting remedy … is the possibility … that not all can be placed in safe districts.").

Anyway, despite Plaintiffs' protests, the remedial plan substantially increases the number of black Georgians who live in majority-black districts.  On the 2021 Congressional plan, 27% of black individuals of voting age in Georgia lived in a majority-black district.  Doc. 327-2, § 2.3.  On the Congressional remedial plan, nearly half (46.4%) now live in a majority-black district.  *Id*.

### 3.    Regardless, the district court did not order the relief Plaintiffs now seek.

Ultimately, Plaintiffs' legal contentions are irrelevant at this stage of the litigation.  Even if one were sympathetic to their arguments about what the district court *should have* required, none of this is what the district court ordered.  The district court outlined "the parameters and the instructions around what the

State of Georgia [was] supposed to do" to cure supposed vote dilution in west metro Atlanta. Doc. 286 at 508–09. The court required "an additional majority-Black congressional district in west-metro-Atlanta." *Id.* at 509. It also acknowledged the State's discretion in crafting appropriate remedial maps, noting that "redistricting … is a legislative task." *Id.* (quoting *Wise*, 437 U.S. at 539). And it specifically *declined* to delineate exactly where and with which voters the remedial district must be drawn. *Id.* (explaining that it would be "[in]appropriate … for the federal court to devise its own plan" (quoting *Wise*, 437 U.S. at 540 (alteration adopted))).

In other words, the district court *did not* order the relief Plaintiffs now argue for. The court went on to say exactly that in its remedial order. *See, e.g.*, Doc. 334 at 7–8 ("reject[ing]" Plaintiffs' "foundational assumption" that "the State was confined to making changes only in [specific] districts").

If Plaintiffs were unhappy with the district court's order, or if they thought it did not conform to the requirements of § 2, then they could have cross-appealed and asked this Court to modify the order. But they chose not to do so. Thus, even if they were somehow correct—and they are not—that the district court *should have* imposed stricter limits on the State's remedial discretion,

36

that argument is beyond the scope of this appeal. *See Justice for All v. Faulkner*, 410 F.3d 760, 772 (5th Cir. 2005) ("Because [the plaintiff] did not cross-appeal from the district court's judgment, however, we lack jurisdiction to expand the scope of the remedy ordered.").

## II. Section 2 does not recognize claims based on "coalition districts," and Plaintiffs did not establish such a claim.

Plaintiffs' next argument is that, when the district court held that the State could not "eliminat[e] minority opportunity districts elsewhere in the plan," it was not referring to *majority-black* districts but, instead, any district where black voters tend to elect preferred candidates (i.e. Democrats). So, apparently, dismantling previous District 7 (not a majority-black district, but a district that reliably elects Democrats) violated the district court's order. That argument is a non-starter. An opportunity district is a majority-black district, full stop, and the district court confirmed as much.

Plaintiffs also suggest (and DOJ, as *amicus*, expands on the argument) that the district court erred in allowing the dismantling of previous District 7 because it was a so-called *coalition* district, where three different minority groups made up a combined majority. But that argument, too, goes nowhere.

37

Section 2 guarantees that "members of *a class* of citizens" have the
same opportunity as other voters to participate in the political
process. 52 U.S.C. § 10301(b) (emphasis added). Nothing in its
text suggests that plaintiffs can cobble together a "coalition" of
*multiple* classes of voters to prove vote dilution. So, to satisfy
their statutory burden, a § 2 plaintiff must show that the racial
group at issue can, on its own, form the majority in a reasonably
compact district. *Gingles*, 478 U.S. at 50. Moreover, even if § 2
reached coalition district claims, Plaintiffs never made such a
claim or presented any evidence to support it.

A.   **The district court did not order the State to
     preserve coalition districts.**

Plaintiffs argue that the district court prohibited the State
from dismantling previous District 7 because it was an
"opportunity district" for black voters. Pendergrass.Br.20–23.
The only problem there is the district court did nothing of the
kind. The district court instructed the State that it "cannot
remedy the Section 2 violations described herein by eliminating
minority opportunity districts elsewhere in the plans." Doc. 286 at
509–10. But Plaintiffs' attempt to redefine "minority opportunity
district" to include anything other than "majority-black district" is
wrong from top to bottom. As the district court itself explained,

when it used the term "minority opportunity district," it meant majority-black district.  Doc. 330 at 7–8; Doc. 334 at 12.

To start, at the remedial hearing, the district court explained that the term "minority opportunity district" in its order referred only to black voters.  Doc. 330 at 7–8.  Given the deference the district court is owed when interpreting its own order, *Cave*, 84 F.3d at 1354–55, the district court's interpretation of its own use of "minority opportunity district" was plainly reasonable and cannot be disturbed on appeal.  Moreover, as the district court explained, it "could not refer to any potential coalition district," because from the onset of the litigation, "this case has been about Black voters—as necessitated by Plaintiffs' Complaint."  Doc. 334 at 12.  And because Plaintiffs did not present any evidence at trial related to the voting behavior of non-black minority groups, the district court could make "no finding that Black voters in Georgia politically join with another minority group or groups and that white voters vote as a bloc to defeat the candidate of choice of that minority coalition."  *Id.*

The district court is plainly correct: no part of the litigation touched on coalition districts.  *See, e.g.* Doc. 286 at 9 ("the Court determines that in certain areas of the State, the political process is not equally open to Black voters."); 96, 107 (*APA* expert Cooper

legislative plans involved majority-black districts); 115 (*Grant* expert Esselstyn only considered black population); 142 (*Pendergrass* expert Palmer only evaluated black and white voter cohesion, not other minority groups); 149 (*APA* expert Handley only evaluated black and white voter cohesion, not other minority groups); 201 (*Pendergrass* reference to minority community was to black voters); 209, 211 (question in *Pendergrass* case was equal openness of process as to "affected Black voters"); 242 (electoral structure was found to affect black voters); 272–273 (findings as to black voters); 274 (question in *APA* and *Grant* cases was equal openness of process to black voters); 405–406 (findings regarding black community in context of Section 2 violation); 426–427 (question in *APA* and *Grant* cases was equal openness of process as to "affected Black voters"); 510 (injury was to "Plaintiffs and other Black voters in Georgia"); 511 (remedy will be assessed to determine "whether it provides Black voters with an additional opportunity district").

Plaintiffs' attempt to read the district court's order as touching coalition districts borders on frivolous. The entire litigation was about black voters, Plaintiffs never put forth a coalition district claim (or any evidence that would support such a claim), and the district court's order never hinted that District 7

40

could not be touched.  Plaintiffs' underlying assumption appears to be that minority voters of every race, color, and creed must always vote alike, think alike, and share the same experiences. That assumption "reflects the demeaning notion that members of the defined racial groups ascribe to certain minority views that must be different from those of other citizens." *De Grandy,* 512 U.S. at 1027.  The Court should reject this argument.

## B.  The district court correctly rejected Plaintiffs' claim that District 7 was a protected coalition district.

To the extent Plaintiffs make a standalone argument that the State's remedial map violates § 2 because it dismantled previous District 7—regardless of what the district court's liability order requires—that claim fails for two reasons.  First, § 2 does not recognize coalition claims.  Second, even if it did, Plaintiffs did not put forth evidence anywhere close to sufficient to prove such a claim, and it would fail as a matter of law.  *Amicus* DOJ, which asserts that the district court should have at least addressed this claim, is wrong for the same reasons.

### 1.  Text, history, and precedent confirm that § 2 does not reach coalition districts.

Statutory claims (like vote dilution) must be based in the statutory text, and the text of § 2 is clear.  It protects the ability of

*a* minority to elect its preferred candidate, not a *coalition* of different minorities.  That should end the matter.  *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous.").  Case law and policy considerations, to the extent they are relevant, confirm the conclusion.

"Even the most cursory examination reveals that § 2 of the Voting Rights Act does not mention minority coalitions, either expressly or conceptually."  *Nixon v. Kent County,* 76 F.3d 1381, 1386 (6th Cir. 1996) (en banc).  The statute specifically protects "members of *a class* of citizens" whose voting rights are infringed on account of race.  52 U.S.C. § 10301(b) (emphasis added); *see also id.* (referring again to "members of a protected class").  To prove a violation of the statute, plaintiffs must show that the protected class is disadvantaged "in that *its* members"—not *their* members—have "less opportunity than other members of the electorate."  *Id.* (emphasis added).  And the statute instructs courts evaluating vote dilution to consider "the extent to which members of *a* protected class have been elected to office."  *Id.* (emphasis added).

In other words, § 2 repeatedly and consistently refers to "a protected class" in the singular.  It does not describe a coalition of

classes who happen to be politically aligned.  Of course, Congress
could have written the statute to protect multiple classes of
citizens if it wanted to permit coalition-based claims.  *See LULAC
v. Clements*, 999 F.2d 831, 894 (5th Cir. 1993) (en banc) (Jones, J.,
concurring) ("[Congress] could have done so by defining the
'results' test in terms of protected *classes* of citizens.").  But it
chose not to.

Given the text's clear reference to singular minority groups, it
is no surprise that multiple courts have rejected coalition-based
vote dilution claims like the one pressed by Plaintiffs here.  The
most in-depth treatment of the subject came from the *en banc*
Sixth Circuit in *Nixon*.  There, the court emphasized § 2's focus on
a singular minority group, *id.* at 1386, noted various
administrability problems with coalition claims, *id.* at 1390–91,
and explored the history of the Voting Rights Act to show that
Congress was focused on protecting discrete minorities, not
"combinations" of different groups, *id.* at 1389–90.

Likewise, in *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004),
the Fourth Circuit rejected coalition claims as incompatible with
the vote dilution test laid out in *Gingles*.  Under *Gingles*, the
Fourth Circuit explained, a minority group must show that it
could, on its own, form the majority in a hypothetical voting

district. *Hall*, 385 F.3d at 429. If the group cannot do this—if, instead, it would require a coalition of voters to form a majority—then the group cannot show that it has "the ability to elect candidates of [its] *own* choice" under any system. *Id.* at 430 (emphasis added).

And just yesterday, the Fifth Circuit brought its precedent into line, rejecting earlier decisions that had allowed for coalition claims. *Petteway v. Galveston County*, 2024 U.S. App. LEXIS 19210, Case No. 23-40582, slip op.[2] at 4 (5th Cir. Aug. 1, 2024). "Section 2 does not require political subdivisions to draw precinct lines for the electoral benefit of distinct minority groups that share political preferences but lack the cementing force of race or ethnicity." *Id.* at 29.[3]

---

[2] Available at https://www.ca5.uscourts.gov/opinions/pub/23/23-40582-CV3.pdf

[3] The only relevant decision from the Eleventh Circuit is *Concerned Citizens of Hardee County v. Hardee County Bd. of Elections*, 906 F.2d 524 (11th Cir. 1990). And while that decision assumed the existence of a coalition-based claim, Plaintiffs do not even mention *Hardee*, which is not surprising because the decision *rejected* a coalition-district claim. The Court did not hold whether coalition claims are theoretically cognizable under § 2 because it would not have mattered; the plaintiffs in that case failed to show that the alleged coalition—black and Latino voters—voted cohesively. *Id.* at 526–27.

Finally, the Supreme Court rejected the logic of coalition districts in *Bartlett v. Strickland*, 556 U.S. 1 (2009).  In *Bartlett*, a controlling plurality held that § 2 does not require "crossover districts," in which a minority group "make[s] up less than a majority of the voting-age population" but "is large enough to elect the candidate of its choice with help from voters who are members of the majority."  *Id.* at 13–14.  Such districts are beyond the reach of § 2 because the statute ensures only that minorities have the same "opportunity" as "other members of the electorate" to elect their preferred representatives, *id.* at 14 (quoting 52 U.S.C. § 10301(b)), and when a racial minority cannot form the majority of a district, it "has no better or worse opportunity to elect a candidate than does any other group of voters with the same relative voting strength," *id.*  The minority group has "the opportunity to join other voters—including other racial minorities, or whites, or both—to reach a majority and elect their preferred candidate," but they cannot do so "based on their own votes."  *Id.*

The Court addressed only "crossover" districts and not "coalition districts," *id.* at 13, but its reasoning applies just as forcefully to both.  Like crossover districts, minority voters in a coalition district cannot elect their preferred candidate—and

45

therefore cannot benefit from the protection of § 2—without relying on *other* voters to support them.

No Circuit court holds otherwise. The Second Circuit, has seemingly *assumed* the existence of coalition claims. *See Bridegeport Coal for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 273 (2d Cir. 1994) (noting without comment that the district court required the city to create, among others, one district with a combined majority of black and Latino voters), *vacated on other grounds*, 512 U.S. 1283 (1994). But the Second Circuit offered no reasoning to support that conclusion.

"[T]here should be no need to discuss the minority coalition theory of vote dilution" any further "because the text of the Voting Rights Act does not support it," *Nixon*, 76 F.3d at 1387 (quoting *Clements*, 999 F.2d at 894 (Jones, J., concurring)), and persuasive case law rejects it. But, to the extent it is relevant, § 2's focus on *singular* minority groups also makes sense as a matter of policy.

The statute is meant to ensure that minority voters have the *same* access to political processes as everyone else. It is *not* meant to guarantee minority voters "the maximum possible point of power." *De Grandy*, 512 U.S. at 1017. But the coalition theory would do just that, offering special protection to districts where, although a minority group is not the majority, their preferred

46

candidates generally win elections.  And that would effectively relieve minority voters of "the obligation to pull, haul, and trade to find common political ground."  *Id.* at 1020.

More fundamentally, Plaintiffs' coalition theory ignores the entire point of the Voting Rights Act.  Section 2, in its own words, protects voters from electoral disadvantages "on account of race or color."  52 U.S.C. § 10301(a).  That's why a single minority group can avail itself of § 2's protections: because every member of the group shares the same race.  *Petteway*, slip op. at 12.  But "when members of various protected minorities 'join forces,' they do so for the same reason that *any* two groups coalesce, i.e., to further their mutual political goals."  *Nixon*, 76 F.3d at 1391–92 (emphasis added).  Their cooperation, in other words, has nothing to do with race, and offering special protection to such coalitions would "wrench[] the Act from its ideological and constitutional foundations."  *Nixon*, 76 F.3d at 1392; *accord Petteway*, slip op. at 12–13.

Finally, coalition claims present a catch-22 for courts endeavoring to protect minority representation.  If a *hypothetical* coalition district can be used as a sword by § 2 plaintiffs trying to increase the number of favorable electoral districts, then *existing* coalition districts could just as easily be used as a shield by States

trying to defend their enacted maps. For example, if the State has created a district in which black and Latino voters together comprise a majority, and such a district counts as a "majority-minority district" for § 2 purposes, then plaintiffs would be unable to prove vote dilution even if additional black voters could be added to the district to create a genuine majority-black district. *See Campos*, 849 F.2d at 945–46 (Higginbotham, J., dissenting from denial of rehearing en banc) (observing that coalition districts could actually "*limit* the protections of the Voting Rights Act" in such cases); *Nixon*, 76 F.3d at 1391 (same). In this very case, Plaintiffs and the district court *rejected* the idea that District 7 should "count" in the State's favor on the merits, Doc. 330 at 22–23; Doc. 286 at 254–55, 262–70—but if § 2 requires coalition districts, then that rejection was in error and the entire merits phase should be redone.

In sum, Plaintiffs' coalition-district theory ignores the statutory text, runs counter to longstanding and well-reasoned case law, and undermines the purpose of the Voting Rights Act. This Court should reject Plaintiffs' theory.

48

**2.    Even if § 2 did reach coalition districts, Plaintiffs offered no evidence to prove that § 2 would reach previous District 7.**

Assuming *arguendo* that § 2 protects coalition districts, the district court correctly rejected Plaintiffs' eleventh-hour claim regarding District 7.  Doc. 334 at 13.  Plaintiffs never pursued such a claim or provided any evidence to support it in two years of litigation prior to the remedial hearing.  And to the extent they provided *any* evidence to support a coalition claim at the remedial hearing, it was not close to sufficient to prevail.

**1.** Because Plaintiffs never pursued a coalition district claim prior to the remedial hearing, the district court properly rejected their attempt to raise one after the fact.  Doc. 334 at 12–13.  As the district court explained, its "entire analysis of political cohesiveness, the second *Gingles* precondition, has pertained to Black voters."  Doc. 334 at 12.  And the Court "made no finding that Black voters in Georgia politically join with another minority group or groups and that white voters vote as a bloc to defeat the candidate of choice of that minority coalition."  *Id.*  In fact, "[t]here was no evidence introduced at trial regarding a coalition of minority voters."  *Id*. at 13.  Thus, the court "could not refer to," much less prohibit the reconfiguration of "any potential coalition district."  *Id*. at 12.

DOJ asserts that the district court should have considered new evidence and new claims at the remedial hearing, DOJ.Br.5–12, but Plaintiffs asked the district court to conduct an entirely new § 2 analysis on an entirely new § 2 claim on entirely new theories and entirely new data.  *See* Doc. 330 at 26–28.  That is wholly unlike cases that relied on the same data and same claims when evaluating remedial plans.  *See, e.g.*, *Dallas County Comm'n*, 850 F.2d at 1438; *Dillard v. City of Greensboro*, 74 F.3d 230, 233 (11th Cir. 1996).  It was surely within the district court's ample discretion not to examine a completely new theory out of the blue, when Plaintiffs had *years* prior to raise this claim.

**2.** Anyway, taking this new claim head on, it fails as a matter of law because Plaintiffs introduced no evidence that could support it.  That is hardly surprising; § 2 involves an "intensely local appraisal" of the facts, *Wright v. Sumter County Bd. of Elections & Registration*, 979 F.3d 1282, 1288 (11th Cir. 2020), so a coalition-district challenge "demands development of significant new evidence and therefore is more appropriately addressed in a separate proceeding."  Doc. 334 at 13 (citing *Covington v. North Carolina,* 283 F. Supp. 3d 410, 427 (M.D.N.C. 2018)).  "[G]auging the voting strength of less-than-majority population groups— either absolutely or relatively—is a difficult and uncertain

business at best." *Gingles v. Edmisten*, 590 F. Supp. 345, 383 (E.D.N.C. 1984). And as the district court pointed out at oral argument, "[Plaintiffs are] asking the Court to resolve a matter in… 20 days that took 22 months to do" in the main case. Doc. 330 at 27:14–16. One would not expect Plaintiffs to provide sufficient evidence off the top of their heads, and they did not.

The sum total of Plaintiffs' material evidence about District 7 was some general election results and some socioeconomic data. As to election results, their expert provided evidence that District 7 tended to elect Democrats. Doc. 317-2 at 2–3. But even assuming for the moment that each minority group cohesively supported the same candidates in general elections, that does not answer the important question here, because the different minority groups might have wildly different views as to the primaries, and there is *no evidence whatsoever* as to their voting patterns or preferences in primaries.

The Supreme Court has explained that, without primary election results, "no obvious benchmark exists for deciding whether African-Americans could elect their candidate of choice" in a district regularly won by a Democrat. *LULAC*, 548 U.S. at 444. This was true even when most black voters supported the Democrat in the general election. *Id.* at 445–46. Further, "[t]hat

African-Americans had influence in the district… does not suffice to state a §2 claim in these cases.  The opportunity to 'elect representatives of their choice,' 42 U.S.C. § 1973(b), requires more than the ability to influence the outcome between some candidates, none of whom is their candidate of choice."  *Id.* at 445.  In other words, just because black voters always or often voted for the Democrat against a Republican, the evidence was not clear that the particular Democrat in the general election was sufficiently supported by black voters in the primary to be considered their candidate of choice.

Applied to coalition districts, this reasoning makes plain that a plaintiff asserting a claim based on a coalition district has to look to primary results.  Otherwise, there is no way of knowing whether various minorities share a preference for particular candidates or just make do with what they have at the general election stage.

Here, Plaintiffs provided *zero* analysis of primaries in District 7.  Plaintiffs' expert Dr. Palmer provided an abbreviated analysis for the remedial phase, which was merely a repurposed report from a completely different case, Doc. 317-2, n. 1, and it does nothing to establish that District 7 was either a coalition district or otherwise protected by Section 2 of the VRA.  It has no data

52

that would show, one way or the other, whether the various minority groups are cohesive or not. Without primary data, there is no basis to conclude that all three racial groups agree on candidates in primaries. *See Concerned Citizens of Hardee County*, 906 F.2d at 527 (no evidence of political coalitions between black and Latino voters).

And Plaintiffs hardly even tried to submit evidence of the § 2 Senate Report Factors. Doc. 317 at 20–26. They pull expert reports from other cases (which the Secretary did not get to probe through depositions or cross examination) in a half-hearted attempt to align the black voter experience with that of other minorities. *Id.* at 21–22. But this effort falls flat, and in any event is certainly far short of the "intensely local appraisal" of facts a § 2 inquiry demands.

The one exception, where Plaintiffs actually did submit an expert who conducted some analysis on a potential coalition, cuts against them. The various socioeconomic factors examined by Dr. Collingwood show white households and Asian households to be far more similar than the various minority groups were among themselves, undercutting claims of a coalition of black, Latino, and Asian voters. For example, white households examined have an average household income of roughly $106,000, while Asian

53

households were at $94,000 annually.  Doc. 317-5, tbl. 2.  Contrast this with black and Latino households, which respectively average $59,000 and $62,000 annually.  *Id.*  Likewise, a "very similar percentage of whites and Asians are college educated."  Doc. 317-5 at 1.  By contrast, according to Plaintiffs' expert, "whites hold a strong education advantage on Blacks and Hispanics."  *Id.*

And this is *all the evidence* Plaintiffs presented.  As a matter of law, one cannot prove a § 2 claim where the evidence shows only that various minority groups in a single district tend to prefer Democrats, and one of those groups is socioeconomically similar to the white plurality.  Plaintiffs provided no evidence of historical discrimination, racial polarization, racial appeals, lack of candidate success, odd voting devices, or *anything else* that could prove a § 2 claim.  *Compare De Grandy*, 512 U.S. at 1010 (Senate factors) *with* Doc. 317 at 20–26.

In sum, even if they were right on the law of coalition districts (and they are not), Plaintiffs have no evidence supporting their conclusory position that District 7 was protected by § 2.  Their argument proves only one thing: Plaintiffs are upset that the General Assembly eliminated a safe congressional district for *Democrats* when it created the required new majority-black district.  But the Voting Rights Act "is a balm for racial minorities,

not political ones." *Baird v. Indianapolis,* 976 F.2d 357, 361 (7th Cir. 1992). It cannot be hijacked to settle partisan disputes that are fairly decided at the polls.[4]

---

[4] DOJ also criticizes the district court for not considering the evidence discussed above regarding whether the changes to District 7 were an independent § 2 violation, but its arguments add little to Plaintiffs'. DOJ.Br.12–21. DOJ does make one valid point, but it is an alternative rationale for affirmance, not a reason for remand. As DOJ concedes, Plaintiffs took no actions to establish their standing to pursue a new claim, DOJ.Br.24, even with plenty of opportunity to do so, *see*, *e.g.*, Doc. 309 at 3. Plaintiffs' failure to present evidence to establish their standing on this point is yet another reason the district court was correct not to countenance this claim. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (plaintiff bears burden of proof of establishing standing).

55

## CONCLUSION

This Court should affirm the judgment below.

Respectfully submitted.

August 2, 2024.

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
  *Special Asst. Att'ys General*

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249
btyson@taylorenglish.com

/s/ *Stephen J. Petrany*
Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Paul R. Draper
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the Secretary of State of Georgia*

56

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 11,167 words as counted by the word-processing system used to prepare the document.

/s/ *Bryan P. Tyson*
Bryan P. Tyson

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2024, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Bryan P. Tyson*
Bryan P. Tyson