No. 24-10231

# In the United States Court of Appeals for the Eleventh Circuit

COAKLEY PENDERGRASS, et al.,

*Plaintiffs-Appellants*,

v.

SECRETARY OF STATE OF GEORGIA,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:21-cv-05339—Steve C. Jones, Judge

## REPLY BRIEF FOR APPELLANTS

Joyce Gist Lewis
Adam M. Sparks
**KREVOLIN & HORST, LLP**
One Atlantic Center
1201 W. Peachtree St. NW,
Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700

Abha Khanna
Makeba Rutahindurwa
**ELIAS LAW GROUP LLP**
1700 Seventh Ave,
Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Plaintiffs-Appellants certify that Coakley Pendergrass, Triana Arnold James, Elliott Hennington, Robert Richards, Jens Rueckert, and Ojuan Glaze are individuals. Plaintiffs-Appellants further certify that no publicly held corporation or company has an interest in the outcome of this case.

Plaintiffs-Appellants certify that the following have an interest in the outcome of this case:

1.  ACLU Foundation, Inc., *Counsel for Alpha Phi Alpha Plaintiffs*

2.  ACLU Foundation of Georgia, Inc., *Counsel for Alphi Phi Alpha Plaintiffs*

3.  Adegbile, Debo P., *Counsel for Alphi Phi Alpha Plaintiffs*

4.  Aiken, D'Ericka, *Counsel for Alphi Phi Alpha Plaintiffs*

5.  Allen, Erick, *Witness for Plaintiffs*

6.  Arbuthnot, Jacqueline Faye, *Grant Plaintiff*

7.  Bokat-Lindell, Noah B., *Counsel for United States*

8.  Boone, Robert, *Counsel for Alphi Phi Alpha Plaintiffs*

9.  Boyle Jr., Donald P., *Counsel for Defendant*

10. Brown, Phil, *Alpha Phi Alpha Plaintiff*

11. Brown, Theron, *Former Grant Plaintiff*

12.   Bush, Jacquelyn, *Grant Plaintiff*

13.   Calvo-Friedman, Jennesa, *Former Counsel for Alpha Phi Alpha Plaintiffs*

14.   Carr, Christopher, *Counsel for Defendant*

15.   Carter, Jason J., *Witness for Plaintiffs*

16.   Cheung, Ming, *Counsel for Alpha Phi Alpha Plaintiffs*

17.   Conner, Mary Nell, *Grant Plaintiff*

18.   Data, Sonika, *Counsel for Alpha Phi Alpha Plaintiffs*

19.   DiGiuseppe, Marisa A., *Counsel for Alpha Phi Alpha Plaintiffs*

20.   Dixit, Anuj, *Counsel for Alpha Phi Alpha Plaintiffs*

21.   Douglas, Maura, *Counsel for Alpha Phi Alpha Plaintiffs*

22.   Draper, Paul Richard, *Former Counsel for Defendant*

23.   Duffey Jr., Hon. William S., *Former Defendant*

24.   Elias Law Group LLP, *Counsel for Plaintiffs*

25.   Flynn, Erin H., *Counsel for Intervenor*

26.   Ford, Christina A., *Counsel for Plaintiffs*

27.   Freeman, Daniel J., *Counsel for Intervenor*

28.   Garabadu, Rahul, *Former Counsel for Alpha Phi Alpha Plaintiffs*

29.   Geaghan-Breiner, Charlotte, *Counsel for Alpha Phi Alpha Plaintiffs*

30.   Georgia Department of Law, *Counsel for Defendant*

31.   Ghazal, Sara Tindall, *Former Defendant*

32.    Glaze, Ojuan, *Plaintiff*

33.    Glenn, Katie Bailey, *Alpha Phi Alpha Plaintiff*

34.    Grant, Annie Lois, *Grant Plaintiff*

35.    Hamilton, Kevin J., *Former Counsel for Plaintiffs*

36.    Hawley, Jonathan P., *Former Counsel for Plaintiffs*

37.    Hennington, Elliott, *Plaintiff*

38.    Howell, Quentin T., *Grant Plaintiff*

39.    Isaacson, Cory, *Counsel for Alpha Phi Alpha Plaintiffs*

40.    Ivey, Marvis McDaniel, *Amicus Curiae*

41.    Jacoutot, Bryan F., *Counsel for Defendant*

42.    James, Triana Arnold, *Plaintiff*

43.    Johnston, Janice W., *Former Defendant*

44.    Jones, Michael B., *Former Counsel for Plaintiffs*

45.    Jones, Hon. Steve C., *U.S. District Court Judge*

46.    Khanna, Abha, *Counsel for Plaintiffs*

47.    Kim, Eliot, *Counsel for Alpha Phi Alpha Plaintiffs*

48.    Kim, Taeyoung, *Counsel for Alpha Phi Alpha Plaintiffs*

49.    Krevolin & Horst LLC, *Counsel for Plaintiffs*

50.    Lakin, Sophia Lin, *Counsel for Alpha Phi Alpha Plaintiffs*

51.    LaRoss, Diane, *Counsel for Defendant*

52.  Le, Anh, *Former Defendant*

53.  Lewis, Joyce Gist, *Counsel for Plaintiffs*

54.  Lindsey, Edward, *Former Defendant*

55.  Mashburn, Matthew, *Former Defendant*

56.  May, Caitlin Felt, *Counsel for Alpha Phi Alpha Plaintiffs*

57.  McGowan, Charlene, *Former Counsel for Defendant*

58.  Miller, Alex W., *Counsel for Alpha Phi Alpha Plaintiffs*

59.  Miller, Kelsey A., *Former Counsel for Alpha Phi Alpha Plaintiffs*

60.  Mitchell, Cassie, *Counsel for Alpha Phi Alpha Plaintiffs*

61.  Osher, Daniel C., *Former Counsel for Plaintiffs*

62.  Paradise, Loree Anne, *Former Counsel for Defendant*

63.  Pendergrass, Coakley, *Plaintiff*

64.  Perkins Coie LLP, *Former Counsel for Plaintiffs*

65.  Petrany, Stephen J., *Counsel for Defendant*

66.  Raffensperger, Brad, *Defendant*

67.  Reynolds, Garrett, *Grant Plaintiff*

68.  Richards, Robert, *Plaintiff*

69.  Rueckert, Jens, *Plaintiff*

70.  Ruiz Toro, Juan M., *Counsel for Alpha Phi Alpha Plaintiffs*

71.  Rutahindurwa, Makeba, *Counsel for Plaintiffs*

72. Savitzky, Ari J., *Counsel for Alpha Phi Alpha Plaintiffs*

73. Shaw, Abigail, *Former Counsel for Alpha Phi Alpha Plaintiffs*

74. Sivaram, Anuradha, *Former Counsel for Alpha Phi Alpha Plaintiffs*

75. Sixth District of the African Methodist Episcopal Church, *Alpha Phi Alpha Plaintiff*

76. Solomon, Elbert, *Grant Plaintiff*

77. Sparks, Adam M., *Counsel for Plaintiffs*

78. Smith, Casey Katharine, *Counsel for Alpha Phi Alpha Plaintiffs*

79. Stewart, Janice, *Alpha Phi Alpha Plaintiff*

80. Stewart, Michael Elliot, *Counsel for Intervenor*

81. Strickland, Frank B., *Counsel for Defendant*

82. Sykes, Eunice, *Grant Plaintiff*

83. Taylor English Duma LLP, *Counsel for Defendant*

84. Tolbert, Elroy, *Grant Plaintiff*

85. Tsai, Denise, *Counsel for Alpha Phi Alpha Plaintiffs*

86. Tyson, Bryan P., *Counsel for Defendant*

87. United States, *Intervenor*

88. Varghese, George P., *Counsel for Alpha Phi Alpha Plaintiffs*

89. Vaughn, Elizabeth Marie Wilson, *Former Counsel for Defendant*

90. Webb, Bryan K., *Counsel for Defendant*

91. Weigel, Daniel H., *Counsel for Defendant*

92.    Weitzman, Samuel, *Former Counsel for Alpha Phi Alpha Plaintiffs*

93.    White, Graham W., *Former Counsel for Plaintiffs*

94.    Willard, Russell D., *Counsel for Defendant*

95.    Williams, Ayana, *Former Counsel for Alpha Phi Alpha Plaintiffs*

96.    Williams, Edward, *Former Counsel for Alpha Phi Alpha Plaintiffs*

97.    Wilmer Cutler Pickering Hale and Dorr LLP, *Counsel for Alpha Phi Alpha Plaintiffs*

98.    Wimbish, Dexter, *Grant Plaintiff*

99.    Woods, Eric T., *Alpha Phi Alpha Plaintiff*

100.    Young, Sean Jengwei, *Former Counsel for Alpha Phi Alpha Plaintiffs*

101.    Zabel, Joseph D., *Former Counsel for Alpha Phi Alpha Plaintiffs*

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT .......................................................................C-1

TABLE OF CONTENTS .......................................................................... i

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ................................................................................ 1

ARGUMENT....................................................................................... 2

  I.    Because Georgia violated Section 2, it had to—but did not—create
      an additional district where Black voters could elect their preferred
      candidates. ................................................................................... 2

  II.   This case is about racial discrimination, not partisan discrimination. ..........10

  III.  The Secretary fails to justify the errors requiring reversal. ..........................12

CONCLUSION ................................................................................. 18

CERTIFICATE OF COMPLIANCE ................................................... 19

CERTIFICATE OF SERVICE............................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan*,
   599 U.S. 1 (2023)......................................................................................1, 18

**Bartlett v. Strickland*,
   556 U.S. 1 (2009)........................................................................................6, 12

**Johnson v. De Grandy*,
   512 U.S. 997 (1994)..........................................................................7, 8, 9, 11

*Justice for All v. Faulkner*,
   410 F.3d 760 (5th Cir. 2005)...............................................................5

**League of United Latin American Citizens v. Perry*,
   548 U.S. 399 (2006).........................................................................11, 16

*Marbury v. Madison*,
   5 U.S. 137 (1803).............................................................................14

*North Carolina v. Covington*,
   581 U.S. 486 (2017)...........................................................................7

**Shaw v. Hunt*,
   517 U.S. 899 (1996)....................................................................14, 15

*Singleton v. Allen*,
   690 F. Supp. 3d 1226 (N.D. Ala. 2023), *appeal dismissed sub nom.*
   *Milligan v. Co-Chairs of Alabama Permanent Legislative*
   *Committee on Reapportionment*, No. 23-12922-D,
   2023 WL 6568350 (11th Cir. Oct. 3, 2023).....................................17

**United States v. Dallas County Commission*,
   850 F.2d 1433 (11th Cir. 1988).....................................................2, 9, 15

## INTRODUCTION

Instead of responding to Plaintiffs' brief, the Secretary misrepresents the facts, misinterprets the law, and "quixotically joust[s] with an imaginary adversary." *Allen v. Milligan*, 599 U.S. 1, 90 (2023) (Thomas, J., dissenting). After Georgia's previous congressional districting map was enjoined for depriving Black voters of electoral opportunities guaranteed to them by Section 2 of the Voting Rights Act, the General Assembly enacted a new map that failed to provide any additional electoral opportunities to Black voters. Because that new map, SB 3EX, fails to remedy the Section 2 violation, the district court's approval of that map was reversible error.

The question on appeal is narrow: what does "additional" opportunity mean in the context of a Section 2 remedy? The text, precedent, and purpose of Section 2 confirm that a remedial map that creates a "new" Black-opportunity district only by drawing from and cannibalizing existing Black-opportunity districts outside the proven vote dilution area provides no remedy at all. In particular, the General Assembly's elimination of an existing district that provided Black voters the opportunity to elect their preferred congressional candidates, as well as its refusal to create a Black-opportunity district within the vote dilution area, guarantees the ongoing dilution of Black voting strength and therefore fails to completely remedy the Section 2 violation.

1

## ARGUMENT

**I.    Because Georgia violated Section 2, it had to—but did not—create an additional district where Black voters could elect their preferred candidates.**

The General Assembly was required, by court order and Section 2, to "remedy the Section 2 violations by incorporating [an *additional* [congressional] district[] in which Black voters have a demonstrable opportunity to elect their candidates of choice." Doc. 286 at 510 (emphasis added); *see* Doc. 317 at 8 (identifying cases where courts specified the need for *additional* minority-opportunity districts to remedy Section 2 violations). There is no meaningful dispute that SB 3EX, as a practical matter, fails to provide an additional district in which Black voters have the opportunity to elect their candidates of choice: the electoral opportunity provided to Black voters in CD 6 comes at the expense of Black voters who previously enjoyed electoral opportunity in CD 7. By capping Black opportunity in Georgia to just five congressional districts—the same as the 2021 Plan—SB 3EX fails to "with certitude *completely* remedy the Section 2 violation." *United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1438 (11th Cir. 1988) (quoting *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 252 (11th Cir. 1987)).

Black voters in Georgia are no better off under SB 3EX than under the unlawful 2021 Plan.[1]

The Secretary launches a host of reasons why the State should be permitted to reshuffle Black opportunity as a remedy to the Section 2 violation, all of which fall flat. First, the Secretary misrepresents that Plaintiffs' objections to SB 3EX during the remedial hearing were rooted in the fact that in "both maps there are five congressional districts that are likely to be solidly Democratic in future elections." Br. of Ga. Sec'y of State 11, ECF No. 47 ("Resp. Br.") (quoting Doc. 330 at 19). In fact, Plaintiffs' attorney was referring to the Secretary's own expert Dr. Barber's analysis:

> According to Dr. Barber, in both maps there are five congressional districts that are likely to be solidly Democratic in future elections. Now, why Dr. Barber chooses to phrase his effectiveness analysis in partisan terms is anyone's guess. But, regardless, his report and his Table 4 makes clear that the 2021 plan had five majority-minority districts that were effective for Black-preferred candidates, and the 2023 plan just swaps out one majority-minority district for another to achieve that same effect: Five Black opportunity districts in the 2021 plan, and five Black opportunity districts in the 2023 plan.

---

[1] The Secretary's suggestion that redrawing CD 6 "naturally required adjustments to adjoining districts, including District 7," Br. of Ga. Sec'y of State 10, ECF No. 47 ("Resp. Br."), is demonstrably false. As Mr. Cooper's illustrative plans demonstrate, there was absolutely no "require[ment]" to reconfigure District 7 in order to create an additional majority-Black district in west metro Atlanta. *See* Doc. 286 at 175; Doc. 317-1 ¶ 9.

Doc. 330 at 19. Plaintiffs' concerns have always been about Black voting opportunity, despite the Secretary's attempts to change the narrative to partisan scorekeeping. *Compare* Br. for Appellants 22–25, ECF No. 34 ("Opening Br.") (explaining the significance of "Black opportunity" and why SB 3EX fails to provide the required additional opportunity that Section 2 demands), *with generally* Resp. Br. (using the term "Democrat" twenty-one times and avoiding any discussion of what opportunity for Black voters meaningfully looks like).

Next, the Secretary asserts that, for purposes of evaluating a Section 2 remedy, Black opportunity is limited to majority-Black districts. The Secretary's newfound confidence that "[a]n opportunity district is a majority-[B]lack district, full stop," Resp. Br. 37, however, is belied by the fact that he argued the *exact opposite* at every stage of the proceedings. *See* Doc. 40 at 21 (Defs.' Resp. in Opp'n to Prelim. Inj.) (counting the 2021 Plan's CD 7 as a district where "Black voters are able to elect their candidates of choice"); Doc. 175-1 at 32 (Defs.' Br. in Supp. of Mot. for Summ. J.) (same); Doc. 268 ¶ 166 (Defs.' Proposed Findings of Fact & Conclusions of Law) (same). The district court also had no trouble in its liability-phase order recognizing that CD 7 was one of the five districts where Black voters had an opportunity to elect their candidates of choice, and that

4

majority-minority districts provide precisely the kind of electoral opportunity that must be considered when evaluating a districting map. *See* Doc. 286 at 263–68.[2]

The Secretary next argues that the possibility of creating a coalition district cannot give rise to Section 2 liability, but this argument improperly conflates liability with remedy in an attempt to send this case back to square one.[3] Section 2 liability has already been established with respect to the 2021 congressional plan, which already included a coalition district in CD 7. The question here is what comes next: Where plaintiffs have established that the State is diluting Black voting strength in violation of Section 2, may a state refuse to create an additional

---

[2] The Secretary's argument that Plaintiffs should have appealed the district court's liability order because "the district court *did not* order the relief Plaintiffs now argue for," Resp. Br. 35–37, is a nonstarter. This appeal concerns the remedial phase of the case, not the liability phase. Plaintiffs do not appeal the district court's order finding a Section 2 violation and providing instructions on the appropriate remedy. Instead, they appeal the district court's refusal to hold the State to account in evaluating the General Assembly's purported remedial plan. Plaintiffs are not seeking an alteration of the judgment on liability, but reversal of the court's approval of the remedy.

[3] Contrary to the Secretary's suggestion, Resp. Br. 41–55, there is no question before the Court as to whether Section 2 independently requires the creation of coalition districts. Plaintiffs do not raise on appeal the issue of whether the lower court erred in declining to address whether the remedial map suffered an independent Section 2 violation. *See generally* Opening Br. To the extent the Secretary attempts to raise for the first time on appeal that the Court should decide whether coalition districts can satisfy an independent claim under Section 2, the Court lacks jurisdiction to do so as the Secretary did not cross-appeal the remedial order. *See Justice for All v. Faulkner*, 410 F.3d 760, 772 (5th Cir. 2005).

district where Black voters can elect candidates of choice? It may not, and the Secretary has not identified any case suggesting otherwise.

The closest the Secretary comes to identifying binding authority is a cursory reference to *Bartlett v. Strickland*, 556 U.S. 1 (2009) (plurality op.), another case that turned on the prerequisites for establishing Section 2 liability—an inquiry that has already been resolved in Plaintiffs' favor here. The *Bartlett* plurality "recognize[d] only that there is no support for the claim that § 2 can require *the creation of crossover districts in the first instance*." 556 U.S. at 24 (emphasis added). Crossover districts are not at issue in this appeal. Moreover, the fact that new crossover districts are not "require[d] . . . in the first instance" under Section 2 does not mean that such districts do not inform whether a remedial plan affords an equal opportunity in the next instance. Indeed, the Supreme Court recognized that even crossover districts "can be evidence . . . of equal political opportunity under the § 2 totality-of-the-circumstances analysis." *Id.* The same can be applied to coalition districts. Since, at the remedial phase, the court is tasked with determining whether a map remedies the minority vote dilution to finally ensure "equal political opportunity," *id.*, it must take into consideration the addition or elimination of such districts on overall Black electoral opportunity. *See also id.* at 25 ("[Section] 2 must be interpreted to ensure that continued progress."). This is especially true given the court's requirement to "undertake an equitable weighing

process to select a fitting remedy" for the Section 2 violation. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (cleaned up).[4]

The weight of Supreme Court precedent confirms that majority-minority districts such as CD 7 must be considered as part of the equation at the remedial stage; otherwise states would be allowed to maximize white voting power by offsetting minority gains required following a finding of a Section 2 violation with minority losses in other parts of the map—"in derogation of the statutory text, . . . its considered purpose, . . . and of the ideal that the Voting Rights Act of 1965 attempts to foster." *Johnson v. De Grandy*, 512 U.S. 997, 1018 (1994). The Supreme Court has recognized that "the textual command of § 2, that the presence or absence of a violation be assessed 'based on the totality of circumstances,' . . . springs from the demonstrated ingenuity of state and local governments in hobbling minority voting power." *Id.* (quoting Section 2). The Court has therefore

---

[4] The Secretary confusingly proffers a hypothetical about whether Black voters could prove vote dilution where Black and Latino voters together comprise a majority. Resp. Br. 48. This once again wrongly ignores the difference between proving a Section 2 violation in the first instance and ensuring an adequate remedy after plaintiffs already satisfied the stringent *Gingles* inquiry. The question here is not whether a coalition district is itself a Section 2 violation if Black voters are sufficiently numerous to comprise a "genuine majority-black district" in that area, *id.*; where Black and Latino voters together make up a majority and vote cohesively for the same candidates, a Section 2 claim would likely fail to satisfy the third *Gingles* precondition. The question instead is whether the State may discharge its obligation to fully remedy its original Section 2 violation by needlessly dismantling an existing coalition district in which Black voters already had the opportunity to elect their preferred candidates.

remained "chary of entertaining a simplification of the sort the State now urges here," and instead determined that "whether the political processes are 'equally open' depends upon a *searching practical evaluation* of the 'past and present reality[.]'" *Id.* at 1018–19 (emphasis added) (quoting S. Rep. No. 97–417, at 30 (1982)).

Here, there is little doubt that the State's narrow interpretation of its responsibility to remedy the Section 2 violation has the practical effect of a legislatively-imposed ceiling on Black voting strength statewide. The State's attempt to "trade[] off" "the rights of some minority voters under § 2" "against the rights of other members of the same minority class" remains "highly suspect" in any instance, *id.* at 1019, and all the more so in the context of a purported remedy to the State's Section 2 violation. *See* Doc. 286 at 516 (acknowledging that "Georgia has not reached the point where the political process has equal openness and equal opportunity for everyone" and its order "ensure[s] that Georgia continues to move toward equal openness and equal opportunity for everyone to participate in the electoral system").

In fact, the State's elimination of an existing coalition district—regardless of whether it is independently protected by Section 2—is a step backwards for both Black Georgians and Section 2.

> If the lesson of *Gingles* is that society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal

political and electoral opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice. Those candidates may not represent perfection to every minority voter, but minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics.

*De Grandy*, 512 U.S. at 1020 (discussing *Thornburg v. Gingles*, 478 U.S. 30 (1986)). Here, the State of Georgia's grudging creation of a majority-Black district where it was "necessitate[d]" under Section 2 came at the expense of those Black voters who had successfully "pull[ed], haul[ed], and trade[d] to find common political ground" with others, in violation of both the text and the principles of Section 2 and the continued progress of Black Georgians across the state. *Id.*

In sum, SB 3EX fails to completely remedy the Section 2 violation because it swaps out opportunity for Black voters in CD 7 for opportunity for Black voters in new majority-Black CD 6, defying both the court's order, Doc. 286 at 509–10, and the requirements of Section 2. Section 2 remedies must "*fully* provide[] equal opportunity for minority citizens to participate and to elect candidates of their choice." *Dall. Cnty. Comm'n*, 850 F.2d at 1442 (cleaned up). A remedial plan that gives with one hand and takes with the other falls far short of this remedial standard. This Court should reject the State's cynical attempt to weaponize its "opportunity to adopt a remedial Congressional plan" after drawing one map in

violation of Section 2, Doc. 286 at 510, to thwart the voting strength of Black Georgians statewide.

## II.    This case is about racial discrimination, not partisan discrimination.

The Secretary seeks to deny Black voters the remedy that Section 2 guarantees them by complaining that the remedy would benefit candidates that Black voters prefer. *See, e.g.*, Resp. Br. 2 (bemoaning that the preservation of districts where Black voters can elect candidates of choice would be "beneficial to Democrats"). It does not matter whether Black voters tend to support Republican candidates or Democratic candidates—each of which has been the case in American history. What matters is that where Black voters are large enough to comprise a majority in a single-member district, vote cohesively, are stymied by bloc voting, and the totality of circumstances supports relief—each of which has been established here—they are entitled to an additional district where they can elect their preferred candidates. Contrary to the Secretary's misdirection, the simple tautology that the *party* Black voters prefer will benefit if *candidates* that Black voters prefer are able to win election does not make this case about partisanship.

The Secretary fundamentally misconceives Section 2's purpose and application. The problem that Section 2 redresses in the vote dilution context is not that white voters vote differently than Black voters, or even that white-preferred

Republican candidates defeat Black-preferred Democratic candidates. The problem is that a Black-preferred candidate *could win* in a given area *but for* the chosen placement of district lines, resulting in vote dilution. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) ("*LULAC*"). As long as officials elected by white majorities can rely on dilutive redistricting schemes as a substitute for courting Black support to win office, the interests of Black voters are condemned to echo in the void. A Section 2 remedy gives candidates the electoral incentive to champion Black voters' unique interests and be their candidate of choice because Black voters have a meaningful opportunity to "pull, haul, and trade" their way to political power. *De Grandy*, 512 U.S. at 1020. Under lawful maps, Democrats and Republicans should have equal incentive to add to their coalition by winning Black voters to their tent.

The Secretary's approach, in contrast, manipulates and distorts the electoral playing field by guaranteeing that white-preferred candidates can remain in power, without ever having to solicit a Black vote, by drawing lines that exploit racially polarized voting. And when a violation is actually proven, as it has been here, the Secretary would *still* guarantee white-preferred candidates remain in power by eliminating an effective opportunity district for Black voters, ensuring Black voters remain inconsequential and underrepresented in the State. This undermines the purpose of Section 2, which was passed to "foster this cooperation" between

11

differing racial groups to join together and elect their candidates of choice. *See Bartlett*, 556 U.S. at 25.

## III.    The Secretary fails to justify the errors requiring reversal.

The district court independently abused its discretion when it failed to analyze whether drawing a new majority-Black district with Black voters from outside the vote dilution area fully and adequately remedied the Section 2 injury within the vote dilution area.

The Secretary does not dispute that more than a quarter of new majority-Black CD 6 came from old CD 5, which is outside the vote dilution area. Resp. Br. 33; Opening Br. 6. Instead, the Secretary argues that the General Assembly was allowed to swap the rights of those within the vote dilution area with Black voters in CD 5 because "previous District 5 was *not* a majority-black district." Resp. Br. 33–34. This argument fails on both the facts and the law.

The Secretary makes this assertion despite stipulating in the proceedings below that CD 5 was in fact a majority-Black congressional district. Doc. 286 at 263–64 & n.70 (identifying CD 5 as a majority-Black district and noting that "[t]he Parties have stipulated that the 2021 Enacted Plan contains 3 majority-Black congressional districts in the Atlanta MSA," which include CDs 4, 5, and 13). In addition, the district court found as a matter of fact that the 2021 plan contained four majority-Black districts (CD 2, 4, 5, 13), *id.*, and that CD 5 has a non-

Hispanic Black citizen voting-age population of 52.35%, *id.* at 51.[5] The Secretary does not dispute either finding on appeal. Resp. Br. 33–34.

Even going by voting age population, there is no denying that CD 5 provided the meaningful electoral opportunities for Black voters that Section 2 was designed to ensure. Black voters comprised 49.6% of CD 5's adult population, and—in every way that matters to actual voters seeking meaningful representation in Congress—their electoral opportunities were identical to those of voters in districts where Black adults comprise a hair over 50% of the population. Hair-splitting, however, has no place in the remedial analysis. Once Black voters prove liability with mathematical precision, a remedy is a remedy whenever it is functional—that is, when it provides Black voters an opportunity to elect candidates of choice. Under the Secretary's logic, the General Assembly could have "remedied" the Section 2 violation by simply dismantling and reconfiguring old CD 5, a district where Black voters undisputedly already had the opportunity to elect their candidates of choice. Surely Section 2 would not countenance such gamesmanship.[6]

_____

[5] Given that this category excludes Black Hispanics, 52.35% is a conservative estimate of the total Black voting-age population.

[6] If the General Assembly could not lawfully dismantle CD 5 to create a remedy, then it must not have been permitted to do so to the other Black-opportunity district nearby, CD 7. *See supra* Section I.

Contrary to the Secretary's strawman, Section 2 does not require States to use unlawful district lines as a "template" for a remedial map. Resp. Br. 28. Obviously, the remedial district is not going to trace the exact boundary of any prior district. It is going to reconfigure district boundaries to unpack and uncrack Black *populations* that were previously diluted. The previous boundaries simply identify the injured voters in need of a remedy, and so the remedial map-drawer looking to add an opportunity district should have started with this population.

This does not require states to maximize the number of Black voters in Black-opportunity districts, *contra id.* at 25, or entitle every Black voter residing within the vote dilution area to be placed into the new Black-opportunity district, Opening Br. 18–19. But neither the Secretary nor the district court has denied that the right to a Section 2 remedy belongs to the Black voters who suffered a vote dilution injury. *Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." (quotation omitted)); *Shaw v. Hunt*, 517 U.S. 899, 917 (1996) ("To accept that the district may be placed anywhere implies that the claim, and hence the coordinate right to an undiluted vote (to cast a ballot equal among voters), belongs to the minority as a group and not to its individual members. It does not."). Accordingly, the State may not choose as a matter of legislative policy to simply bypass the Black voters who

14

suffered the Section 2 injury by drawing in Black voters from other areas who already had the opportunity to elect their preferred candidates.

The Secretary faults Plaintiffs for relying on *Shaw*, insinuating that racial gerrymandering cases are irrelevant to analyzing remedial maps. Resp. Br. 29–30. But *Shaw did* involve an analysis of what kind of remedy is appropriate for a Section 2 violation. 517 U.S. at 916–18. And unlike the Secretary's representation otherwise, this case is *not* "the polar opposite of *Shaw*." Resp. Br. at 30. Just as in *Shaw*, the Section 2 violation that Plaintiffs proved—based on cracking and packing of Black voters within the boundaries of CDs 3, 6, 11, 13, and 14—"flows from the fact that individuals in this area 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Shaw*, 517 U.S. at 917 (quoting Section 2). The Secretary asks the Court to tolerate any remedy that does not, with certitude, completely *fail* to address the vote dilution injury that was shown. Resp. Br. 30–31 (conceding "Georgia could not create a non-compact majority-black district in Augusta to justify 'dismantling' a compact majority-black district in Atlanta"). But that turns the test on its head. Once liability is established, states are required to "with certitude *completely remedy* the Section 2 violation." *Dall. Cnty. Comm'n*, 850 F.2d at 1438 (second emphasis added) (quoting *Dillard*, 831 F.2d at 252). A

"remedy" that falls moderately short of that standard is just as unacceptable as one that fails egregiously.

The Secretary's attempts to distinguish *LULAC* fare no better. Resp. Br. 31–32. The Secretary focuses on the fact that the improper remedy in *LULAC* was the result of the creation of a non-compact majority-minority district in another part of the state. *LULAC*, 548 U.S. at 437. But there is no meaningful difference between a lack of a Section 2 right stemming from the fact that the minority population is not sufficiently compact or because the minority population is not in the vote dilution area. The result is the same: The State cannot purport to remedy a Section 2 violation by creating a new majority-Black district that includes minority populations "without a § 2 right" and be excused "for its failure to provide an opportunity district for those with a § 2 right." *Id.* at 430.

* * *

The Secretary would ask the Court to overlook the General Assembly's deliberate maneuver—after already having violated the voting rights of Black Georgians—to minimize and zero out Black voting strength in the state by failing to provide a remedy to tens of thousands of Black voters in the vote dilution area and dismantling a district that provided Black voters an opportunity to elect their candidates of choice. But the Court cannot accept the Secretary's narrow view of its responsibility to right the Section 2 wrong. "The requirement of a complete

16

remedy means that we cannot accept a remedial plan that (1) perpetuates the vote dilution we found, or (2) only partially remedies it." *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1294 (N.D. Ala. 2023) (cleaned up), *appeal dismissed sub nom. Milligan v. Co-Chairs of Ala. Permanent Legis. Comm. on Reapportionment*, No. 23-12922-D, 2023 WL 6568350 (11th Cir. Oct. 3, 2023) (looking at the plan as a whole to determine whether it provided an additional district that gave Black voters the opportunity to elect their preferred candidates). Here, SB 3EX's purported remedy to the Section 2 violation is unacceptable, as the creation of new majority-Black CD 6 came about by: (1) dismantling an existing Black-opportunity district and (2) drawing in Black voters outside the vote dilution area who already had the opportunity to elect their preferred candidates, to the exclusion of tens of thousands of Black voters within the vote dilution area who suffered—and continue to suffer—the voting rights injury. SB 3EX fails outright for either or both of these reasons—there is no partial credit.

In the end, the Secretary argues that the State can prioritize political advantages over compliance with the Voting Rights Act. SB 3EX effectively ensures that there will never be more than five members of Congress representing and serving the needs and interests of Black voters in Georgia, despite the dramatic increase in the Black population who vote cohesively for candidates that white voters do not support and the proven "social and historical conditions" that have

17

resulted in "inequality in the opportunities enjoyed by [B]lack and white voters." *Milligan*, 599 U.S. at 17 (quoting *Gingles*, 478 U.S. at 47). The Court must not allow such flagrant disrespect and disregard for Black Georgians who fought hard and won the right to equal opportunity for additional representation in the State.

## CONCLUSION

For the foregoing reasons, the district court's order approving SB 3EX should be reversed and this case should be remanded for further proceedings.

Dated: September 23, 2024        Respectfully submitted,

By *Abha Khanna*

| | |
|---|---|
| Joyce Gist Lewis | Abha Khanna |
| Georgia Bar No. 296261 | Makeba Rutahindurwa |
| Adam M. Sparks | ELIAS LAW GROUP LLP |
| Georgia Bar No. 341578 | 1700 Seventh Ave., |
| KREVOLIN & HORST, LLC | Suite 2100 |
| One Atlantic Center | Seattle, WA 98101 |
| 1201 W. Peachtree St. NW, | (206) 656-0177 |
| Suite 3250 | AKhanna@elias.law |
| Atlanta, GA 30309 | MRutahindurwa@elias.law |
| (404) 888-9700 | |
| JLewis@khlawfirm.com | |
| Sparks@khlawfirm.com | |

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(ii), as it contains 4,423 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as the brief has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: September 23, 2024              *Makeba Rutahindurwa*
                                        *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that, on September 23, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: September 23, 2024              *Makeba Rutahindurwa*
                                        *Counsel for Plaintiffs-Appellants*