No. 24-10231

---

In the United States Court of Appeals
for the Eleventh Circuit

---

COAKLEY PENDERGRASS, et al.,

*Plaintiffs-Appellants*,

v.

SECRETARY OF STATE OF GEORGIA,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:21-cv-05339—Steve C. Jones, Judge

---

**APPELLANTS' SUPPLEMENTAL APPENDIX**

**VOLUME I OF I**

---

Joyce Gist Lewis
Adam M. Sparks
**KREVOLIN & HORST, LLP**
One Atlantic Center
1201 W. Peachtree St. NW,
Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700

Abha Khanna
Makeba Rutahindurwa
**ELIAS LAW GROUP LLP**
1700 Seventh Ave,
Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177

*Counsel for Plaintiffs-Appellants*

# Index of Appendix

**Docket/Tab #**

**Volume I**

Defendants' Response in Opposition to
    Plaintiffs' Motion for Preliminary Injunction ...............................................40

Defendants' Brief in Support of Motion for Summary Judgment................... 175-1

Defendants' Proposed Findings of Fact and Conclusions of Law........................ 268

Certificate of Service

1

**40**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

COAKLEY PENDERGRASS, *et al.*,

     *Plaintiffs*,

v.

BRAD RAFFENSPERGER, *et al.*,

     *Defendants*.

CIVIL ACTION

FILE NO. 1:21-CV-05339-SCJ

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

The Georgia General Assembly spent from June 15, 2021 through November 22, 2021 creating a redistricting plan for Georgia's congressional districts. The first draft congressional plan was released on September 27, 2021 for public comment and the final congressional plan maintained many of the cores of districts from the draft plan. Candidates for congressional seats made decisions based on the adopted plan, including Congresswoman Lucy McBath announcing a run against Congresswoman Carolyn Bordeaux in new District 7.[1] After all that time and preparation, Plaintiffs now ask this Court to redraw eight of Georgia's 14 congressional districts—almost 60% of those districts—on an emergency basis with no opportunity for public input. Not only are Plaintiffs too late to request such extensive relief, they also are not entitled to any relief on the merits.

This Court should deny Plaintiffs' motion because voters are not well served by a "chaotic, last-minute reordering of . . . districts. It is best for candidates and voters to know significantly in advance of the petition period who may run where." *Favors v. Cuomo*, 881 F. Supp. 2d 356, 371 (E.D.N.Y.

---

[1]   Politico, *McBath, Bourdeaux set for Georgia showdown*, https://www.politico.com/news/2021/11/22/mcbath-bourdeaux-georgia-523189 (Nov. 22, 2021).

1

2012) (three-judge court) (citing *Diaz v. Silver*, 932 F. Supp. 462, 466-68 (E.D.N.Y. 1996) (three-judge court)).

But this Court should also deny the motion because (1) Plaintiffs have not shown they can prevail on the merits of the claim since they have not submitted evidence of the compactness of the relevant minority community, they only offer unconstitutional remedies, and significant reason for doubt exists about the legal effect of the polarized voting they identify; (2) Section 2 cases are not well-designed for preliminary injunctions given the fact-intensive nature of the claims, preventing a searching analysis of the totality of the circumstances, including proportionality; (3) significant questions exist about this Court's ability to act without a three-judge panel and when there is no private right of action in the statute; and (4) the remaining injunctive factors do not favor Plaintiffs at this late stage. This case can proceed on a non-emergency track to hear Plaintiffs' claims in time for the 2024 elections, but this Court should not disrupt the 2022 election process.

## FACTUAL BACKGROUND

### I.    The 2021 redistricting plans.

The Georgia General Assembly began the process of developing redistricting maps on June 15, 2021, holding a series of joint committee

meetings through the summer to take input from voters.[2] The committees released an educational video about the process during their first meeting.[3] They created an online portal for voters to offer comments and made all of those comments public.[4] They undertook a day of committee education from a variety of groups interested in the redistricting process.[5] They adopted committee guidelines to govern the creation of redistricting plans.[6] The Senate committee chair released a draft congressional plan for public comment in late September.[7]

After public comment, both House and Senate chairs released a congressional plan that was largely based on the September plan, with the map passing on the final day of the special session on November 22, 2021—

---

[2] Committee Meeting Archives, https://www.house.ga.gov/Committees/en-US/CommitteeArchives114.aspx

[3] Joint Redistricting Informational Video, https://www.youtube.com/watch?v=RXbgkTxXOkQ

[4] Joint Reapportionment Public Comments, https://www.legis.ga.gov/joint-office/reapportionment/public-comments

[5] August 30, 2021 Joint Meeting, https://www.youtube.com/watch?v=kUed1Ku6zBQ

[6] House Guidelines: https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/2021-2022-house-reapportionment-committee-guidelines.pdf?sfvrsn=f1b4cc44_2; Senate Guidelines: https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/2021-senate-redistricting-committee-guidelines.pdf?sfvrsn=a9bbb991_2

[7] *See* https://www.legis.ga.gov/joint-office/reapportionment, Proposed Plans, 2021 Draft plans (referencing Senate Committee Chair draft).

completing a 160-day long process to arrive at redistricting maps, even accounting for the delays in the Census data release due to COVID-19.[8] The adopted congressional map maintained the cores of the 2012 congressional districts that were precleared by the U.S. Department of Justice.[9] Dec. of John Morgan, attached as Ex. A ("Morgan Dec.") at ¶¶ 11-12. The new congressional plan includes five majority-non-white voting age population districts, which is 35% of the districts. Morgan Dec. at ¶ 9.

## II.   The 2022 election timeline.

Georgia statutes contain specific provisions related to the timeline for elections. A copy of the 2022 election calendar for the state as generated by the Secretary of State's office is attached as Ex. 1 to the Declaration of Michael Barnes, which is itself attached as Ex. B to this brief ("Barnes Dec.").

The 2022 election cycle effectively began on January 13, 2022, when candidates and their supporters could begin circulating nomination petitions. O.C.G.A. § 21-2-170(e). Only individuals who are "entitled to vote in the next election for the filling of the office sought by the candidate," O.C.G.A. § 21-2-

---

[8] Maps that were publicly released are included in the "Proposed Plans" tab on the Legislative and Congressional Reapportionment Office website, https://www.legis.ga.gov/joint-office/reapportionment

[9] Georgia Department of Law Press Release, https://law.georgia.gov/press-releases/2011-12-23/justice-approves-georgias-redistricting-plans (December 23, 2011).

170(c), may sign nomination petitions, so for district-based elections, final district maps are required.

On March 7, 2022, candidates begin qualifying for office and voters may begin applying for absentee ballots for the primary elections. O.C.G.A. §§ 21-2-153(c)(1)(A) (qualifying), 21-2-381(a)(1)(A) (absentee applications). Leading up to the March 7 start of qualifying, county registrars are updating street segments in the voter-registration database, which is known as eNet. Barnes Dec. at ¶ 6. This process requires registrars to update voter districts and to conduct error checks to be sure voters are allocated to the right districts. Barnes Dec. at ¶ 7.

Once registrars have completed updating voter districts, the Secretary's office can then begin the process of creating "ballot combinations." Barnes Dec. at ¶ 8. Within one county, there can be a number of different combinations of Congressional, state Senate, state House, and local election districts, with more than 2,000 such combinations using the existing district lines. Barnes Dec. at ¶ 9. Each of these combinations must be built into the election management database before qualifying so candidate names can be added and ballots can be generated. Barnes Dec. at ¶ 9. This election cycle is the first time the Secretary's office has built ballot combinations for elections in the

Dominion election management system following a statewide redistricting process where every combination must be updated. Barnes Dec. at ¶ 10.

Ballot combinations must be ready in time for candidate qualifying so that there is no delay in the creation of primary ballot proofs. Barnes Dec. at ¶¶ 11-12. When qualifying is completed on March 11, the Secretary's office adds each candidate name to the relevant contests in each district, so they appear on the correct ballot combinations. Barnes Dec. at ¶ 12. The Secretary's office then generates proofs of every ballot combination for each county and sends those proofs to county election officials for review and editing. Barnes Dec. at ¶ 13. County officials must complete their review and all edits must be made in time for absentee ballots to be printed and sent to voters by the UOCAVA deadline of April 5, 2022. Barnes Dec. at ¶14; O.C.G.A. § 21-2-384(a)(2).

In order to ensure that all of these deadlines are met, the Secretary's office has instructed county election officials to complete the reallocation process for voters no later than February 18, 2022. Barnes Dec. at ¶ 15, Ex. 2. County registrars generally need several weeks to complete the reallocation process for voters in their particular counties. Barnes Dec. at ¶ 16.

### III.   Plaintiffs' illustrative plan.

Plaintiffs' illustrative plan redraws eight of the 14 congressional districts with a singular goal in mind: "the creation of an additional majority-Black congressional district in the Atlanta metropolitan area." [Doc. 34-1, ¶¶ 8, 46] ("Cooper Report"). The illustrative plan accomplishes this goal by reducing the Black population in District 13 to barely over majority status (51.40% on any-part Black voting age population), *id*. at ¶ 51 and moving District 6 from its current district core to the western part of Atlanta while also making it barely over 50%, *id*.; *see also* Morgan Dec. at ¶¶ 9, 12.

The illustrative plan also increases the number of counties split by one. Morgan Dec. at ¶¶ 14-15. It maintains far fewer district cores from the existing 2012 congressional plan, including placing less than 5% of the prior District 6 into the new District 6. Morgan Dec. at ¶ 12. On a district-by-district basis, the districts in the illustrative congressional plan are less compact overall than the adopted plan. Morgan Dec. at ¶¶ 16-17. While the overall compactness scores for the plans are similar, looking at each district shows the reduced compactness for most of the districts in the remedial plan. Morgan Dec. at ¶ 17. The 2021 adopted congressional plan consistently scores as more compact. *Id*.

## ARGUMENT AND CITATION OF AUTHORITY

### I.   Applicable legal standards.

#### A.   Plaintiffs' burden to obtain a preliminary injunction.

Because preliminary injunctions are such extraordinary and drastic remedies, courts may not grant this type of relief "unless the movant clearly established the burden of persuasion as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F. 3d 1301, 1306 (11th Cir. 1998) (cleaned up). Plaintiffs must show that: (1) they have a substantial likelihood of success on the merits of their claims; (2) they will likely suffer irreparable harm in the absence of an injunction; (3) the balance of equities tips in Plaintiffs' favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

A preliminary injunction is never granted as a matter of right, even if a plaintiff can show a likelihood of success on the merits. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018). While it is already a form of extraordinary relief, that relief is even more drastic in the context of elections, because of the public interest in orderly elections and election integrity. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5, 127 S. Ct. 5 (2006).

Further, when "an impending election is imminent and a State's election machinery is already in progress," equitable considerations justify a court

denying an attempt to gain immediate relief. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *see also Repub. Nat'l Comm. v. Dem. Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). This is because parties must show they exercised reasonable diligence in filing their request for relief, especially in the context of elections. *Benisek*, 138 S. Ct. at 1944.

**B.     Standard for Section 2 redistricting cases.**

Section 2 of the Voting Rights Act prohibits jurisdictions from diluting the strength of minority voters through a "standard, practice, or procedure" "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Proof of illegal vote dilution is established through a "totality of the circumstances" analysis. 52 U.S.C. § 10301(b).

To prove a violation of Section 2 in a vote-dilution case, a plaintiff bears the burden of first proving each of the three *Gingles* preconditions: "(1) that the minority group is 'sufficiently large and geographically compact to constitute a majority in a single-member district'; (2) that the minority group is 'politically cohesive'; and (3) that sufficient racial bloc voting exists such that the white majority usually defeats the minority's preferred candidate." *Nipper v. Smith*, 39 F. 3d 1494, 1510 (11th Cir. 1994). After a plaintiff establishes the three preconditions, a court then reviews the so-called "Senate Factors" to

assess the totality of the circumstances. *Id.* at 1512; *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986); *Johnson v. De Grandy*, 512 U.S. 997, 1011, 114 S.Ct. 2647 (1994). Failure to establish one of the *Gingles* preconditions is fatal to a Section 2 claim because each of the three prongs must be met. *See Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F. 3d 1335, 1343 (11th Cir. 2000); *Burton v. City of Belle Glade*, 178 F. 3d 1175, 1199 (11th Cir. 1999); *Brooks v. Miller*, 158 F. 3d 1230, 1240 (11th Cir. 1998); *Negron v. City of Miami Beach, Fla.*, 113 F. 3d 1563, 1567 (11th Cir. 1997).

## II. Plaintiffs cannot succeed on the merits because their illustrative plan is not an appropriate remedy (*Gingles* prong 1).

### A. Plaintiffs have submitted no evidence on the compactness of the minority communities at issue.

Plaintiffs miss the point of what they have to show in order to prevail on the first prong of *Gingles*. *Gingles* requires a plaintiff to prove that the minority community is "sufficiently large and geographically compact to constitute a majority in a single district." 478 U.S. at 50-51. The various scores and calculations about Plaintiffs' illustrative plan do not provide any useful information to the Court. Plaintiffs must do more than just draw a district—they must demonstrate connections between the disparate geographic communities they unite that go beyond race. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433, 126 S. Ct. 2594, 2618 (2006) (*LULAC*);

*Bush v. Vera*, 517 U.S. 952, 997, 116 S. Ct. 1941 (1996). By relying solely on compactness scores of the *districts*, they miss the requirement of compactness of the underlying *community*.

Compactness of minority communities does not eliminate the need to consider the geographic boundaries in which those minority communities are situated. The Section 2 analysis of compactness is not centered on "the relative smoothness [and contours] of the district lines," but rather the compactness of the minority population itself. *LULAC*, 548 U.S. at 432-433. The inquiry, therefore, is whether "*the minority group* is geographically compact." *Id*. at 433 (quoting *Shaw v. Hunt*, 517 U.S. 899, 916 (1996) ("*Shaw II*")) (emphasis added). The lack of evidence on this point dooms Plaintiffs' claim to emergency relief.

**B.    The illustrative plan is not an appropriate remedy.**

But even if Plaintiffs had shown some evidence of compactness of the minority community, their claims still fail to pass the first prong of *Gingles*. The Eleventh Circuit prohibits the separation of the first prong of liability under *Gingles* and the potential remedy. *Nipper*, 39 F. 3d at 1530-31; *see also Burton*, 178 F. 3d at 1199 ("We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy."); *accord Wright v. Sumter Cty. Bd. of Elections & Registration*, 979 F. 3d 1282, 1302 (11th Cir. 2020). Whatever plan is used to demonstrate the

violation of the first prong of *Gingles* must also be a remedy that can be imposed by the Court. *Nipper*, 39 F. 3d at 1530-31. In short, if a plaintiff cannot show that the plan used to demonstrate the first prong can also be a proper remedy, then the plaintiff has not passed the first precondition of *Gingles*. *Wright*, 979 F. 3d at 1302.

Plaintiffs cannot succeed because their illustrative plan is not a proper remedy. First, the plan cannot be ordered as a remedy by the Court because it does not defer to the legislature's policy choices for the majority of districts in Georgia. Morgan Dec. ¶¶ 11-13. This is not a situation where Plaintiffs identified a specific problem and fixed that district in a larger statewide plan—instead, they propose redrawing almost 60% of the congressional districts in the state, making major changes to districts from Rabun Gap in the north Georgia mountains and all the way to Columbus. Cooper Report, Figure 8.

"The Court has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539, 98 S. Ct. 2493, 2497 (1978). Redrawing more than half of the districts in the state is not appropriate deference to the legislature's policy decisions in districts that are not challenged by Plaintiffs and thus the illustrative plan cannot be ordered as

a remedy. *Id*. Without a proper remedy, Plaintiffs cannot succeed on the first prong of *Gingles*.

But that is not the only problem with Plaintiffs' proposed remedy. The second problem is that the boundaries of the districts on the illustrative plan are "unexplainable other than on the basis of race," which is unconstitutional. *Miller v. Johnson*, 515 U.S. 900, 910, 115 S. Ct. 2475, 2485 (1995). In creating Plaintiffs' illustrative plan, their expert had a singular goal: "the creation of an additional majority-Black congressional district in the Atlanta metropolitan area." Cooper Report, ¶ 8. But "[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Bush v. Vera*, 517 U.S. 952, 979 (1996). Plaintiffs' expert discusses the status of traditional principles after he drew his map, but never identifies a single one of those factors that he used in the drawing process besides race—not even "traditional districting principles such as maintaining communities of interest and traditional boundaries." *LULAC*, 548 U.S. at 433 (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)). *See* Cooper Report at ¶¶ 42-46. The Voting Rights Act does not ask merely whether more majority-Black districts can be drawn—it asks whether *reasonably compact* majority-Black districts can be drawn if all other factors are also met. *Shaw II*, 517 U.S. at 913.

It remains a significant issue of fact whether the illustrative plan's connecting voters in Acworth and Fayetteville is reasonably compact or whether they were only put together because they share a similar skin color or were being used to achieve a racial outcome. Cooper Report, Figure 8. This is especially true when Plaintiffs barely achieved their apparent racial goal because District 6 is only slightly majority—only 50.69% non-Hispanic Black citizen voting age population. Cooper Report at ¶ 51, Figure 9.

Thus, the illustrative plan is not an appropriate remedy and Plaintiffs have not shown they are likely to succeed on the first prong of *Gingles*. *Burton*, 178 F. 3d at 1199. This alone is fatal to their preliminary-injunction motion.

## III. Plaintiffs are not likely to succeed on the merits because of the nature of significant questions about the cause of polarized voting (*Gingles* prongs 2 and 3).

Plaintiffs offer the declaration of Dr. Maxwell Palmer in their effort to demonstrate voting is racially polarized in Georgia. But while Dr. Palmer studiously avoids the mention of political parties, a review of his report shows that partisanship explains the polarization better than race. The support of Black voters for candidates in every race he analyzes are virtually identical. [Doc. 34-2] ("Palmer Report"), pp. 14-19, Tables 1-6. That holds true for every general election Republican versus Democratic matchup Dr. Palmer analyzed, regardless of the race of the candidate. *Id.*

In order to succeed, Section 2 plaintiffs do not just have to show that voting is racially polarized—they have to prove that electoral losses are the result of racial bias and not partisan voting patterns. *Solomon v. Liberty County*, 221 F. 3d 1218, 1225 (11th Cir. 2000) (en banc); *League of United Latin Am. Citizens v. Clements*, 999 F. 2d 831, 854 (5th Cir. 1993) (en banc) ("failures of a minority group to elect representatives of its choice that are attributable to 'partisan politics' provide no grounds for relief").

This matters because "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates." *Solomon*, 221 F. 3d at 1225. This explains why Section 2 claims present an "often-unstated danger": "Unless courts 'exercise extraordinary caution' in distinguishing race-based redistricting from politics-based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena." *Cooper v. Harris*, 137 S. Ct. 1455, 1490 (2017) (Alito, J., concurring in part) (quoting *Miller*, 515 U.S. 916) (cleaned up).

Several judges on the Eleventh Circuit believed that, where partisanship causes the defeat of minority-preferred candidates, it is reversible error to find a Section 2 violation. *Nipper*, 39 F. 3d at 1525. This interpretation of Section 2 was based on the purpose and legislative history of the VRA itself:

> [S]ection 2 . . . prohibits voting practices that deny minority voters equal access to the political process *on account of race*. Indeed, "[w]ithout an inquiry into the circumstances underlying unfavorable election returns, courts lack the tools to discern results that are in any sense 'discriminatory,' and any distinction between deprivation and mere losses at the polls becomes untenable."

> \*       \*       \*

> Unless the tendency among minorities and white voters to support different candidates, and the accompanying losses by minority groups at the polls, are somehow tied to race, voting rights plaintiffs simply cannot make out a case of vote dilution.

*Id.* at 1523-24 (citations omitted) (emphasis in original). The requirement of this type of proof is also why the Court should allow time to fully investigate whether racial bias exists or whether the polarization Dr. Palmer found is better explained by partisan behaviors.[10] Whether the Court considers partisanship as part of the *Gingles* prongs 2 and 3 analysis or under the totality of the circumstances, it should not grant emergency relief to Plaintiffs because of the questions of fact that remain—Plaintiffs have not "clearly established" their likelihood of success.[11] *McDonald's Corp.*, 147 F. 3d at 1306.

---

[10] Given the short timeline for a response, Defendants reserve the right to present additional evidence on this point at a hearing on Plaintiffs' motion.

[11] Indeed, if Section 2 of the Voting Rights Act requires partisan districting schemes that benefit only Democratic candidates, its constitutionality would be suspect. *See City of Boerne v. Flores*, 521 U.S. 507, 530, 117 S. Ct. 2157, 2169 (1997).

**IV.   Plaintiffs are not likely to succeed on the totality-of-the-circumstances analysis on an emergency basis.**

Plaintiffs are also not likely to succeed on the totality-of-the-circumstances analysis. This Court's duty when considering the "Senate factors" is to determine whether "the totality of the circumstances results in an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choosing as compared to other members of the electorate." *Ga. State Conference of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F. 3d 1336, 1342 (11th Cir. 2015) ("*Fayette*").

This type of analysis is particularly ill-suited to emergency relief because the totality is generally weighed after significant discovery and a bench trial. Even grants of summary judgment to plaintiffs in Section 2 cases after discovery are "unusual." *Fayette*, 775 F. 3d at 1345. This is because "[n]ormally," Section 2 claims "are resolved pursuant to a bench trial." *Id*. at 1343. Ordering relief earlier in the case is problematic "due to the fact-driven nature of the legal tests required by the Supreme Court and [Eleventh Circuit] precedent." *Id*. at 1348. This remains true even when the parties agree on many basic facts at stages before a bench trial. *See Burton*, 178 F. 3d at 1187 (quoting *Clemons v. Dougherty Cty., Ga.*, 684 F. 2d 1365, 1369 (11th Cir. 1982)).

17

Courts considering Section 2 claims must conduct an "intensely local appraisal" of the facts in the local jurisdiction, which is not generally amenable to resolution as a matter of law or on an emergency basis. *De Grandy*, 512 U.S. at 1020-21 (no statistical shortcuts to determining vote dilution); *Gingles*, 478 U.S. at 45, 78 (stating that courts must conduct a "searching practical evaluation of the 'past and present reality'" of the challenged electoral system and whether vote dilution is present is "a question of fact"); *White v. Regester*, 412 U.S. 755, 769-70 (1983) (assessing the impact "in light of past and present reality, political and otherwise").

This is especially true when the Court faces difficulty weighing out the totality of the circumstances as applied to Georgia in 2022. For example, the Senate factors include "majority vote requirements" as a discriminatory election practice. *Solomon*, 221 F. 3d at 1225-1226 (factor three); *see also* [Doc. 32-1, p. 19]. But a majority-vote requirement is the only way that Sen. Warnock and Sen. Ossoff—candidates Plaintiffs agree were preferred by Black voters in Georgia—succeeded in their recent elections.

Plaintiffs also offer scant evidence for many of the factors, especially considering the amount of relief they are seeking. While Plaintiffs cite past objections to redistricting plans drawn by the Democratic Party through the early 2000s, [Doc. 32-1, pp. 16-17], they ignore the DOJ approval of the 2011

Republican-drawn plans on which the 2021 congressional plan was based.[12] Morgan Dec. at ¶ 12. Plaintiffs also cite practices over which Defendants have no control or that have been found constitutional, including polling place closures and voter-list maintenance. [Doc. 32-1, p. 18]. For racial appeals, Plaintiffs cite primarily local officials and family members of candidates, which hardly indicates racism permeates Georgia political campaigns. [Docs. 34-20 through 34-31]. Indeed, Herschel Walker's widely reported frontrunner status[13] as the Republican nominee for U.S. Senate would tend to indicate a lack of racism in Georgia politics. Other Senate factors make little sense in context—for example, Plaintiffs claim that Black candidates "rarely succeed outside of majority-minority districts" while acknowledging the election of Sen. Warnock statewide. [Doc. 32-1, p. 25].  Strangely, Plaintiffs claim that Georgia is not responsive to the needs of Black residents while attaching a report from the Republican legislature studying the very issue about which Plaintiffs raise concerns. [Doc. 32-1, p. 26]; [Doc. 34-39].

Plaintiffs also ignore a key factor in the totality of the circumstances—

---

[12] Georgia Department of Law Press Release, https://law.georgia.gov/press-releases/2011-12-23/justice-approves-georgias-redistricting-plans (December 23, 2011).

[13] *See, e.g.*, https://www.politico.com/news/2021/11/01/herschel-walker-georgia-senate-republican-primary-poll-518140

whether Black voters have already achieved proportionality on the 2021 congressional plan. In *De Grandy*, the Supreme Court concluded that "proportionality . . . is obviously an indication that minority voters have an equal opportunity . . . to participate in the political process and to elect representatives of their choice." 512 U.S. at 1020 (cleaned up). Because Section 2 does not require a State to maximize the number of "safe" minority districts in an area, *id.* at 1016-1017, the Supreme Court found that, when the minority group in question enjoyed "rough proportionality," there was no Section 2 violation. 512 U.S. at 1023.

The Supreme Court gave further direction in *LULAC*, finding that the relevant geographic area for a proportionality analysis is the entire state. 548 U.S. at 437. In *LULAC*, the Supreme Court explained that the proportionality inquiry entails "comparing the percentage of total districts that are [African-American] opportunity districts with the [African-American] share of the citizen voting-age population." 548 U.S. at 436.

While proportionality is not a safe harbor for a jurisdiction, *LULAC*, 548 U.S. at 436, it is an extremely relevant factor to consider whether an equal opportunity to participate in the political process exists. *See*, *e.g.*, *African Am. Voting Rights Legal Def. Fund v. Villa*, 54 F. 3d 1345, 1355 (8th Cir. 1995) (evidence of "persistent proportional representation" sufficient to support

grant of summary judgment to jurisdiction); *Fairley v. Hattiesburg Miss.*, 662 F. App'x 291, 301 (5th Cir. 2016) (same).

Plaintiffs agree that Black voters represent 34.86% of the voting-age population in Georgia. Cooper Report, ¶ 30, Figure 6. With five districts that are majority non-white on the adopted 2021 congressional plan, Morgan Dec. at ¶ 9, if Black voters are able to elect their candidates of choice in all five districts, their candidates of choice will hold 35.7% of the districts in the state (5 districts divided by 14 total districts). That provides at least a significant basis "rough proportionality" that would indicate no violation of Section 2. *De Grandy*, 512 U.S. at 1023.

All these factors demonstrate how difficult it is for the Court to assess the totality of the circumstances on an emergency basis and provide a separate basis for denying Plaintiffs' motion.[14]

---

[14] Defendants were only able to identify a handful of cases where courts granted injunctions in Section 2 cases involving redistricting and those did not involve statewide redistricting plans. *See, e.g., Citizens for Good Gov't v. City of Quitman*, 148 F. 3d 472, 474 (5th Cir. 1998) (noting injunction issued to stop use of at-large method of election for county); *Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F. 3d 271, 273 (2d Cir. 1994) (appeal of injunction for city council elections); *Johnson v. Halifax Cty.*, 594 F. Supp. 161, 163 (E.D.N.C. 1984) (injunction granted to enjoin at-large method of electing county commissioners); *see also* Christopher Elmendorf and Douglas Spencer, *Administering Section 2 of the Voting Rights Act after Shelby County*, 115 Colum. L. Rev. 2143, 2158 (2015) ("Together, the fact-intensive nature of section 2 claims and the uncertain standard for liability make preliminary

**V.      Plaintiffs will not suffer any irreparable harm.**

Because Plaintiffs are not likely to succeed on the merits, they are also not likely to suffer any irreparable harm. The lack of any certainty of vote dilution means that Plaintiffs will not certainly be harmed. The individual voter plaintiffs further will be entitled to vote in the upcoming elections, even if the candidates they support are not as favored in the current district configurations.

**VI.     The equities and the public interest counsel heavily against any injunctive relief.**

Plaintiffs' proposed injunction is not in the public interest because the granting of an injunction and the confusion that will follow would likely harm candidates who have announced for office, the voting rights of the public, result in voter frustration, and even disenfranchisement.

Litigation involving elections is unique because of the interest in the orderly administration and integrity of the election process. *Purcell*, 549 U.S. at 4. The risks of voter confusion and conflicting orders counsel against changing election rules, especially when there is little time to resolve factual disputes. *Id.* at 5-6. That is even more true when facing a "chaotic, last-minute

---

relief hard to obtain. Veteran litigators estimate that plaintiffs have secured preliminary injunctions in only about 5% of section 2 cases.").

reordering of . . . districts. It is best for candidates and voters to know significantly in advance of the petition period who may run where." *Favors*, 881 F. Supp. 2d at 371.

Since the completion of the map-drawing process on November 22, 2021, the Secretary's office has been advising local election officials to prepare to update the voter-registration database with new district information for each voter. Barnes Dec. at ¶ 5, Ex. 2. The time-consuming process of updating the voter-registration database must be completed by February 18, giving registrars only a few weeks from now to complete the entirety of the process so that ballot combinations can be built. Barnes Dec. at ¶¶ 7-17. Absentee ballots must be created, proofed, and printed prior to April 5, 2022 so they can be sent to overseas and military voters by the deadline set by federal law. Barnes Dec. at ¶ 14. Any delay past February 18, 2022 in having final district information included for each voter places a substantial likelihood that the Secretary's office will not be able to complete the relevant tasks in time to hold the 2022 primary elections as scheduled. Barnes Dec. at ¶¶ 15-17. Further, candidate qualifying begins on March 7, 2022, O.C.G.A. § 21-2-153(c)(1)(A), and candidates must have final districts in which to qualify for the 2022 elections.

Nominating petitions became available for distribution to voters on January 13, 2022 for candidates who wish to obtain ballot access through the

signature process. O.C.G.A. § 21-2-170(e). Changing district boundaries after that date could mean that individuals who signed a nominating petition may have been "entitled to vote in the next election for the filling of the office sought by the candidate," O.C.G.A. § 21-2-170(c), when they signed, but may no longer be eligible if district boundaries are later changed.

Finally, if this Court were to enjoin the use of any or all of the challenged redistricting plans, new districts should have been in place by January 13. And, because of the primacy of legislatures in creating districting plans, the Supreme Court requires that, where practicable, federal courts should give a "reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise*, 437 U.S. at 540. Even using an extremely accelerated timeline, it is impossible to finish briefing a complex case, hold a hearing, rule, allow the legislature to create a remedial plan, and either consider the legislature's remedial plan or create a court-drawn plan in time for the applicable deadlines in 2022.

Moreover, in this instance, it is not just candidates who may now be confused because of Plaintiffs' sought injunction, but also poll workers, election officials, and supervisors who have been preparing to carry out their duties with the assumption that redistricting maps adopted by the General Assembly

would be in effect. If this Court in the eleventh hour enjoins the congressional redistricting plan, it will likely hamper the smooth administration of the upcoming election and potentially result in voter confusion or outright disenfranchisement. The public interest and the equities clearly favor denying the motion for preliminary injunction and instead allowing Plaintiffs to litigate this case on a non-emergency basis and seek relief for the 2024 elections.

## VII.  This Court lacks jurisdiction to grant any relief.

This Court also lacks jurisdiction for all of the reasons outlined in Defendants' motion to dismiss based on the lack of jurisdiction for a single-judge court to consider this case and on the lack of a private right of action under Section 2. [Doc. 38]. Defendants incorporate those arguments by reference as a separate basis to deny Plaintiffs' motion

## CONCLUSION

The General Assembly spent almost six months creating the congressional district plan that Plaintiffs challenge here. Given the lack of evidence of success on the merits, the significant jurisdictional questions, and the timeline for elections, this Court should deny Plaintiffs' motion.

This 18th day of January, 2022.

Respectfully submitted,

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 678600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339

26

(678) 336-7249

*Counsel for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned certifies that the foregoing Response Brief has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson

# 175-1

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| COAKLEY PENDERGRASS, *et al.*, | |
| *Plaintiffs*, | |
| v. | CIVIL ACTION |
| BRAD RAFFENSPERGER, *et al.*, | FILE NO. 1:21-CV-05339-SCJ |
| *Defendants*. | |

### DEFENDANTS' BRIEF IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

After engaging in a months-long process in 2021 that sought broad input and despite COVID-related Census delays, Georgia implemented a redistricting map for Congress that split fewer counties than prior plans and that elected five Black members of Congress. Plaintiffs claim this map results in "a denial or abridgement of the right . . . to vote on account of race or color," 52 U.S.C. § 10301(a), because they say the General Assembly had an obligation to draw one additional majority-Black congressional district, so the adopted map constitutes illegal vote dilution.

But Section 2 of the Voting Rights Act does not allow this Court to infer vote dilution "from mere failure to guarantee a political feast," *Johnson v. De*

*Grandy*, 512 U.S. 997, 1017 (1994) (majority op.), because the "[f]ailure to maximize cannot be the measure of § 2." *Id.*

This means that Section 2 is not simply a checklist—"do we have a map with more districts, polarized voting, and a history of discrimination? End of analysis!"—instead, this Court is required to "conduct an intensely local appraisal of the design and impact of a voting system." *Johnson v. Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002) (quoting *Negron v. City of Miami Beach*, 113 F.3d 1563, 1566 (11th Cir. 1997)). And the alleged deprivation "must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc) (quoting *Nipper v. Smith*, 39 F.3d 1494, 1515 (11th Cir. 1994) (en banc)); *accord Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2359 (2021) (Section 2 asks whether an election law interacts with conditions "to ***cause*** race-based inequality in voting opportunity") (Kagan, J, dissenting) (emphasis added). This local appraisal also does not mean the adopted plan has to beat Plaintiffs' maps in a "beauty contest." *Bush v. Vera*, 517 U.S. 952, 977 (1996) (O'Connor, J.). This is at least in part because "the Constitution charges States, not federal courts, with designing election rules." *Curling v. Raffensperger*, 50 F.4th 1114, 1122 (11th Cir. 2022).

Instead of engaging in a wholesale review of the legislature's choices in this case, this Court must answer one fundamental question, in an area of law that is "notoriously unclear and confusing," *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring):

- Did the Georgia General Assembly adopt a map that dilutes the right to vote of Black voters in Georgia on account of race or color when it drew districts without a single additional majority-Black congressional districts in metro Atlanta? If so, why?

As discussed below, Plaintiffs cannot prevail on their claims after discovery. This Court should determine that Plaintiffs have failed to present evidence that Georgia's congressional map dilutes the right to vote on account of race or color and dismiss this case.

First, this Court must dismiss the members of the State Election Board (SEB) as Defendants, because no evidence demonstrates they played any role in the redistricting process, and they cannot provide Plaintiffs with any relief.

Second, the map proposed by Plaintiffs does not meet prong one of *Thornburg v. Gingles*, 478 U.S. 30 (1986), because it is improperly focused on race and thus cannot be implemented as a remedy and because it does not demonstrate the State should have drawn an additional majority-Black district. Plaintiffs' experts utilized racial shading, racial splits, and other tools

3

while drawing and could not identify communities beyond race when preparing the maps that united disparate communities of Black voters. Indeed, if Georgia had used the same processes Plaintiffs' expert used, it would be accused of racial gerrymandering.[1]

Third, the second and third prongs of *Gingles* are not met because Plaintiffs' experts studiously avoided any analysis of the cause of the polarization they found, opting instead to refer to any voting pattern where the majority votes to defeat the minority as "racially polarized." But the requirement of Section 2's text that any vote dilution be "on account of race or color" requires that it not be "on account of politics." Plaintiffs' failure to address this issue in discovery is fatal to their claims.

Fourth, Georgia already elects more Black and Black-preferred members of Congress than the proportion of Black individuals in the population. This bars any claim that the General Assembly failed to draw additional majority-Black congressional districts.

---

[1] In fact, while Georgia is accused of not considering race enough in this case by failing to draw a sufficient number of majority-Black districts, it is accused of considering race too much by plaintiffs who say the congressional plans are racial gerrymanders in the *Ga. NAACP* and *Common Cause* three-judge panel cases.

As discussed below, after discovery, there is no material fact in dispute that could cause this case to continue. This Court should grant judgment as a matter of law to Defendants.

## FACTUAL BACKGROUND[2]

### I.    Georgia's redistricting plans.

Following the delayed release of Census data in 2021,[3] the Georgia General Assembly began working on redistricting maps ahead of its November 2021 special session. Both chairs of the House and Senate committees with jurisdiction over redistricting sought to meet with all of their colleagues, both Republican and Democratic, to gain input on their areas of the state. SMF ¶ 3; Wright Dep. 68:17-69:7. Consistent with past redistricting cycles, the joint House and Senate committees also held a series of "listening sessions" across the state to hear from citizens about maps, including several Zoom meetings. SMF ¶ 4; Kennedy Dep. 171:13-20, 194:1-195:10. And for the first time in 2021,

---

[2] As required by this Court's instructions, III. I., all citations to the record are included in the brief and in the accompanying Statement of Material Facts (SMF) that is filed contemporaneously with this brief. The SMF includes the full citations to the shortened deposition citations in the brief, along with the exhibits and deposition excerpts required by the Local Rules.

[3] That Census data showed that the increase in the percentage of Black voters in Georgia from 2010 to 2020 was slightly more than two percentage points statewide. SMF ¶ 1; Cooper Report, ¶ 14, Figure 1. But further Census data has shown decreases in the Black Citizen Voting Age Population between 2019 and 2021. SMF ¶ 2; Cooper Dep. 38:24-39:10.

the General Assembly provided a public comment portal online, seeking comments from the public. SMF ¶ 5; Wright Dep. 252:20-253:4. After holding a committee education day where a variety of stakeholder groups presented about map-drawing, the committees adopted guidelines to govern the map-drawing process. SMF ¶ 6; Kennedy Dep. 161:1-4; Rich Dep. 214:19-215:7.

To prepare maps, Gina Wright, the director of the Joint Reapportionment Office, worked with a leadership group to work on the congressional map from an earlier draft from Sen. Kennedy. SMF ¶ 7; Wright Dep. 28:19-30:23. Political considerations were important, including placing portions of Cobb County into District 14 to increase political performance in other parts of the state. SMF ¶ 8; Wright Dep. 111:16-112:10; 158:4-21.

The resulting Congressional map reduced the number of split counties from the prior plan. SMF ¶ 9; Cooper Report, ¶ 81, Figure 14. The Governor signed the plan on December 30, 2021, and it was used in the 2022 elections. SMF ¶ 10; [Doc. 120], ¶ 33.

## II.   Role of SEB.

Discovery in this case demonstrates that the members of the SEB have nothing to do with the redistricting process. Despite the opportunity for extensive discovery, the only material fact related to the SEB's role in Plaintiffs' claims is what the SEB said in its responses to interrogatories, that

they "were not involved in the map-drawing process." SMF ¶ 11; Responses to Interrogatories, Response No. 2. Discovery has revealed no basis to conclude that the SEB plays any role in the implementation of any district map. As a result, there is no dispute of any material fact regarding their involvement.

### III.   The individual Plaintiffs.

All of the individual Plaintiffs in this case consider themselves to be members of the Democratic Party, have held positions in the Democratic Party, and most of them have never voted for a Republican candidate. SMF ¶¶ 12-35; James Dep. 38:20-22, 40:20-41:8, 41:9-18; Pendergrass Dep. 25:17-19, 26:4-5, 9-15, 26:5-6, 26:21-27:8, 26:6-8, 27:20-25; Hennington Dep. 36:23-37:9, 37:20-38:7; Richards Dep. 44:21-23; Rueckert Dep. 29:7-13, 30:20-23; Glaze Dep. 33:9-11. Given the political nature of the polarization discussed below and the impact of partisanship in this case, the political goals of Plaintiffs are relevant for this Court's consideration.

### IV.   Plaintiffs' proposed maps.

Plaintiffs began planning for this litigation before the Georgia maps were even complete—retaining experts to work on alternative maps around the same time as the special session convened. SMF ¶ 36; Cooper Dep. 8:14-8:23. After the Governor signed the maps, Plaintiffs immediately sued.

**A. Overall *Pendergrass* maps.**

Plaintiffs' goal in offering their illustrative plan was to determine whether they could draw one additional majority-Black[4] district beyond those drawn by the state plan. SMF ¶ 37;  Cooper Dep. 14:15-15:2. This is despite the fact that five of Georgia's fourteen members of Congress are Black individuals. SMF ¶ 39; Cooper Dep. 19:19-21.

When Mr. Cooper was creating his illustrative maps, he turned on features in the software to indicate where Black individuals were located. SMF ¶ 40; Cooper 24:12-25:6. Unlike the legislature, Mr. Cooper did not have any political data available to him. SMF ¶ 41; Wright Dep. 55:25-56:7; 140:3-11; 140:17-19; 257:21-258:1; 258:2-14; Cooper Dep. 56:8-11. Mr. Cooper's preliminary injunction plans contained the maximum number of Black districts he drew for any congressional plan in Georgia. SMF ¶ 42; Cooper Dep. 14:15-15:2.

---

[4] Map-drawers distinguish "majority-minority" from "majority-Black." Majority-minority districts have a majority of non-white and Latino voters, while majority-Black districts are districts where Black voters as a single racial category constitute a majority of a district. SMF ¶ 38; Cooper Dep. 16:14-20.

**B. Illustrative congressional plan.**

Mr. Cooper created one additional majority-Black congressional district on his illustrative plan, which is titled District 6.[5] SMF ¶ 43; Cooper Report, ¶ 53. Despite relying on the existence of four state Senate districts in the same area, Cooper Report, ¶ 45, large geographic areas of Senate Districts 39 and 38 in Fulton County were not included in illustrative District 6. SMF ¶ 45; Cooper Dep. 49:5-49:15. Unlike Mr. Cooper's preliminary injunction plan, Cobb County is split three ways in the plan he submitted with his expert report. SMF ¶ 46; Cooper Dep. 51:3-6. To create the one additional majority-Black district, Mr. Cooper had to alter eight of the existing 14 congressional districts, but was careful to avoid altering Districts 2, 5, and 7, all of which currently elect Black Democratic members of Congress. SMF ¶ 47; Cooper Report, ¶ 51; Cooper Dep. 36:5-36:14.

In illustrative District 6, the only portion of a county in the district that is majority-Black in voting age population is Fulton County. SMF ¶ 48; Cooper Dep. 77:12-17. Without the portion of Fulton County that Mr. Cooper moved out of District 13 into illustrative District 6, the remaining components of the

---

[5] This is a change from the plan he submitted five years ago in a different Section 2 case challenging Georgia's prior congressional districts, which analyzed a South Georgia area to create a new majority-Black district in rural Georgia. SMF ¶ 44; Cooper Dep. 42:10-42:18, 43:4-13.

district would not allow it to be majority-Black. SMF ¶ 49; Cooper Dep. 78:6-11.

In order to create District 6 as a majority-Black district, Mr. Cooper adjusted other districts in ways that he could not explain. He connected urban areas in North Fulton with rural areas in Bartow County. SMF ¶ 50; Cooper Dep. 59:6-60:1. He connected Cobb County with rural parts of Georgia going all the way down to Columbus, Georgia in District 3. SMF ¶ 51; Cooper Dep. 63:15-24, 64:17-65:4. The only connection he could identify to this similar configuration of enacted District 14 was that Heard and Troup counties were closer to Atlanta. SMF ¶ 52; Cooper Dep. 65:20-66:2. He also agreed that his illustrative 13 connected urban (and heavily Black) parts of Clayton County with rural areas out to Jasper County. SMF ¶ 53; Cooper Dep. 73:13-17.

And when asked why he connected majority-Black Hancock County (from the Black Belt, according to his testimony in other cases) to the North Carolina border, he could only point to population equality.[6] SMF ¶ 54; Cooper Dep. 68:6-69:2, 70:16-22; 86:5-8.

---

[6] He also could not explain why he included Athens/Clarke County in the same district as Hancock County and Rabun County. SMF ¶ 55; Cooper Dep. 71:21-72:11.

10

## ARGUMENT AND CITATION OF AUTHORITIES

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden but is not required to negate the opposing party's claims. Instead, the moving party may point out the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Marion v. DeKalb County, Ga.* 821 F. Supp. 685, 687 (N.D. Ga. 1993).

Section 2 of the Voting Rights Act prohibits jurisdictions from diluting the strength of minority voters through a "standard, practice, or procedure" "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Proof of illegal vote dilution is established through a "totality of the circumstances" analysis. 52 U.S.C. § 10301(b).

In order to show a Section 2 violation, a plaintiff bears the burden of first proving *each* of the three *Thornburg v. Gingles*, 478 U.S. 30 (1986), preconditions[7]:

---

[7] These preconditions are also frequently referred to in cases as the *Gingles* "prongs." *See, e.g., Bartlett v. Strickland*, 556 U.S. 1, 17 (2009); *Johnson*, 296 F.3d at 1073.

> Specifically, plaintiffs in vote dilution cases must establish as a threshold matter: (1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) that the minority group is "politically cohesive"; and (3) that sufficient racial bloc voting exists such that the white majority usually defeats the minority's preferred candidate.

*Nipper v. Smith*, 39 F.3d 1494, 1510 (11th Cir. 1994) (quoting *Gingles*, 478 U.S. at 50-51). Only after establishing the three preconditions does a court begin a review of the so-called "Senate Factors" to assess the totality of the circumstances. *Id.* at 1512; *Gingles*, 478 U.S. at 79; *De Grandy*, 512 U.S. at 1011. Failure to establish one of the *Gingles* prongs is fatal to a Section 2 claim because each of the three prongs must be met. *See Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1343 (11th Cir. 2000); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999); *Brooks v. Miller*, 158 F.3d 1230, 1240 (11th Cir. 1998); *Negron v. City of Miami Beach*, 113 F.3d 1563, 1567 (11th Cir. 1997). And of course, while these preconditions are *necessary* to proving a Section 2 claim, they are not *sufficient*. *De Grandy,* 512 U.S. at 1011 (*Gingles* preconditions are not "sufficient" to "prove a § 2 claim.").

## I.   Members of the SEB must be dismissed because any injuries are not traceable to nor redressable by the SEB.

As the Eleventh Circuit recently explained, "[t]o satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action

of some third party not before the court.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The problem for Plaintiffs is that the Georgia legislature, not the SEB, designs the legislative districts at issue. Indeed, the SEB has no say in the matter one way or another, and Plaintiffs have not located any evidence that the named members of the SEB had any say in the design of the maps or in their implementation. The SEB is not implicated in this action, and its members in their official capacity should be dismissed as parties to it. "Because the [SEB] didn't do (or fail to do) anything that contributed to [Plaintiffs' alleged] harm, the voters… cannot meet Article III's traceability requirement." *Jacobson,* 974 F.3d at 1253 (quoting *Lewis v. Governor of Ala.,* 944 F.3d 1287, 1301 (11th Cir. 2019) (internal quotations omitted)).

The only basis Plaintiffs even identify to assert claims against the SEB members is based on their general statutory duty to "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." [Doc. 120, ¶¶ 18-22], citing O.C.G.A § 21-2-31(2). But this is only a generalized duty that was insufficient in *Jacobson* when the plaintiffs could not show the Secretary of State of Florida had any role in the design of the ballots they claimed injured them. "In the absence of any evidence that the Secretary

13

controls ballot order, the voters and organizations… cannot rely on the Secretary's general election authority to establish traceability." 974 F.3d at 1254. In *Lewis,* the Eleventh Circuit came to a similar conclusion. There, plaintiffs challenged a minimum-wage law promulgated by the State and sued the Alabama Attorney General because of "a host of provisions of the Alabama Code that generally describe the Attorney General's [enforcement] authority." *Lewis,* 944 F.3d at 1300. But these generalized duties did not establish traceability to the plaintiffs' injuries, in part because the statute at issue in the plaintiffs' complaint "envisions no role for the Attorney General." *Id.* at 1299.

The same is true here. Because Plaintiffs have produced no evidence in discovery that any of the individually named SEB members designed or implement the maps in any substantive way, they should be dismissed from this case.

## II.    Plaintiffs cannot establish the first *Gingles* precondition.

As this Court already found, illustrative plans cannot "subordinate traditional redistricting principles to racial considerations substantially more than is reasonably necessary to avoid liability under Section 2." [Doc. 97, p. 87] (citing *Davis*, 139 F.3d at 1424). The evidence demonstrates that Plaintiffs have gone beyond that limitation here.

As Mr. Cooper testified, he used racial shading and other techniques in his efforts to create the new majority-Black district. *See Miller v. Johnson*, 515 U.S. 900, 925 (1995) (use of racial shading in district maps). He was unable to identify factors that connected areas of his new majority-Black district beyond the common community of interest shared by all Black individuals. And when he split counties, he did so in ways that ensured higher concentrations of Black voters were included in the portions of counties in the new majority-Black district, while also being unable to explain other configurations of districts that ran from the heavily Black areas north to the mountains. This cannot meet prong one.

The Eleventh Circuit prohibits the separation of the first prong of liability under *Gingles* and the potential remedy. *Nipper*, 39 F.3d at 1530-31; *see also Burton*, 178 F.3d at 1199 ("We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy."). Whatever plan is used to demonstrate the violation of the first prong of *Gingles* must also be a remedy that can be imposed by the Court. *Nipper*, 39 F.3d at 1530-31. In short, if a plaintiff cannot show that the plan used to demonstrate the first prong can also be a proper remedy, then the plaintiff has not shown compliance with the first prong of *Gingles*. *Id.* at 1530-31.

Additionally, Plaintiffs have presented no evidence of the geographic compactness of the Black community in the new configuration of District 6 aside from the fact that it was drawn—and the only majority-Black portion of the new District 6 is in a single county that is already located in a majority-Black district on the enacted plan. This absence of evidence supports a grant of summary judgment to Defendants. *Marion*, 821 F. Supp. At 687. The Supreme Court also requires that the size and geographic compactness portions of the first *Gingles* prong relate to the community, not to any potential district created by a plaintiff: "The first *Gingles* condition refers to *the compactness of the minority population*, not to the compactness of the contested district." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (*LULAC*) (emphasis added) (quoting *Bush v. Vera*, 517 U.S. 952, 997 (1996)).

Mr. Cooper's districts combine distinct minority communities, often with intervening white population, and reduce districts so that several are barely majority-Black. Mr. Cooper could identify practically nothing beyond the race of the voters in a number of his districts that united them—in clear violation of the requirements of *LULAC*: "there is no basis to believe a district that combines two far-flung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition

contemplates." *Id.*; SMF ¶ 56; Cooper Dep. 68:6-69:2, 70:16-22, 73:13-17, 86:5-8.

### III.   Plaintiffs cannot establish the second and third *Gingles* preconditions.

Even if Plaintiffs have shown a proper remedy, they still cannot prevail because they have not shown legally significant racially polarized voting. The basis for a Section 2 vote-dilution claim must be more than a simple failure to win elections—because, in a majoritarian system, "numerical minorities lose elections." *Holder v. Hall,* 512 U.S. 874, 901 (1994) (Thomas, J., concurring) (citations omitted). In order to succeed, Plaintiffs must show that minority voters, although able to vote, are unable to elect their preferred candidates because their votes have been "submerge[ed]" in a majority that votes as a "racial bloc" against them. *Gingles,* 478 U.S. at 46, 49-52. And this racial bloc voting, by its very terms, must be attributable to *race*, rather than, for example, race-neutral partisan politics. Otherwise, it is just *majority* bloc voting or, as Justice White put it, "interest-group" politics. *Id.* at 83 (White, J., concurring). And "Congress and the Supreme Court" have refused "to equate losses at the polls with actionable vote dilution where these unfavorable results owe more to party than race." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 860 (5th Cir. 1993).

**A. To establish vote dilution "on account of race," a plaintiff must prove *racial* bloc voting, not *majority* bloc voting attributable to ordinary partisan politics.**

In its ruling denying Plaintiffs' respective motions for preliminary injunction in this action, this Court "conclude[d] as a matter of law that, to satisfy the second *Gingles* precondition, Plaintiffs need not prove the causes of racial polarization, just its existence." *Alpha Phi Alpha Fraternity v. Raffensperger*, 587 F. Supp. 3d 1222, 1303 (N.D. Ga. 2022). Relying on the plurality opinion in *Gingles,* this Court stated "[f]or purposes of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent. *It means simply that the race of voters correlates with the selection of a certain candidate or candidates*; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates." *Id.* (emphasis original) (quoting *Gingles*, 478 U.S. at 62). But a closer review of the opinions shows that a majority of the justices in *Gingles* declined to endorse this approach to majority-bloc voting.

Justice White, in a concurring opinion, called it little more than "interest-group politics." *Gingles,* 478 U.S. at 83. Justice O'Connor, writing for the remaining justices, declared flatly that "I agree with Justice White that Justice Brennan's conclusion that the race of the candidate is always irrelevant in identifying racially polarized voting conflicts with *Whitcomb* and is not

necessary to the disposition of this case." *Id.* at 101 (O'Connor, J., concurring). And it is important to note that Justice O'Connor arrived at this conclusion after endeavoring to construe what she called the "compromise legislation" of the amended Section 2. That is, the calculated equivocation in Part B of Section 2 that expressly disclaims a right to proportional representation cannot be given any substantive effect if all that matters when establishing racially polarized voting is whether minority voters and majority voters are voting differently. But the plurality view does just that:

> [T]he combination of the Court's definition of minority voting strength and its test for vote dilution results in the creation of a right to a form of proportional representation in favor of all geographically and politically cohesive minority groups that are large enough to constitute majorities if concentrated within one or more single-member districts. *In so doing, the Court has disregarded the balance struck by Congress in amending § 2* and has failed to apply the results test as described by this Court in *Whitcomb* and *White.*

*Id.* at 85 (emphasis added) (O'Connor, J., concurring in the judgment). Thus, while this Court was correct in identifying what a plurality of Justices in *Gingles* described as "racially polarized voting," it is just as true that an equally sized plurality of the *Gingles* Court rejected that view. When combined with Justice White's admonition against construing Section 2 as enshrining interest-group politics into law, the former plurality does not carry the day.

But even if this Court still disagrees with Defendants on this point, there is a remaining issue: The contrary view—that racial bloc voting is present anywhere a minority happens to vote for a different candidate than the majority—would raise serious questions about the constitutionality of Section 2, which cannot be validly understood to require changes in districts solely because of partisan voting behavior.

> **1. *Statutory text, history, and precedent establish that if the majority blocks the minority group's preferred candidates because of ordinary partisan politics, there is no "racial bloc voting."***

Section 2 is designed to root out racially discriminatory laws. The text requires Plaintiffs to prove that there is a "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*." 52 U.S.C. § 10301(a) (emphasis added). It is Plaintiffs' burden to show that "the political processes leading to nomination or election in the State or political subdivision are not *equally open* to participation by members of a class of citizens… in that its members have less opportunity *than other members of the electorate* to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b) (emphasis added). Section 2 thus requires Plaintiffs to show that the "challenged law… *caused*" them, "on account of race" to have less opportunity

20

to elect their preferred candidates than members of other races. *Greater Birmingham Ministries v. Sec'y of Ala.,* 992 F.3d 1299, 1329 (11th Cir. 2021) (emphasis in original).

The text explicitly does *not* "guarantee" partisan victories or "electoral success." *LULAC,* 548 U.S. at 428 (citation omitted). If minority voters' preferred candidates lose for non-racial reasons, such as failing to elect candidates because they prefer Democrats in Republican-dominated areas, they nonetheless have *precisely* the same opportunity as "other members of the electorate," and they have correspondingly not suffered any "abridgement" of their right to vote "on account of race." 52 U.S.C. § 10301. Section 2 does not, in other words, relieve racial minorities of the same "obligation to pull, haul, and trade to find common political ground" that affects all voters. *De Grandy,* 512 U.S. at 1020.

This view is not some recent legal phenomenon, but rather was borne out in *Gingles* itself. As Justice O'Connor explained, the view advocated by Plaintiffs here (and the view espoused by the plurality in *Gingles*) would effectively overturn *Whitcomb v. Chavis,* one of the two Supreme Court precedents that the "[a]mended § 2 intended to codify." *Gingles,* 478 U.S. at 83 (citations omitted). In *Whitcomb,* the Court explained that although residents in one area of Marion County consistently lost elections, that was because they

21

"vote[d] predominantly Democratic," and Republicans generally won elections in the county. 403 U.S. at 153. "[H]ad the Democrats won all of the elections or even most of them, the ghetto would have no justifiable complaints about representation." *Id.* at 152. And the failure of *Democrats* was insufficient to show illegality. Thus, in *Gingles*, Justice O'Connor stressed that *Whitcomb* required courts to differentiate between situations where race explains voting patterns from those where the partisan "interests of racial groups" simply "diverge." 478 U.S. at 100.

Section 2 cannot be rationally interpreted as prohibiting certain election practices when Republicans are in the majority but requiring other election practices where Democrats dominate. "The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates." *Baird v. Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992). Instead, as the Senate Report makes clear, the amended Section 2 applies only where "racial politics … dominate the electoral process." S. Rep. at 33 (emphasis added).

The alternative view would mandate not only a partisan preference but a racial preference. Here, for instance, Black Democrats—like white Democrats, Asian Democrats, and Latino Democrats—ordinarily fail to elect their preferred candidates because the majority of Georgia voters generally

choose Republicans.[8] Although Plaintiffs claim that Black voters alone among that group are entitled to districts in which they are guaranteed electoral success, "Section 2 requires an electoral process 'equally open' to all, not a process that favors one group over another." *Gonzalez v. City of Aurora*, 535 F.3d 594, 598 (7th Cir. 2008). Section 2 does not require courts to mandate that Black Democrats vote more successfully than white Democrats. *Clements*, 999 F.2d at 861 ("[W]hite Democrats have in recent years experienced the same electoral defeats as minority voters. If we are to hold that these losses at the polls, without more, give rise to a racial vote dilution claim warranting special relief for minority voters, a principle by which we might justify withholding similar relief from white Democrats is not readily apparent.").

Moreover, to hold that there is no racial component beyond simply observing that majority and minority voters vote differently would also eviscerate another aspect of Section 2: its emphatic rejection of a right to proportional representation. 52 U.S.C. § 10301(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). Avoiding a *requirement* of

---

[8] With several notable exceptions in statewide races in 2020, 2021, and 2022.

proportionality was a central focus of Congress in amending Section 2. *See Gingles*, 478 U.S. at 84 (O'Connor, J., concurring).

Given all this, it should be no surprise that other circuits have rejected a view of Section 2 that showing polarization is enough. The Fifth Circuit, for instance, has held that Section 2 plaintiffs cannot succeed when they "have not even attempted to establish proof of racial bloc voting by demonstrating that race, not … partisan affiliation, is the predominant determinant of political preference." *Clements*, 999 F.2d at 855. Likewise, the First Circuit holds that "plaintiffs cannot prevail on a VRA Section 2 claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to [race]." *Vecinos De Barrio Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995). And Judge Tjoflat has opined that, even if a plaintiff has provided evidence of racial bloc voting, a "defendant may rebut the plaintiff's evidence by demonstrating the absence of racial bias in the voting community; for example, by showing that the community's voting patterns can best be explained by other, non-racial circumstances." *Nipper*, 39 F.3d at 1524 (plurality opinion).

To be sure, the courts disagree on whether the third *Gingles* factor or the totality phase is the appropriate time to ensure racial, as opposed to merely partisan, polarization exists. The Fifth Circuit, for instance, holds that there

is no third *Gingles* factor without proof of racial, as opposed to partisan, polarization. *Clements*, 999 F.2d at 892. The Second Circuit—as this Court held at its Order denying the preliminary injunction—holds that the inquiry should be conducted at the totality-of-the-circumstances phase of analysis. *Goosby v. Town Bd.*, 180 F.3d 476, 493 (2d Cir. 1999); *see also Lewis v. Alamance County, N.C.*, 99 F.3d 600, 615 n.12 (4th Cir. 1996) (noting differences among circuit courts).

But this minor disagreement does not matter much. The key point is that Plaintiffs, who bear the ultimate burden of proof, must establish that race is the reason they supposedly lack equal "opportunity." 52 U.S.C. § 10301(b). And if voting patterns establish, instead, that Republicans always win (regardless of race), then non-Republican voters of *all* races have exactly the same opportunity to elect their candidates of choice, in every case. This is why this Court should require proof of racial bloc voting as part of the third *Gingles* factor (if race is not the "domina[nt]" reason for bloc voting, there can be no "racial bloc voting." S. Rep. at 33 (emphasis added)), even if the analysis is ultimately the same. As discussed below, Plaintiffs' lack of evidence on this point is fatal to their claims here.

## 2. If § 2 allowed partisan bloc voting to form the basis of a claim, it would be unconstitutional.

Beyond being irreconcilable with the text or binding precedent, a view that racial bloc voting requires only that majority and minority voters vote differently would also make Section 2 unconstitutional. Congress enacted Section 2 under its power to enforce the Fifteenth Amendment, which prohibits only "purposeful discrimination," not laws that merely "resul[t] in a racially disproportionate impact." *City of Mobile v. Bolden*, 446 U.S. 55, 70 (1980) (citation omitted); *see also* U.S. CONST. amend. XV. Section 2's results test goes beyond the constitutional provision that it purports to enforce, which makes sense to the extent that Section 2 can be understood as a tool for addressing invidious racial discrimination. But Congress certainly cannot place a particular political party in a favored electoral position. Congress may use its enforcement power only as a "congruen[t] and proportional[] ... means" to "remedy or prevent" the unconstitutional "injury" of intentional discrimination. *City of Boerne v. Flores*, 521 U.S. 507, 519–20 (1997). The Fifteenth Amendment's enforcement power does not allow Congress to "alter[] the meaning" of the Constitution. *Id.* at 519. Accordingly, to ensure that Section 2 stays within the bounds of the Fifteenth Amendment, the results test

must be "limited to those cases in which constitutional violations [are] most likely." *Id*. at 533 (citation omitted).

If Section 2 were interpreted in a way that plaintiffs can establish racial bloc voting merely by showing that minorities and majorities vote differently, it would not fit within those constitutional bounds. As Justice White explained in his dissent in *Bolden*, the original results test was designed to target "objective factors" from which discrimination "*can be inferred*." 446 U.S. at 95 (emphasis added). The amendments to Section 2 were meant to "restore" that test. *Gingles*, 478 U.S. at 43-44 & n.8 (citations omitted). And Plaintiffs' interpretation does not alter this "objective factors" test.

What is more, interpreting Section 2 to grant preferential treatment to particular racial groups would violate the Equal Protection Clause by compelling state action to benefit one racial group at the expense of others. *See* U.S. CONST. amend. XIV, § 1. "[S]ubordinat[ing] traditional race-neutral districting principles" to increase minority voting strength violates the Constitution. *Miller*, 515 U.S. at 916. Where Section 2 is used not to undo racial bias but to undo a pattern of partisan voting, in favor of one (and only one) racial minority, that must be unconstitutional.[9]

---

[9] At a minimum, such an interpretation of Section 2 raises constitutional questions and should be avoided if possible. "When a serious doubt is raised

**B. There is no racial bloc voting here because partisan politics, not race, explains the voting patterns highlighted by Plaintiffs, and Plaintiffs' experts offer no evidence disputing this.**

With the proper rule in place, Plaintiffs' claim fails under Section 2 because they "have not even attempted to establish proof of racial bloc voting by demonstrating that race, not ... partisan affiliation, is the predominant determinant of political preference." *Clements*, 999 F.2d at 855.

As established above, a successful Section 2 claim requires that *race*, not *party*, is the cause of "divergent voting patterns." *Id.* at 861. Plaintiffs must, therefore, *prove* as much. But Plaintiffs here did not even try to do so, instead just throwing up their hands or arguing that race and party are too inseparable ever to be considered separately.

But one cannot determine whether the voting patterns of Georgia voters are due to *racial* politics when they only examine general elections because, as Plaintiffs' experts own reports clearly indicate, Black voters in Georgia

---

about the constitutionality of an act of Congress, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (citation omitted). That is doubly true where the interpretation would "upset the usual constitutional balance of federal and state powers." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Courts should interpret statutes to do so only when congressional intent is "unmistakably clear." *Id.* (citations omitted).

overwhelmingly vote for Democrats and against Republicans. Dr. Palmer's decision not to review any primary results in his report undermines the usefulness of the data and analysis he presents as purported evidence of racial polarization in Georgia's elections. SMF ¶ 57; Palmer Dep. 59:23-60:01; Alford Dep. 29:07-30:01. But even without the benefit of viewing the stark drop-off in polarization once party is controlled for by examining primary elections, Dr. Palmer's data still only demonstrates two things: The race of the candidate *does not* change voting behavior of Georgia voters; and the party of the candidate *does.* SMF ¶ 58; Alford Dep. 54:18-22.

Plaintiffs' purported evidence of racial polarization is, in reality, nothing more than evidence of partisan polarization where a majority of voters support one party and a minority of voters support another party. This is, as Justice White described in *Gingles,* "interest group" politics. Plaintiffs' own political goals in bringing this case further illustrate that the issues in this case are not a matter of race, but rather that the "most political activity in America"[10] had political consequences they do not like.

Moreover, Plaintiffs' own experts do not offer evidence from primaries, where the issue of polarization could be viewed apart from party. That is

_____

[10] *See, e.g.*, Charles S. Bullock III, *Redistricting: The Most Political Activity in America* (2nd Ed. 2021).

simply not enough for Plaintiffs to carry their burden of proving racial polarization sufficient to satisfy prongs two and three of *Gingles*. To the contrary, all the Court has before it is evidence establishing that party, rather than race, explains the "diverge[nt]" voting patterns at issue. *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring). Plaintiffs' failure to offer any other evidence ends this case because they failed to show that prongs two and three of *Gingles* are met.

## IV. Plaintiffs cannot succeed because proportionality bars their claims.

When applying § 2 of the Voting Rights Act to single-member legislative district challenges, if "minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting age population," no violation of Section 2 can be found. *De Grandy,* 512 U.S. at 1000. This is because when the minority group in question enjoys "rough proportionality," there is no evidence that "voters in either minority group have 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Id.* at 1024 (quoting 52 U.S.C. § 10301(b)). The Voting Rights Act "was passed to guarantee minority voters a fair game, not a killing." *Bartlett*, 556 U.S. at

29 (Souter, J., dissenting). This is why the Supreme Court has generally looked to the "rough proportion of the relevant population." *Id*.

Proportionality in this context is analyzed by comparing "the number of districts where minority voters can elect their chosen candidate with the group's population percentage." *Id*.[11] Because Section 2 focuses on "equal political opportunity," when considering districts that elected members proportional to their population, the Supreme Court did "not see how . . . district lines, apparently providing political effectiveness in proportion to voting age numbers, deny equal political opportunity." *De Grandy*, 512 U.S. at 1014.

The Supreme Court gave further direction in *LULAC*, finding that the relevant geographic area for a proportionality analysis is the entire state. *LULAC,* 548 U.S. at 437. In *LULAC*, the Supreme Court explained that the proportionality inquiry entails "comparing the percentage of total districts that are [African-American] opportunity districts with the [African-American]

---

[11] The proportionality analysis that is part of the totality-of-the-circumstances review in Section 2 cases is distinct from the *language* in Section 2 regarding proportional representation. *Solomon*, 221 F.3d at 1223, n.5 ("it is important to keep the concepts of 'proportionality' and 'proportional representation' distinct"). While no minority group has a *right* to proportional representation under Section 2, the degree of *achievement* of proportional representation may be relevant to evaluating whether minority voters have formed effective voting majorities in districts roughly proportional to their population. *Id*.

share of the citizen voting-age population." *Id.* at 436. This is because this Court must determine "whether the absence of that additional district constitutes impermissible vote dilution." *Id.* at 437.

While proportionality is not a safe harbor for a jurisdiction, *LULAC*, 548 U.S. at 436, it is an extremely relevant factor to consider whether an equal opportunity to participate in the political process exists. *See*, *e.g.*, *African Am. Voting Rights Legal Def. Fund v. Villa*, 54 F.3d 1345, 1355 (8th Cir. 1995) (evidence of "persistent proportional representation" sufficient to support grant of summary judgment to jurisdiction); *Fairley v. Hattiesburg Miss.*, 662 F. App'x 291, 301 (5th Cir. 2016) (same).

In the 2022 election cycle, the 2021 congressional plan elected five Black Democratic candidates to the 14 congressional districts. SMF ¶ 59; Cooper Dep. 19:19-21. That constitutes 35.7% of the Georgia congressional delegation. The Any-Part Black VAP for Georgia as a whole is 31.73%, and the 2021 AP Black CVAP is 33.3%. SMF ¶ 60; Cooper Report, ¶ 18, Figure 2. Thus, the percentage of Black candidates and Black-preferred candidates being elected is more than roughly proportional to the percentage of Black individuals in Georgia.

Given the rough proportionality in Congress, along with the fact that both of Georgia's U.S. senators are Black-preferred candidates because they are Democrats (Sen. Ossoff was elected in 2021 and Sen. Warnock was re-

elected in 2022), Plaintiffs' claim that Black voting strength in Georgia's congressional races was diluted by the 2021 congressional redistricting plan is without merit. SMF ¶ 61; Palmer Dep. 53:2-54:2. Black voters in Georgia have demonstrated that they have an equal opportunity to participate in the political process and to elect representatives of their choice. Consequently, Plaintiffs' claim for a Section 2 violation fail as a matter of law.

## CONCLUSION

After discovery, there remains no issue of any material fact in this case. This Court must dismiss the members of the SEB as defendants. Plaintiffs have not shown their proposed remedial map can function as a remedy, but even if they have, the lack of evidence of legally significant racially polarized voting is fatal to their claims because they have not shown the *Gingles* preconditions are met. Even if this Court agrees with Plaintiffs on those points, the rough proportionality already achieved by Black voters in Georgia is sufficient to bar their claims. This Court should grant summary judgment to Defendants and dismiss this case.

Respectfully submitted this 20th day of March, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb

Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for Defendants*

34

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Brief has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

<u>/s/ Bryan P. Tyson</u>
Bryan P. Tyson

**268**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

COAKLEY PENDERGRASS, *et al.*,
    Plaintiffs,

    v.

BRAD RAFFENSPERGER, *et al.*,
    Defendants.

CIVIL ACTION

FILE NO. 1:21-CV-05339-SCJ

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## INTRODUCTION

For reference, the following citations are used for support for each of the

findings below:

| Citation | Document Type |
|---|---|
| APA Doc. No. [ ] | Docket entry from Alpha Phi Alpha |
| Grant Doc. No. [ ] | Docket entry from Grant |
| Pendergrass Doc. [ ] | Docket entry from Pendergrass |
| Tr. | Transcript of the trial record |
| DX | Defendants' Exhibits |
| APAX | Alpha Phi Alpha Plaintiffs' Exhibits |
| GPX | Grant Plaintiffs' Exhibits |
| PPX | Pendergrass Plaintiffs' Exhibits |
| JX | Parties' Joint Exhibits |
| Stip. | Joint stipulated facts filed with pretrial order, filed at APA Doc. No. [270-5]; Grant Doc. No. [231], pp. 33–88; Pendergrass Doc. No. [217], pp. 33–88. |
| Jud. Not. | Judicial notice order, filed at APA Doc. No. [284], Grant Doc. No. [246], Pendergrass Doc. No. [234]. |

## I.    FACTUAL BACKGROUND

1.    Voting is "a fundamental political right, [] preservative of all rights." Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886). Indeed, "[i]t would be difficult to overstate the importance of the right to vote." Curling v. Raffensperger, 50 F.4th 1114, 1126 (11th Cir. 2022).

2.    Recognizing how critically important this right is, and the seriousness of Plaintiffs' claims that their voting rights have been violated, this Court approaches this case "with caution, bearing in mind that these circumstances involve 'one of the most fundamental rights of . . . citizens: the right to vote.'" Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs, 775 F.3d 1336, 1345 (11th Cir. 2015) (citations omitted).

3.    Part of that caution includes the recognition that the drawing of district maps is "primarily the duty and responsibility of the State[s], not the federal courts." Allen v. Milligan, 599 U.S. 1, 29 (2023) (quoting Abbott v. Perez, 138 S. Ct. 2305, 2324 (2018)).

4.    Indeed, one of the key issues this Court must determine is how to address the close relationship between race and politics in Georgia. In other words, this case calls on the Court to determine whether the alleged vote dilution is "on account of race or color," 52 U.S.C. § 10301(a), or caused by some other factor.

5.     This distinction must be addressed because "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates." <u>Solomon v. Liberty County Comm'rs,</u> 221 F.3d 1218, 1225 (11th Cir. 2000).

6.     If dilution is **<u>not</u>** happening on account of race, then there can be no findings for Plaintiffs because "[u]nless courts 'exercise extraordinary caution' in distinguishing race–based redistricting from politics–based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena." <u>Cooper v. Harris</u>, 581 U.S. 285, 335 (2017) (Alito, J., concurring in the judgment in part and dissenting in part) (quoting <u>Miller v. Johnson</u>, 515 U.S. 900, 916 (1995)).

7.     This issue is further heightened because Plaintiffs in this case seek not to vindicate a complete lack of political success, but rather they seek to have this Court use Section 2 of the Voting Rights Act (VRA) to order "more success in place of some." <u>Johnson v. De Grandy</u>, 512 U.S. 997, 1012-13 (1994). And this Court cannot "conflat[e] discrimination on the basis of party affiliation with discrimination on the basis of race." <u>League of Women Voters of Fla. Inc. v. Fla. Sec'y of State</u>, 66 F.4th 905, 924 (11th Cir. 2023) (citations omitted).

8.     This is because "partisan motives are not the same as racial motives." <u>Brnovich v. Democratic Nat'l Comm.,</u> 141 S. Ct. 2321, 2349 (2021). And federal

courts are "not responsible for vindicating generalized partisan preferences." Rucho v. Common Cause, 139 S. Ct. 2484, 2501 (2019).

9.      One unique area involving the application of the VRA is that there is some tension with the Equal Protection Clause, because "the Equal Protection Clause restricts consideration of race and the VRA demands consideration of race." Abbott v. Perez, 138 S. Ct. 2305, 2315 (2018).

10.      Gingles and its progeny avoid the constitutional problems with race-based admission policies in Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 143 S. Ct. 2141, 2165 (2023), because they are essentially self-regulating. In other words, a properly cabined application of Gingles avoids the constitutional problems of race-based redistricting extending "indefinitely into the future." Allen, 599 U.S. at 45 (Kavanaugh, J., concurring in part). That is because a finding of equal openness on the facts before the Court avoids the necessity of determining whether Section 2 improperly requires race-based redistricting after an election system has achieved what Section 2 set out as the goal—equal political opportunity.

11.      Thus, the success of Black and Black-preferred candidates across the state of Georgia is a key part of this case as the Court treats "equal political opportunity as the focus of the enquiry." De Grandy, 512 U.S. at 1014. As discussed below, considering the totality of the circumstances after a searching local

appraisal of the facts, this Court concludes that the challenged district plans do not deny or abridge the right to vote on account of race or color and that Georgia's electoral system is equally open to participation by all voters.

### A.    What is redistricting?

12.    The country's system of elections is based on the principle of "one person, one vote" espoused by the Supreme Court in Baker v. Carr, 369 U.S. 186 (1962).

13.    As a result, and because our federal system of government is representative when people are drawn into electoral districts, those districts must have equal populations. Karcher v. Daggett, 462 U.S. 725, 730 (1983) ("Article I, § 2 establishes a 'high standard of justice and common sense' for the apportionment of congressional districts: 'equal representation for equal numbers of people.'" (quoting Wesberry v. Sanders, 376 U.S. 1, 18 (1964))).

14.    Otherwise, the voting strength of people who live in districts with large populations will be diluted compared to those who live in districts with smaller populations. The Supreme Court has therefore held that in elections for members of the United States House of Representatives, "the command of Art. I, § 2 [of the Constitution], that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one [person's] vote in a

congressional election is to be worth as much as another's." <u>Wesberry</u>, 376 U.S. at

7–8 (footnotes omitted) (citations omitted).

15.     This principle has also been extended to state legislative bodies: "[A]s

a basic constitutional standard, the Equal Protection Clause requires that the seats

in both houses of a bicameral state legislature must be apportioned on a

population basis." <u>Reynolds v. Sims</u>, 377 U.S. 533, 568 (1964); <u>see also</u> <u>Larios v.</u>

<u>Cox</u>, 300 F. Supp. 2d 1320, 1331 (N.D. Ga. 2004) (three-judge panel) (delineating

principles that can justify deviations from equal population for legislative plans).

16.     The number of people who must be in a particular electoral district

depends on which legislative office the district is designed to cover. For instance,

the U.S. Constitution prescribes that for the House of Representatives, "[t]he

Number of Representatives shall not exceed one for every thirty Thousand, but

each State shall have at Least one Representative." U.S. Const. art. I, § 2, cl. 3.

17.     When district populations are not equal, the districts are

malapportioned. Because populations naturally shift and change over time,

district boundaries must be adjusted periodically to correct any

malapportionment. This "[r]ealignment of a legislative district's boundaries to

reflect changes in population and ensure proportionate representation by elected

officials" is known as reapportionment or redistricting. <u>Reapportionment</u>, <u>Black's</u>

Law Dictionary (11th ed. 2019) (citing U.S. Const. art. I, § 2, cl. 3); redistricting,

Black's Law Dictionary (11th ed. 2019).

18.    The U.S. Constitution requires that reapportionment for members of

the U.S. House of Representatives occur every ten years, based on the Decennial

Census. U.S. Const. art. I, § 2, cl. 3; id., amend XIV, § 2.

19.    The Georgia Constitution requires that the Senate and House districts

of the General Assembly be reapportioned after each Decennial Census. Ga. Const.

art. III, § 2, ¶ II.

20.    Redistricting is a very political process. Tr. 2125:12–20.

**B.    Past redistricting cycles in Georgia.**

21.    During the 2001 redistricting cycle, state Senate and state House plans

drawn in 2001 and 2002 were used in the 2002 elections. Larios, 300 F. Supp. 2d at

1326–27.

22.    During the 2001 redistricting cycle, the Congressional plan drawn in

2001 was used in the 2002 elections. Larios, 300 F. Supp. 2d at 1335.

23.    The 2001 redistricting plans reduced Black percentages and majority-

Black districts in service of political goals. Charles S. Bullock, III, The History of

Redistricting in Georgia, 52 Ga. L. Rev. 1057, 1083–84 (Summer 2018).

24.    After being used in the 2002 elections, the state Senate and state House plans drawn in 2001 and 2002 were found unconstitutional. Larios, 300 F. Supp. 2d at 1356.

25.    A federal court drew new district plans for state Senate and state House that were subsequently used in the 2004 election cycle. Larios v. Cox, 314 F. Supp. 2d 1357, 1364 (N.D. Ga. 2004) (three-judge panel).

26.    Once Republicans became the majority in both the state Senate and state House following the 2004 elections on the court-drawn maps, they redrew the Congressional plan in 2005. Charles S. Bullock, III, The History of Redistricting in Georgia, 52 Ga. L. Rev. 1057, 1094–95 (Summer 2018).

27.    The 2011 cycle state Senate, state House, and Congressional plans as drawn by the majority Republican legislature were precleared by the U.S. Department of Justice on their initial submission. Jud. Not., p. 8.

28.    The 2012 Congressional plan split 16 counties and had four majority-Black[1] districts when the 2020 Census data was applied. Stip. ¶¶ 161, 165.

29.    The 2014 state Senate plan split 38 counties. Stip. ¶ 188; APAX 1, Ex. T-2.

---

[1] For purposes of these findings, the term "majority-Black district" refers to a district where the Any-Part Black voting-age population is greater than 50%.

8

30.     The 2014 state Senate plan contained 13 majority-Black districts using 2020 Census data, plus a 14th district with a Black VAP of 49.76%. Stip. ¶ 174.

31.     The 2015 state House plan split 73 counties. Stip. ¶ 188, APAX 1, Ex. AH-2.

32.     The 2015 state House plan contained 47 majority-Black districts using 2020 Census data. Stip. ¶ 181.

33.     Congresswoman Lucy McBath was elected in 2018 and 2020 in 2012 Congressional District 6 when that district was 58.11% Non-Hispanic White VAP and 14.46% AP Black VAP using the 2020 Census results. Jud. Not., pp. 9–11; Stip. ¶ 167, PPX 1, Ex. F.

**C.     Background of adoption Georgia 2021 plans.**

34.     To prepare for redistricting in 2021, the Georgia General Assembly undertook an extensive process even with delays due to the COVID-19 pandemic.

35.     The General Assembly held nine in-person and two virtual joint committee meetings beginning on June 15, 2021, to gather input from voters. Stip. ¶ 136.

36.     The joint redistricting committees released an educational video about the redistricting process at their June 15, 2021 meeting. Stip. ¶ 137.

37.     The General Assembly created an online portal for voters to offer comments on redistricting plans and received more than 1,000 comments from voters in at least 86 counties. Stip. ¶ 138.

38.     On August 21, 2021, the Census Bureau released the detailed population counts that Georgia used to redraw districts. Stip. ¶ 140.

39.     The joint committees held a meeting to hear from interested groups on August 30, 2021. Stip. ¶ 141.

40.     The National Conference of State Legislatures, American Civil Liberties Union of Georgia, Common Cause, Fair Districts GA, the Democratic Party of Georgia, and Asian-Americans Advancing Justice – Atlanta presented at the August 30, 2021 joint meeting. Stip. ¶ 142.

41.     Prior to drawing redistricting plans, the House Legislative and Congressional Reapportionment Committee and the Senate Reapportionment and Redistricting Committee adopted guidelines for the redistricting process. Stip. ¶¶ 134–35.

42.     The guidelines provide the following principles for drafting Congressional plans: (1) total population deviation of plus or minus one person from the ideal district size; (2) compliance with Section 2 of the Voting Rights Act; (3) comply with the U.S. and Georgia constitutions; (4) contiguous geography; (5) consider counties and precincts, compactness, and communities of interest; (6)

make efforts to avoid the unnecessary pairing of incumbents; and (7) any other principles or factors the Committee deems appropriate. JX1, JX2.

43.    The guidelines provide the following principles for drafting state legislative plans: (1) total population that is substantially equal as practicable, considering the other principles; (2) compliance with Section 2 of the Voting Rights Act; (3) compliance with the U.S. and Georgia constitutions; (4) contiguous geography; (5) no multi-member districts; (6) consider counties and precincts, compactness, and communities of interest; (7) make efforts to avoid the unnecessary pairing of incumbents; and (8) any other principles or factors the Committee deems appropriate. JX1, JX2.

44.    Drafts of the 2021 Senate and House Plans were first released on November 2, 2021. Stip. ¶ 143.

45.    The General Assembly's special session to consider the draft Senate and House Plans (and Congressional redistricting) began on November 3, 2021. Stip. ¶ 144.

46.    After the special session convened, the House and Senate redistricting committees held multiple meetings prior to voting on proposed redistricting plans. Stip. ¶ 145.

47.    The House and Senate redistricting committees received public comment on plans during committee meetings held in the special session. Stip. ¶ 146.

48.    During the special session, the Georgia General Assembly passed the 2021 adopted state Senate and 2021 adopted state House plans. Stip. ¶ 147

49.    On November 22, 2021, the Georgia General Assembly passed the 2021 adopted Congressional plan. Stip. ¶ 148.

50.    No Democratic members of the General Assembly voted in favor of the 2021 Congressional, Senate, or House plans. Stip. ¶ 150.

51.    Governor Kemp signed the 2021 Congressional, Senate, and House plans into law on December 30, 2021. Stip. ¶ 149.

52.    The 2021 Congressional, Senate, and House plans were used in the 2022 elections. Stip. ¶ 152.

     **i.    Congress.**

53.    There are 14 districts on the 2021 enacted Congressional plan. Stip. ¶ 159.

54.    The 2021 enacted Congressional plan splits 15 counties. Stip. ¶ 164.

55.    The 2021 enacted Congressional plan has two majority-Black districts plus two additional districts with greater than 49% AP Black VAP. Stip. ¶ 166, PPX 1, Ex. K-1.

56.    The 2021 enacted Congressional plan elected five Black Democratic members of Congress from Districts 2, 4, 5, 7, and 13 in the 2022 general election out of the 14 districts. Jud. Not., pp. 9–10.

**D.    Other Georgia election information.**

57.    Herschel Walker was opposed in the 2022 Republican Primary election for U.S. Senate by the then-incumbent Agriculture Commissioner, Gary Black, who is white and who had been successfully elected statewide in past statewide elections. Jud. Not., p. 11.

58.    Herschel Walker received the highest number of votes in every county in Georgia in the 2022 Republican Primary election for U.S. Senate and won the Republican nomination for U.S. Senate. Jud. Not., p. 11.

59.    Fitz Johnson is a Black Republican man who won the 2022 Republican nomination for Public Service Commission District 3 with 1,007,354 votes in an uncontested primary election. Jud. Not., p. 11.

60.    United States Senator Raphael Warnock and Herschel Walker are both Black men. Jud. Not., p. 11.

61.    Senator Raphael Warnock received the highest number of votes in the 2022 General Election and won the runoff election against Herschel Walker held in December 2022. Stip. ¶¶ 352, 355.

62.     Senator Warnock received the highest number of votes in each election in which he ran in 2020, 2021, and 2022. Stip. ¶ 352.

63.     Senator Warnock, Senator Jon Ossoff, and President Joe Biden were all candidates of choice of Black voters in Georgia and won statewide elections in 2020, 2021, and 2022. Stip. ¶¶ 352–354, 358.

64.     The Insurance Commissioner for the State of Georgia, John King, is a Latino man and a Republican. Jud. Not., p. 11.

65.     Commissioner John King received 2,107,388 votes in the 2022 general election, while his opponent received 1,788,136 votes. Jud. Not., p. 11.

66.     Justice Carla McMillian is an Asian-American who has been elected to nonpartisan statewide office in Georgia multiple times. Jud. Not., p. 11.

**E.     Timeline of case and trial.**

67.     When they first filed this case, Pendergrass Plaintiffs challenged "congressional Districts 3, 6, 11, 13, and 14." Alpha Phi Alpha Fraternity v. Raffensperger, 587 F. Supp. 3d 1222, 1235-36 (N.D. Ga. 2022). Pendergrass Plaintiffs claim the General Assembly should have drawn an additional majority-Black congressional district in the western Atlanta metropolitan area. Id.

**i.     Preliminary injunction proceedings.**

68.     The Court moved rapidly to hear motions to dismiss and motions for preliminary injunction in early January 2022, culminating in a six-day preliminary

injunction hearing held February 7 through 14, 2022. <u>Alpha Phi Alpha</u>, 587 F. Supp. 3d at 1237.

69.    Following the hearing, the Court found a likelihood of success on the merits of some claims brought by Plaintiffs but denied preliminary injunctive relief because "due to the mechanics of State election requirements, there is insufficient time to effectuate remedial relief for purposes of the 2022 election cycle." <u>Alpha Phi Alpha</u>, 587 F. Supp. 3d at 1326–27.

70.    While this Court provided an assessment of Plaintiffs' likelihood of success on the merits after the preliminary injunction, that is not dispositive of Plaintiffs' claims. "At the preliminary injunction stage, the court is called upon to assess the probability of the plaintiff's ultimate success on the merits." <u>Sole v. Wyner</u>, 551 U.S. 74, 84 (2007). It is "only the parties' opening engagement," and any "provisional relief granted" is "tentative" "in view of the continuation of the litigation to definitively resolve the controversy." <u>Id</u>. "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." <u>Univ. of Texas v. Camenisch</u>, 451 U.S. 390, 395 (1981).

### ii.    Discovery.

71.    Following entry of this Court's denial of Plaintiffs' motion for preliminary injunction, <u>Pendergrass</u> Plaintiffs did not amend their Complaint.

### iii.   Trial proceedings.

72.   Following discovery, the Court heard the evidence on all three cases in a trial that began on September 5, 2023 and concluded on September 14, 2023. While the cases were tried together, they were not consolidated, and this Court required counsel to identify which case for which each evidentiary component was presented.[2]

## II.   LEGAL STANDARDS

### A.   Role of federal courts in redistricting.

#### i.   Generally.

73.   Reapportionment is "primarily the duty and responsibility of the State[s], not the federal courts." Allen v. Milligan, 599 U.S. 1, 29 (2023) (quoting Abbott v. Perez, 138 S. Ct. 2305, 2324 (2018).

74.   "The States do not derive their reapportionment authority from the Voting Rights Act, but rather from independent provisions of state and federal law." Voinovich v. Quilter, 507 U.S. 146, 156 (1993) (cleaned up). "Districting

---

[2] Three witnesses testified in one case but had their testimony incorporated into the other cases. Those witnesses are: (1) Dr. Diane Evans, who testified for Grant but whose testimony was incorporated into Alpha Phi Alpha at Tr. 634:2–10; (2) Dr. Adrienne Jones, who testified for Alpha Phi Alpha but whose testimony was incorporated into Grant and Pendergrass at Tr. 1244:10–1245:17; and (3) Dr. Orville Burton, who testified for Grant and Pendergrass but whose testimony was incorporated into Alpha Phi Alpha at Tr. 1464:11–24.

involves myriad considerations—compactness, contiguity, political subdivisions, natural geographic boundaries, county lines, pairing of incumbents, communities of interest, and population equality." <u>Allen</u>, 599 U.S. at 35. And "the federal courts are bound to respect the States' apportionment choices unless those choices contravene federal requirements." <u>Voinovich</u>, 507 U.S. at 156.

75.     Section 2 places the "burden of proving an apportionment's invalidity squarely on the plaintiff's shoulders." <u>Id</u>. at 155. Conversely, a state is never required "to prove the invalidity of its own apportionment scheme." <u>Id</u>. at 156. "Of course, the federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law." <u>Id</u>.

76.     The <u>Gingles</u> analytical process must be "properly applied" in Section 2 cases to "help ensure this remains the case." <u>Allen</u>, 599 U.S. at 29 (citing <u>Thornburg v. Gingles</u>, 478 U.S. 30 (1986)). This is because Section 2 limits judicial action to "instances of intensive racial politics where the excessive role of race in the electoral process denies minority voters equal opportunity to participate." <u>Id</u>. (cleaned up).

77.     Further, this Court recognizes that "the Constitution charges States, not federal courts, with designing election rules." <u>Curling v. Raffensperger</u>, 50 F.4th 1114, 1122 (11th Cir. 2022).

### ii.     Limitations on adjudicating partisan gerrymandering claims.

78.     "Partisan gerrymandering is nothing new. Nor is frustration with it." <u>Rucho v. Common Cause</u>, 139 S. Ct. 2484, 2494 (2019).

79.     While federal courts can hear constitutional challenges to redistricting involving population and race, the Supreme Court has determined federal courts lack jurisdiction to hear partisan gerrymandering claims because there are no judicially manageable standards to assess partisan gerrymandering. <u>Id</u>. at 2495–96 ("[u]nlike partisan gerrymandering claims, a racial gerrymandering claim does not ask for a fair share of political power and influence, with all the justiciability conundrums that entails. It asks instead for the elimination of a racial classification. A partisan gerrymandering claim cannot ask for the elimination of partisanship").

80.     Thus, as <u>Rucho</u> explained, "[t]he 'central problem' is not determining whether a jurisdiction has engaged in partisan gerrymandering. It is 'determining when political gerrymandering has gone too far.'" <u>Id</u>. at 2497 (quoting <u>Vieth v. Jubelirer</u>, 541 U.S. 267, 296 (2004) (plurality opinion)).

81.     This is because federal courts have no "commission to allocate political power and influence." <u>Id</u>. at 2508.

18

82.     Partisan gerrymandering claims ultimately ask courts to "make their own political judgment about how much representation particular parties deserve—based on the votes of their supporters—and to rearrange the challenged districts to achieve that end." Id. at 2499 (emphasis in original).

83.     Federal courts lack the power to apportion political power because they cannot "vindicate[e] generalized partisan preferences." Id. at 2499–2501.

84.     Because there is no right to proportional representation, or even a guarantee that redistricting "come as near as possible" to proportional representation—that argument is "clearly foreclose[d]'" under Supreme Court cases—Plaintiffs' claims do not rise to the level of invoking this Court's power. See Rucho, 139 S. Ct. at 2499.

**B.     Jurisdictional limitations applicable to this case.**

**i.     Section 2 challenges to statewide plans must be heard by three-judge panels.[3]**

85.     28 U.S.C. § 2284(a) ("Section 2284") is mandatory: it contains "shall" language, depriving a single-judge federal district court of jurisdiction when an action falls within its coverage. Antonin Scalia & Bryan Garner, Reading Law: The

---

[3] Defendants recognize the Court has previously denied motions on this topic in this case. These findings and conclusions are included to ensure the appellate record is complete.

Interpretation of Legal Texts 114 (2012); see also Shapiro v. McManus, 577 U.S. 39, 43 (2015) ("[28 U.S.C.] §2284(a) admits of no exception, and the mandatory shall . . . normally creates an obligation impervious to judicial discretion") (internal quotations omitted).

86.     Historically, Section 2 challenges to districts have been brought in conjunction with constitutional challenges under the Fourteenth and/or Fifteenth Amendments to the U.S. Constitution. See, e.g., Thompson v. Kemp, 309 F. Supp. 3d 1360, 1361 (N.D. Ga. 2018) (three-judge panel). Further, in prior redistricting cycles, when these types of challenges were made under the VRA, it was almost universally through the preclearance provisions of the VRA, which are no longer applicable to Georgia. Shelby County v. Holder, 570 U.S. 529 (2013).

87.     A court's reading of a statute "begins with the statutory text, and ends there as well if the text is unambiguous." Packard v. Comm'r, 746 F. 3d 1219, 1222 (11th Cir. 2014) (citing BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004)).

88.     The statutory language of Section 2284(a) makes clear that a three-judge panel is required for this case. It requires a three-judge panel to be convened "when an action is filed challenging the constitutionality of the apportionment of congressional districts **or the** apportionment of any statewide legislative body" 28 U.S.C. § 2284(a) (emphasis added).

89.   "Questions regarding the legitimacy of the state legislative apportionment (and particularly its review by the federal courts) are highly sensitive matters, and are regularly recognized as appropriate for resolution by a three-judge district court." Page v. Bartels, 248 F. 3d 175, 190 (3d Cir. 2001).

90.   Indeed, "in such redistricting challenges, the potential for federal disruption of a state's internal political structure is great, counseling in favor of the establishment of a specialized adjudicatory machinery." Id.

91.   For this reason, it makes sense that Congress chose a broader standard for state legislative districting challenges. As the Supreme Court has explained, "Congress has determined that three-judge courts are desirable in a number of circumstances involving confrontations between state and federal power or in circumstances involving a potential for substantial interference with government administration." Allen v. State Bd. of Elections, 393 U.S. 544, 562 (1969) (applying Section 5 of the VRA). And the congressional record supports reading Section 2284 to apply to any federal challenge statewide apportionment.

92.   In enacting the 1976 amendments to Section 2284(a), which, in relevant part, brought the statute to its present text, "Congress was concerned less with the source of the law on which an apportionment challenge was based than on the unique importance of apportionment cases generally. The Senate Report, for example, consistently states that 'three-judge courts would be retained . . . in

any case involving congressional reapportionment or the reapportionment of any statewide legislative body…'" <u>Page</u>, 248 F.3d at 190 (citing S. Rep. No. 94-204 (1976)) (alterations accepted).

93.     The Senate Report goes on to explain that the amendment "preserves three-judge courts for cases involving . . . the reapportionment of a statewide legislative body because it is the judgment of the committee that these issues are of such importance that they ought to be heard by a three-judge court…" S. Rep. No. 94-204 (1976), reprinted in 1976 U.S.C.C.A.N. 1996.

94.     Unlike many statutes, the underlying language of Section 2 of Voting Rights Act as initially enacted and the language of the Fifteenth Amendment are essentially identical. <u>See</u> <u>City of Mobile v. Bolden</u>, 446 U.S. 55, 61 (1980). As the Supreme Court pointed out, "it is apparent that the language of § 2 no more than elaborates upon that of the Fifteenth Amendment." <u>Id</u>.

95.     Though Section 2 of the VRA has since been amended, the thrust of the argument that the VRA remains a direct exercise of the enforcement power of Congress under the Fourteenth and Fifteenth Amendments remains unchanged. <u>See</u> <u>City of Boerne v. Flores</u>, 521 U.S. 507, 518 (1997) ("We have also concluded that . . . measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures placed on the States."); <u>Lewis v. Governor of Ala.</u>, 896 F.3d 1282, 1293 (11th Cir.

2018), vacated and rehearing en banc granted by 914 F.3d 1291 (11th Cir. Jan. 30, 2019) ("The Voting Rights Act . . . 'is designed to implement the Fifteenth Amendment and, in some respects, the Fourteenth Amendment.'") (Wilson, J.). Thus, more than most congressional actions, the VRA represents a direct effort by Congress to implement constitutional provisions in the Fifteenth and Fourteenth Amendments.

96.     Thus, the text and the intent of Congress both demonstrate that this case must be heard by a three-judge panel, and this case must be dismissed unless heard by such a panel.

### ii.     There is no private right of action under Section 2.[4]

97.     The Supreme Court has often "[a]ssum[ed], for present purposes, that there exists a private right of action to enforce" Section 2, but it has never directly confronted that question. See Bolden, 446 U.S. at 60 (1980) (plurality). As a result, the question of whether "the Voting Rights Act furnishes an implied cause of action under § 2" remains "open." Brnovich, 141 S. Ct. at 2350 (Gorsuch, J., concurring).

---

[4] Defendants recognize the Court has previously denied motions on this topic in this case. These findings and conclusions are included to ensure the appellate record is complete.

98.     Congress has not clearly expressed its intent to provide a right of action under Section 2, and thus, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001).

99.     "Moreover, a reviewing court may not plumb a statute's supposed purposes and policies in search of the requisite intent to create a cause of action; rather, the inquiry both begins and ends with a careful examination of the statute's language." In re Wild, 994 F.3d 1244, 1255 (11th Cir. 2021) (en banc).

100.    The default view is that no private right of action exists—Congress must "intend[] to provide one" for such a right to exist. Id. at 1259 (emphasis in original); accord Bellitto v. Snipes, 935 F.3d 1192, 1202 (11th Cir. 2019) (applied to Help America Vote Act).

101.    Nothing in the text of Section 2 "clearly and affirmatively manifest[s] its intent—as reflected in the Act's text and structure—to create a private right of action." In re Wild, 994 F.3d at 1256. In fact, there is no "'rights-creating' language" in Section 2. Sandoval, 532 U.S. at 288 (finding no private right of action to enforce disparate-impact regulations promulgated under Title VI of Civil Rights Act of 1964).

102.    Merely referring to the right to vote generally is not a clear intent to create a private right of action, and thus cannot create that kind of right "in [the]

clear and unambiguous terms" that precedent requires. <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 290 (2002).

103.    Further, Congress specifically created private rights of action in other parts of the Voting Rights Act but failed to do so in Section 2. For example, Section 3 includes language authorizing proceedings to be "instituted by the Attorney General **<u>or an aggrieved person</u>** under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302 (emphasis added).

104.    There is no reference in Section 2 to any "aggrieved person" being permitted to bring an action under its provisions—and the fact that the adjoining section contains such a clear statement of congressional intent "very nearly forecloses" the idea that Section 2 could contain a private right of action. <u>In re Wild</u>, 994 F.3d at 1259 (applied to Crime Victims' Rights Act).

105.    Because Section 2's text does not "clearly and affirmatively manifest" a private cause of action, none exists. <u>Id</u>. at 1256. Thus, in addition to the dismissal for failing to notice a three-judge court, Plaintiffs' cases should also be dismissed because they have no ability to bring this action as private citizens and entities.

**C.    The Voting Rights Act.**

106.    As amended in 1982, Section 2(a) of the VRA prohibits any state or political subdivision from imposing or applying any "qualification or prerequisite" to voting or any "standard, practice, or procedure" which "results in

a denial or abridgement of the right of any citizen of the United States to vote on account or race or color." 52 U.S.C. § 10301(a).

107.   Section 2 prohibits "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" which "is established if" the members "of a class of citizens . . . have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(a) and (b). A "totality of circumstances" must show the challenged process is "not equally open" because a minority group has "less opportunity . . . to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

108.   The section prohibits all forms of voting discrimination that "result in the denial of equal access to any phase of the electoral process for minority group members." S. Rep. No. 97-417, at 30 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 205. It also protects voters from election practices "which operate, designedly or otherwise" to deny them the same opportunity to participate in the political process as other citizens enjoy. Id. at 28.

109.   "The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society

26

that is no longer fixated on race." League of United Latin Am. Citizens v. Perry,

548 U.S. 399, 433–34 (2006) ("LULAC").

110.   Vote-dilution (effects) claims under Section 2 of the VRA are analyzed

under the framework set forth in Thornburg v. Gingles, 478 U.S. 30 (1986).

111.   The Gingles framework cannot be applied mechanically and without

regard to the nature of the claim. Voinovich v. Quilter, 507 U.S. 146, 158 (1993).

112.   Section 2 does not allow this Court to infer vote dilution "from mere

failure to guarantee a political feast," De Grandy, 512 U.S. at 1017 (majority op.),

because the "[f]ailure to maximize cannot be the measure of § 2." Id.

113.   To prove a violation of Section 2 in a vote-dilution case, a plaintiff

bears the burden of first proving each of the three Gingles preconditions: "(1) that

the minority group is 'sufficiently large and geographically compact to constitute

a majority in a single-member district'; (2) that the minority group is 'politically

cohesive'; and (3) that sufficient racial bloc voting exists such that the white

majority usually defeats the minority's preferred candidate." Nipper v. Smith, 39

F.3d 1494, 1510 (11th Cir. 1994).

114.   The Gingles preconditions "limit judicial intervention to 'those

instances of intensive racial politics' where the 'excessive role [of race] in the

electoral process . . . den[ies] minority voters equal opportunity to participate.'"

Allen, 599 U.S. at 30.

115.   Failure to establish one of the <u>Gingles</u> preconditions is fatal to a Section 2 claim because each of the three prongs must be met. <u>Johnson v. DeSoto Cnty. Bd. of Comm'rs</u>, 204 F.3d 1335, 1343 (11th Cir. 2000); <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1199 (11th Cir. 1999); <u>Brooks v. Miller</u>, 158 F.3d 1230, 1240 (11th Cir. 1998); <u>Negron v. City of Miami Beach, Fla.</u>, 113 F.3d 1563, 1567 (11th Cir. 1997).

116.   After a plaintiff establishes the three preconditions, a court then conducts a searching review of the relevant facts and circumstances related to the jurisdiction, guided by the so–called "Senate Factors" to assess the totality of the circumstances. <u>Nipper</u>, 39 F.3d at 1512; <u>Gingles</u>, 478 U.S. at 79; <u>De Grandy</u>, 512 U.S. at 1011.

117.   "[I]n the words of the Supreme Court, the district court is required to determine, after reviewing the 'totality of the circumstances' and, 'based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minority voters. This determination is peculiarly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms.'" <u>Wright v. Sumter Cty. Bd. of Elections & Registration</u>, 979 F.3d 1282, 1288 (11th Cir. 2020) (quoting <u>Gingles</u>, 478 U.S. at 79).

118.   The Court is not limited to reviewing only the Senate factors because that list is "neither comprehensive nor exclusive." <u>Ga. State Conf. of the NAACP</u>, 775 F.3d at 1342.

119.   Further, there is no requirement that any particular Senate factors be proved or a majority point one way or another. <u>Id</u>.

120.   Ultimately, "the essential inquiry in a § 2 case is 'whether the political process is equally open to minority voters.'" <u>Id</u>.

121.   Further, when considering a challenge under Section 2, this Court must determine whether the alleged vote dilution is "on account of race or color," 52 U.S.C. § 10301(a), or caused by some other factor. This is because "[u]nless courts 'exercise extraordinary caution' in distinguishing race–based redistricting from politics–based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena." <u>Cooper</u>, 137 S. Ct. at 1490 (Alito, J., concurring in the judgment in part and dissenting in part) (quoting <u>Miller</u>, 515 U.S. at 916).

122.   Section 2 is not simply a checklist—do we have a map with more districts, racially distinctive bloc voting patterns, and a history of discrimination? End of analysis!—instead, this Court is required to "conduct an intensely local appraisal of the design and impact of a voting system." <u>Johnson v. Hamrick</u>, 296 F.3d 1065, 1074 (11th Cir. 2002) (quoting <u>Negron</u>, 113 F.3d at 1566).

123.    Any deprivation of the right to vote found by this Court "must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." <u>Solomon</u>, 221 F.3d at 1225 (en banc) (quoting <u>Nipper</u>, 39 F.3d at 1515 (en banc)); <u>accord</u> <u>Brnovich</u>, 141 S. Ct. at 2359 (Section 2 asks whether an election law interacts with conditions "to **cause race-based inequality** in voting opportunity") (Kagan, J., dissenting) (emphasis added).

## III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Parties and standing.

124.    Alleged harms of vote dilution are "district specific." <u>Gill v. Whitford</u>, 138 S. Ct. 1916, 1930 (2018). As a result, this Court first considers the claims of each Plaintiff.

#### i.    Individual plaintiffs (Pendergrass).

125.    Coakley Pendergrass is a Black registered voter from Cobb County, Georgia who lives in Congressional District 11 on the 2021 enacted plan. Stip. ¶¶ 1–3.

126.    Triana Arnold James is a Black registered voter from Douglas County, Georgia who lives in Congressional District 3 on the 2021 enacted plan. Stip. ¶¶ 4– 6.

127.    Elliott Hennington is a Black registered voter from Cobb County, Georgia who lives in Congressional District 14 on the 2021 enacted plan. Stip. ¶¶ 7–9.

128.    Robert Richards is a Black registered voter from Cobb County, Georgia who lives in Congressional District 14 on the 2021 enacted plan. Stip. ¶¶ 10–12.

129.    Jens Rueckert is a Black registered voter from Cobb County, Georgia who lives in Congressional District 14 on the 2021 enacted plan. Stip. ¶¶ 13–15.

130.    Ojuan Glaze is a Black registered voter from Cobb County, Georgia who lives in Congressional District 13 on the 2021 enacted plan. Stip. ¶¶ 16–18.

**ii.    Defendants.**

131.    Brad Raffensperger is the Georgia Secretary of State and is named as a defendant in his official capacity. Stip. ¶ 85.

132.    Sara Tindall Ghazal is a member of the State Election Board (SEB) and is named as a defendant in her official capacity in the <u>Grant</u> and <u>Pendergrass</u> cases. Stip. ¶ 86.

133.    Janice Johnston is a member of the SEB and is named as a defendant in her official capacity in the <u>Grant</u> and <u>Pendergrass</u> cases. Stip. ¶ 87.

134.    Edward Lindsey is a member of the SEB and is named as a defendant in his official capacity in the <u>Grant</u> and <u>Pendergrass</u> cases. Stip. ¶ 88.

135.    Matthew Mashburn is a member of the SEB and is named as a defendant in his official capacity in the <u>Grant</u> and <u>Pendergrass</u> cases. Stip. ¶ 89.

136.    William S. Duffey, Jr. previously served as chair of the SEB and was named as a defendant in his official capacity in the <u>Grant</u> and <u>Pendergrass</u> cases. Stip. ¶ 90. Judge Duffey has resigned from the State Election Board effective September 1, 2023,[5] and because this is an official-capacity suit, under Fed. R. Civ. P. 25(d), Judge Duffey's successor will automatically take his place when named.

### iii.    Legal conclusions regarding standing.

#### b. Standing against members of the State Election Board.

137.    As the Eleventh Circuit recently explained, "[t]o satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" <u>Jacobson v. Fla. Sec'y of State</u>, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992)).

138.    Despite the opportunity at trial, Plaintiffs have adduced no admissible evidence in this case that the SEB has any role in the implementation of the districts Plaintiffs challenge. Thus, the SEB simply is not implicated in this

---

[5]    https://s3.documentcloud.org/documents/23929621/duffey-william-letter-of-resignation-071823.pdf

action, and its members in their official capacity should be dismissed as parties to it.

139.    "Because the [SEB] didn't do (or fail to do) anything that contributed to [Plaintiffs' alleged] harm, the voters… cannot meet Article III's traceability requirement." Jacobson, 974 F.3d at 1253 (quoting Lewis v. Governor of Ala., 944 F.3d 1287, 1301 (11th Cir. 2019) (internal quotations omitted)).

140.    Thus, the members of the SEB are dismissed from this case.

### c. Standing of individuals and organizations.

141.    A federal court is not "a forum for generalized grievances," and the requirement that plaintiffs have a personal stake in the claim they bring "ensures that courts exercise power that is judicial in nature." Lance v. Coffman, 549 U.S. 437, 439, 441 (2007).

142.    Federal courts uphold these limitations by insisting that a plaintiff satisfy the familiar three-part test for Article III standing: (1) injury in fact, (2) traceability, and (3) redressability. Spokeo, Inc. v. Robins, 578 U. S. 330, 338 (2016).

143.    "Foremost among these requirements is injury in fact—a plaintiff's pleading and proof that he has suffered the 'invasion of a legally protected interest' that is 'concrete and particularized,' i.e., 'which affect[s] the plaintiff in a personal and individual way.'" Gill v. Whitford, 138 S. Ct. 1916, 1929 (2018) (quoting Lujan v. Defenders of Wildlife, 504 U. S. 555, 560 & n.1 (1992)).

144.    In redistricting cases alleging vote dilution, organizations can only have associational standing, because an organization does not "reside" in any particular district. "To the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific." <u>Gill</u>, 138 S. Ct. at 1930.

145.    In other words, "a plaintiff who alleges that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that his own district has been so gerrymandered." <u>Id</u>.

146.    "A plaintiff who complains of gerrymandering, but who does not live in a gerrymandered district, 'assert[s] only a generalized grievance against governmental conduct of which he or she does not approve.'" <u>Id</u>. (quoting <u>United States v. Hays</u>, 515 U. S. 737, 745 (1995)).

147.    In <u>Gill</u>, the Supreme Court noted that "[a]n individual voter in Wisconsin is placed in a single district. He votes for a single representative. The boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked." <u>Id</u>. at 1930.

148.    The Court further held that this apparent disadvantage to the voter "results from the boundaries of the particular district in which he resides. And a plaintiff's remedy must be "limited to the inadequacy that produced [his] injury in fact." <u>Id</u>. at 1931 (quoting <u>Lewis v. Casey</u>, 518 U. S. 343, 357 (1996)).

149.    Finally, the Court concluded that "[i]n this case the remedy that is proper and sufficient lies in the revision of the boundaries of the individual's own district." Id. at 1930 (emphasis added).

150.    Based on the information stipulated to by the parties, this Court finds that the individual plaintiffs have standing to proceed with this action for the districts in which they reside.

**B.    First Gingles precondition.**

**i.    Legal standards.**

151.    In order to meet the first Gingles precondition, Plaintiffs must show that the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district . . . ." Wisc. Legis. v. Wisc. Elections Comm'n, 142 S. Ct. 1245, 1248 (2022) (per curiam) (citing Gingles, 478 U.S. at 50–51).

152.    The compactness review under this precondition refers to the population, not the district: "The first Gingles condition refers to the compactness of the minority **population**, not to the compactness of the contested district." LULAC, 548 U.S. at 433 (emphasis added) (quoting Bush v. Vera, 517 U.S. 952, 997 (1996)).

153.    The first precondition also asks whether the proposed district is geographically compact, meaning whether it is reasonably configured. Allen, 599

U.S. at 18. A district is reasonably configured when it complies with traditional redistricting criteria, including contiguity, compactness, and communities of interest. Id. The purpose of the first Gingles precondition is to "establish that the minority has the potential to elect a representative of its own choice in some single-member district." Id.

154.   The Eleventh Circuit prohibits the separation of the first prong of liability under Gingles and the potential remedy. Nipper, 39 F.3d at 1530-31; see also Burton, 178 F.3d at 1199 ("We have repeatedly construed the first Gingles factor as requiring a plaintiff to demonstrate the existence of a proper remedy.").

155.   Whatever plan is used to demonstrate the violation of the first prong of Gingles must also be a remedy this Court can impose. Nipper, 39 F.3d at 1530-31.

156.   If a plaintiff cannot show that the plan used to demonstrate the first prong can also be a proper remedy, then the plaintiff has not shown compliance with the first prong of Gingles. Id. at 1530-31.

157.   Illustrative plans for this precondition cannot "subordinate traditional redistricting principles to racial considerations substantially more than is reasonably necessary to avoid liability under Section 2." Alpha Phi Alpha, 587 F. Supp. 3d at 1264 (citing Davis v. Chiles, 139 F.3d 1414, 1424 (11th Cir. 1998)).

158.   Thus, Plaintiffs must show as part of the first <u>Gingles</u> precondition that "race did not predominate the drawing of the Illustrative Plans." APA Doc. No. [268], p. 20 n.16; Grant Doc. No. [229], p. 31 n.23; Pendergrass Doc. No. [215], p. 28 n.17.

159.   And "[r]ace may predominate even when a reapportionment plan respects traditional principles, the Court explained, if '[r]ace was the criterion that, in the [mapdrawer's] view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" <u>Bethune-Hill v. Va. State Bd. of Elections</u>, 580 U.S. 178, 189 (2017) (quoting <u>Shaw v. Hunt</u>, 517 U.S. 899, 907 (1996)).

160.   Further, a mapdrawer "may not 'assum[e] from a group of voters' race that they "think alike, share the same political interests, and will prefer the same candidates at the polls."'" <u>LULAC</u>, 548 U.S. at 433 (quoting <u>Miller v. Johnson</u>, 515 U.S. 900, 912 (1995) (quoting <u>Shaw v. Reno</u>, 509 U.S. 630, 647 (1993)).

**ii.      Credibility determinations.**

**b.  Cooper qualifications (Pendergrass).**

161.  William Cooper was qualified by Plaintiffs as an expert in redistricting, demographics, and Census data. Tr. 715:8–10, 717:1–4. Mr. Cooper has served as an expert witness in over 50 cases. Tr. 713:8–21.

162.    Despite Mr. Cooper's experience, the Court assigns very little weight to Mr. Cooper's testimony. During Mr. Cooper's live testimony, the Court carefully observed his demeanor, particularly as he was cross-examined about his work in this case. Mr. Cooper was combative and evasive in many answers.

163.    In an expert report filed five years ago in the <u>Dwight</u> case, Mr. Cooper claimed that a new majority-Black congressional district could have been drawn in east Georgia instead of metro Atlanta. Tr. 779:15–20; DX 21, 155.

164.    In the <u>Dwight</u> report, Mr. Cooper specifically excluded counties in the Atlanta Metropolitan statistical area from his analysis, resulting in the creation of a majority-Black district in east Georgia.

> **IV. PLAINTIFFS' ILLUSTRATIVE PLANS**
>
>     63.    This section presents two illustrative plans. Both plans comply with traditional redistricting principles, including one-person one-vote, compactness, contiguity, respect for communities of interest, and the non-dilution of minority voting strength. The plans avoid 2018 incumbent conflicts, i.e. no incumbents are paired in the same district.[12] The plans have the following features:
>
> - Both plans create a new majority-Black District 12 that joins African American communities in Macon, Augusta, and Savannah.

Tr. 780:18–21; DX 155, ¶¶ 7, 63.

165.  In contrast to this case, Mr. Cooper only looked at adding a new majority-Black district in metro Atlanta, not elsewhere in the state. Tr. 781:23–8; 783:19–21.

166.  In creating the illustrative Congressional plan, Mr. Cooper did not alter Districts 2, 5, and 7, all of which were electing Black Democratic members of Congress. Tr. 786:12–14, 787:11–15.

167.  Indeed, every district on the illustrative Congressional plan that touches enacted District 7 is altered. Tr. 788:2–5.

168.  Despite years of experience as a mapdrawer, Mr. Cooper was evasive when asked about racial predominance, falling back to rote answers about every factor being important. Tr. 822:14–823:23.

169.  Despite relying on the common experience of Black Americans in creating plans in one case, Mr. Cooper said he did not rely on that experience in creating the illustrative Congressional plan, but he admitted that it was "overall in the background" as he was drawing the plan. Tr. 826:15–827:1.

170.  Finally, Mr. Cooper has been found to draw maps that were improperly focused on race in Ala. State Conference of the NAACP v. Alabama, 612 F. Supp. 3d 1232, 1269 (M.D. Ala. 2020).

171.  That court found, "Mr. Cooper testified that he joined the substantial African-American population of Jefferson County for the sheer sake of satisfying

a numerical threshold. His explanation reveals that maintaining communities of interest, if considered at all, was subordinated to the necessity of creating an African-American, voting-age population in District 1 of his AC plans with a 50% plus one voting-age population. This feature illustrates the warning of <u>Shaw v. Reno</u>." <u>Id</u>. (citation omitted).

172.    As discussed below, Mr. Cooper engaged in the same pattern of behavior in this case.

173.    This lack of credibility combined with his constantly shifting testimony when faced with his prior work on this case demonstrates that Mr. Cooper's testimony lacks credibility, and the Court assigns little weight to his testimony.

### c.  Morgan Qualifications.

174.    Defendants qualified Mr. Morgan as an expert in redistricting, the analysis of demographic data, and the analysis of redistricting plans. Tr. 1748:8–16. Mr. Morgan has a bachelor's in History from the University of Chicago and has earned his living for the last thirty years by drawing maps, both for electoral purposes and for demographic analysis. DX 1, 2, 3, 4.

175.    Mr. Morgan previously provided limited testimony at the preliminary-injunction hearing, not addressing issues related to race in the redistricting process given the timing, but rather focusing on the overall statistics

on plans. <u>Alpha Phi Alpha</u>, 587 F. Supp. 3d at 1247. While the Court previously assigned little weight to his testimony, Mr. Morgan's additional expert reports and testimony have significantly bolstered his credibility at trial.

176.   Mr. Morgan undertook additional analysis in his reports after the preliminary-injunction hearing, directly addressing questions of the use of race in the redistricting process that were previously unaddressed.

177.   Mr. Morgan has the most experience of any mapdrawer who testified, having drawn redistricting plans that were used in elections in many states following four Censuses: 1990, 2000, 2010, and 2020. Tr. 1745:12–16.

178.   Mr. Morgan served as a mapdrawer for independent or bipartisan redistricting commissions in three states in the 2020 redistricting cycle, Michigan, Virginia, and New Jersey. Tr. 1746:5–14.

179.   Mr. Morgan did redistricting work in Georgia in 2001 and 2021 and has worked on a number of Georgia political campaigns. Tr. 1746:20–1747:7.

180.   Despite working largely in Republican politics, Mr. Morgan has worked extensively with Democratic officials to draw redistricting plans. Tr. 2121:2–2123:12.

181.   Redistricting plans drawn by Mr. Morgan have been upheld by courts or have not been challenged in dozens of states.  Tr. 2123:13–2125:10.

182.   Those states include plans in Connecticut, Pennsylvania, Virginia, South Carolina, Indiana (both legislative and Congressional districts), and Missouri. Id.

183.   Mr. Morgan has familiarity with the demographics and geography of Georgia, including visiting every county in the state of Georgia. Tr. 1747:8–13.

184.   Mr. Morgan is primarily a mapdrawer as opposed to an expert witness but has evaluated redistricting plans drawn by others as part of his work in the field. Tr. 1747:14–1748:7.

185.   The Court finds Mr. Morgan's testimony highly credible. Mr. Morgan has spent most of his career drawing maps for redistricting that have been utilized in elections across the country. While some district plans he drew have been overturned, Mr. Morgan primarily carries out the goals of policymakers so those court decisions cannot be the sole result of his mapdrawing processes.

186.   Mr. Morgan's testimony was clear and consistent, and he was able to explain the basis for his opinions, including the various techniques of racial focus in redistricting that were particularly helpful to the Court in weighing Plaintiffs' plans.

187.   During Mr. Morgan's live testimony at trial, the Court carefully observed his demeanor. He explained his reports with careful and deliberate explanations and the Court did not observe any inconsistencies or questions he

refused to answer. The Court finds Mr. Morgan's methods and conclusions are highly reliable and ultimately, his work is extremely helpful to the Court.

### iii.    Evidence on Congressional plan.

188.   The most significant change from the 2011 enacted to the 2021 enacted Congressional plan was the change of boundaries of Congressional District 6. Tr. 785:17–21.

189.   To create a new majority-Black illustrative Congressional District 6, Mr. Cooper altered the boundaries of eight of the 14 congressional districts on the enacted plan. Tr. 807:5–9.

190.   Of the altered eight districts, four districts are less compact on the illustrative Congressional plan on the Reock compactness measurement when compared to the enacted Congressional plan and five districts on the illustrative Congressional plan are less compact on the Polsby-Popper compactness measurement when compared to the enacted Congressional plan. Tr. 1836:3–11; DX 4, ¶ 22, Chart 2.

191.   Population placed in illustrative Congressional District 6 from Fulton, Douglas, and Cobb Counties were already in majority-Black District 13 on the enacted plan. Tr. 788:6–19.

192.    District 13 on the enacted Congressional plan does not contain any of DeKalb, Rockdale, or Newton Counties, unlike the illustrative Congressional plan. Tr. 788:20–22.

193.    While drawing the illustrative Congressional plan, Mr. Cooper displayed dots showing him where precincts with more than 30% Black population were located. Tr. 789:25–790:10, 823:25–824:7.

194.    Mr. Cooper did not have any election return data available to him while drawing the illustrative Congressional plan. Tr. 790:11–14, 818:21–23.

195.    Mr. Cooper did not review any public testimony from Georgia voters as part of the process for preparing the illustrative Congressional plan. Tr. 819:13–15.

196.    Mr. Cooper did not opine that any districts on the enacted Congressional plan are packed. Tr. 820:3–822:12.

197.    Mr. Cooper did not include reports on regional commission splits in his report. Tr. 828:16–24.

198.    Illustrative Congressional District 6 contains almost none of the population included in enacted Congressional District 6 on the 2011 Congressional plan.





Tr. 791:9–14; PPX 1, Ex. E, p. 82.

199.    Despite Mr. Cooper claiming he relied on four majority-Black state
Senate districts for a location of illustrative Congressional District 6, only one of
the four state Senate districts is wholly contained in the illustrative Congressional
District 6.



Tr. 792:8–793:5; PPX 1, Figure 10.

200.    Despite Mr. Cooper stating in his report that he followed the
municipal boundary of Tyrone, illustrative Congressional District 6 splits the city
of Tyrone. Tr. 793:10–20.

201.    The only portion of illustrative Congressional District 6 that is
majority-Black is the Fulton portion of the district. Tr. 795:8–22, 796:8–10.

46

202.   The only geographically compact Black community Mr. Cooper could identify in District 6 were the boundaries of illustrative Congressional District 6. Tr. 796:11–797:2.

203.   The largest county by population included in illustrative Congressional District 6 contains the second-smallest Black population concentration.

| District 006 | | | | |
|---|---|---|---|---|
| **County: Cobb GA** | | | | |
| Total: | 452,386 | 164,732 | 175,347 | 83,302 |
| | | 36.41% | 38.76% | 18.41% |
| Voting Age | 352,053 | 141,014 | 131,674 | 55,556 |
| | | 40.05% | 37.40% | 15.78% |

Maptitude                                                           Page 8 of 22

| **Plan Components with Population Detail** | | | | Nov14_GA_congress |
|---|---|---|---|---|
| | Total Population | NH_Wht | AP_Blk | [Hispanic Origin] |
| **District 006** | | | | |
| **County: Douglas GA** | | | | |
| Total: | 144,237 | 49,877 | 74,260 | 16,035 |
| | | 34.58% | 51.48% | 11.12% |
| Voting Age | 108,428 | 41,416 | 53,377 | 10,212 |
| | | 38.20% | 49.23% | 9.42% |
| **County: Fayette GA** | | | | |
| Total: | 4,143 | 2,109 | 998 | 891 |
| | | 50.91% | 24.09% | 21.51% |
| Voting Age | 3,000 | 1,700 | 652 | 543 |
| | | 56.67% | 21.73% | 18.10% |
| **County: Fulton GA** | | | | |
| Total: | 164,371 | 9,267 | 146,286 | 8,173 |
| | | 5.64% | 89.00% | 4.97% |
| Voting Age | 123,766 | 8,240 | 109,273 | 5,487 |
| | | 6.66% | 88.29% | 4.43% |
| **District 006 Total** | | | | |
| Total: | 765,137 | 225,985 | 396,891 | 108,401 |
| | | 29.54% | 51.87% | 14.17% |
| Voting Age | 587,247 | 192,370 | 294,976 | 71,798 |
| | | 32.76% | 50.23% | 12.23% |

Tr. 797:3–13; PPX 1, Ex. I-3.

204.    Illustrative Congressional District 6 is so close to 50% that a shift of as few as 1,353 people in a district of over 765,000 people could reduce the district below majority-Black status. Tr. 849:4–850:8; PPX 1, Ex. I-3.

205.    The technique of racial sensitivity, where every move has a racial impact, is present in illustrative Congressional District 6. Tr. 1836:12–19; DX 4, ¶ 17.

206.    The only community of interest Mr. Cooper could identify between the south side of illustrative Congressional District 6 and the northern part of the district was that they were both part of suburban Atlanta. Tr. 798:24–799:16.

207.    Despite Mr. Cooper changing the boundaries of illustrative Congressional District 6 from the preliminary injunction plan to the current version, the Black VAP remained identical. Tr. 802:6–20.

208.    Only 2.5% of the population of illustrative Congressional District 6 lives in enacted Congressional District 6. Tr. 1835:16–22; DX 4, ¶ 18.

209.    Despite criticizing the enacted Congressional plan for mixing urban/suburban metro Atlanta with Appalachian north Georgia, the illustrative Congressional plan also connects urban/suburban metro Atlanta with rural areas in Georgia.[6] Tr. 803:7–10, 803:24–804:20.

_____

[6] Even if this Court only considers illustrative Congressional District 6 for purposes of <u>Gingles</u> 1, Pendergrass Doc. No. [215], p. 29, the changes to adjoining

210.   The illustrative Congressional plan connects majority-Black Hancock

County with the Appalachian Mountains in North Georgia.



Tr. 806:10–23; PPX 1, p. 86.

211.   The illustrative Congressional plan connects urban areas in Clayton

County with rural areas.

_____

districts are relevant to the totality of the circumstances and the evaluation of the
enacted plan.



Tr. 807:10–17; PPX 1, p. 86.

212.   Both illustrative Congressional Districts 6 and 13 on the illustrative plan connect areas with higher concentrations of white voters to areas with higher concentrations of Black voters. Tr. 808:5–14.

213.   Congressional Districts 3, 4, 9, 10, 11, and 13 are more compact on the enacted Congressional plan than on the illustrative Congressional plan. Tr. 810:1–811:24.

214.   Illustrative Congressional Districts 9, 11, and 13 contain less than 55% of the population from the corresponding district numbers on the enacted Congressional plan. Tr. 1835:9–15; DX 4, ¶ 18.

215.   Mr. Cooper believed he might have crossed a mountain range on illustrative Congressional District 14. Tr. 807:2–4.

216.   Despite including socioeconomic data with his report, Mr. Cooper did not rely on that information when creating the illustrative Congressional plan. Tr. 816:23–817:2.

217.   The socioeconomic data included are only available at the county level and Mr. Cooper did not include any information from that data when drawing the plans. Tr. 816:6–16, 819:8–12.

218.   By using the techniques of racial sensitivity and elongation of districts, Mr. Cooper's illustrative Congressional plan prioritizes race in the creation of illustrative Congressional District 6. As discussed below, this means the illustrative plan is not merely race-conscious, but is drawn primarily based on race.

### b.   Wright mapdrawing information.

219.   As part of Defendants' first Gingles precondition evidence (and the totality of the circumstances), Gina Wright, the Executive Director of the Georgia General Assembly's Office of Legislative and Congressional Reapportionment, testified about the mapdrawing process in Georgia. As discussed below in the totality of the circumstances, the Court finds Ms. Wright's testimony highly

credible, and it assisted the Court in evaluating the first precondition and Plaintiffs' illustrative plans.

220.    Creating redistricting plans involves a number of competing interests. Tr. 1603:15–20.

221.    Ms. Wright drew Georgia's redistricting plans for Congress, state Senate, and state House in 2021. Tr. 1604:14–16.

222.    Ms. Wright provides equal access to her office for members of all political parties in the General Assembly. Tr. 1601:11–20.

223.    Ms. Wright used political data in drawing those plans, including election-return data that was estimated at the Census block level. Tr. 1604:17–1607:2.

224.    The estimated political data allows Ms. Wright to have access to political data even when splitting a precinct. Tr. 1607:4–7.

225.    Population equality is the goal of redistricting, ensuring districts have equal population. Tr. 1607:8–1608:7.

226.    Population equality is measured by deviations from the ideal districts size, which is located by taking the total population and dividing by the number of districts. Tr. 1608:14–1609:2.

227.    Using more narrow deviation ranges is a change from the 2001 cycle of redistricting in Georgia, which used broader deviations. Tr. 1607:8–1608:13.

228.    Ms. Wright never uses compactness score reports but instead relies on visual reviews of districts, which is a process she utilized in drawing the Congressional, state Senate, and state House plans in 2021. Tr. 1609:3–1610:12.

229.    The creation of the Congressional, state Senate, and state House plans in 2021 took county splits into account by trying to avoid splits of counties. Tr. 1611:16–1612:1.

230.    The creation of the Congressional, state Senate, and state House plans in 2021 took precinct splits into account by trying to avoid splits of precincts. Tr. 1612:2–1613:8.

231.    Despite Mr. Cooper relying on city splits for comparisons, the splitting of city boundaries was not as high of a consideration in the creation of the Congressional, state Senate, and state House plans in 2021 because cities frequently change boundaries. Tr. 1613:21–1614:9.

232.    Despite Mr. Cooper relying on splits of Metropolitan Statistical Areas for comparisons, Ms. Wright did not consider splits of Metropolitan Statistical Areas in drawing the Congressional, state Senate, and state House plans in 2021. Tr. 1614:10–24.

233.    Despite Mr. Cooper relying on splits of Core-Based Statistical Areas for comparisons, Ms. Wright did not consider splits of Core-Based Statistical Areas

in drawing the Congressional, state Senate, and state House plans in 2021. Tr. 1614:25–1615:3.

234.   Despite Mr. Cooper relying on splits of regional commissions for comparisons, Ms. Wright did not consider splits of regional commissions in drawing the Congressional, state Senate, and state House plans in 2021. Tr. 1615:5–9.

235.   Regional commissions are quasi-governmental agencies that are a resource for local governments but have no bearing on statewide plans. Tr. 1615:10–20.

236.   Ms. Wright took communities of interest into account based on testimony at public hearings, input from legislators, and Ms. Wright's extensive knowledge of Georgia from interactions with local officials. Tr. 1615:21–1618:18, 1638:1–1639:8.

237.   Despite Mr. Cooper relying on transportation corridors for communities of interest in the creation of the illustrative plans, Ms. Wright does not generally believe that roads or highways are communities of interest. Tr. 1681:21–1682:6.

238.   Despite Mr. Cooper relying on socioeconomic data as the basis for a community of interest, Ms. Wright did not utilize socioeconomic data when

drawing the Congressional, state Senate, and state House plans in 2021. Tr. 1618:20–23.

239.   Ms. Wright is aware of the Black Belt, but she did not utilize it as a community of interest when drawing districts, in part because the boundaries are uncertain. Tr. 1618:24–1619:13.

240.   The 2021 redistricting cycle followed a similar process to the 2011 redistricting cycle. Tr. 1619:24–1620:4.

241.   Georgia's redistricting plans for Congress, state Senate, and state House were never enjoined by any court from 2011 to 2020. Tr. 1620:19–22.

242.   The only challenge to the enacted state House plans in the 2011 cycle was dismissed after Democrats won the districts being challenged in the Section 2 lawsuit. Tr. 1709:4–14.

243.   When drawing redistricting plans, Ms. Wright's mapping system does not allow the display of the 2010 and 2020 Census information simultaneously, but only the current Census information. Tr. 1708:15–1709:3. As a result, many of Plaintiffs' claims about growth in Black population were not visible to Ms. Wright during the mapdrawing process. Id.

### iv.  Analysis of proposed plan.

### b.  Numerosity.

244.   Plaintiffs have presented evidence of a district drawn with more than 50% Black VAP. Bartlett v. Strickland, 556 U.S. 1, 13 (2009) (plurality op.). The fact that such districts can be drawn is not dispositive of the first Gingles precondition, because Plaintiffs must present evidence of a district that complies with traditional redistricting principles in addition to being over 50% Black VAP. Allen, 599 U.S. at 30.

### c.  Population.

245.   Plaintiffs' illustrative plan complies with the traditional redistricting principle of population equality because the districts are equally sized.

### d.  Compactness.

246.   There is no numerical threshold for when a district is completely non-compact because compactness scores only provide a point of comparison. Tr. 363:16–364:7.

247.   While Plaintiffs' plan on an overall basis is similar on compactness scores to the enacted plan, the areas around the new majority-Black district have lower compactness scores, showing that a decrease in compactness is necessary to add a majority-Black district.

248.   Further, the Court finds this factor to be of little weight because Mr. Cooper was able to design districts overall that matched or nearly matched the compactness scores of the enacted plans, essentially "teaching to the test" in ways that limit the value of this metric.

### e. Contiguity.

249.   All of Plaintiffs' illustrative districts are contiguous.

### f. Political subdivisions.

250.   The illustrative plan splits similar numbers of counties and precincts when compared with the enacted plans.

### g. Communities of interest.

251.   Mr. Cooper was largely unable to explain the communities of interest utilized in the mapdrawing process, which is significant in light of the importance of the illustrative plan being a plan the legislature could have drawn.

252.   Perhaps recognizing this shortcoming, Plaintiffs offered several lay witnesses to talk about various communities of interest on the illustrative plans. While the Court appreciates the testimony of each individual and believes they hold sincere beliefs about their communities, the Court finds that the testimony's value is of extremely limited weight in evaluating Plaintiffs' illustrative plans.

253.   None of the mapdrawers ever utilized the information provided by the individual witnesses or any Plaintiffs because they never spoke to each other.

254.    Thus, the information provided by the individual witnesses is, at best, Plaintiffs' attempt to provide "race-neutral" reasons for the creation of the districts that were only considered <u>after</u> the majority-Black districts were drawn. <u>Bethune-Hill</u>, 580 U.S. at 189.

255.    Dr. Evans has lived in Georgia her whole life, originally from Screven County and in Jefferson County for the last forty years. Tr. 619:9–17.

256.    Dr. Evans received her doctorate of ministry from Erskine College, and she has been a part-time pastor at St. Paul Missionary Baptist Church in Sylvania, Georgia for twenty-five years. Tr. 620:2–17.

257.    St. Paul Missionary Baptist Church is the church Dr. Evans and her family attend, approximately 67 miles from where she lives. Tr. 620:10–14.

258.    Dr. Evans has run for political office three times, the first time as a write-in candidate because "we did not have a Democrat on the ticket," and the other two times as a candidate for the Democratic Party. Tr. 623:5–18, 635:10–13.

259.    Dr. Evans served as a chair of the Jefferson County Democratic Party, where her role included recruiting candidates to run for office as Democrats. Tr. 636:2–14.

260.    Dr. Evans is not an expert in, and has never testified regarding, <u>Gingles</u> maps. Tr. 636:15–637:19.

261.   Dr. Evans considers herself to reside in the Black Belt, described in her own terms to be an area where "there is a large population of Blacks," but she did not identify specific counties. Tr. 624:18–625:11.

262.   Dr. Evans agreed that people in Washington, Georgia, in Wilkes County would not regularly attend church in Sylvania, Georgia, in Screven County. Tr. 638:11–16.

263.   Dr. Evans testified "[her] community is just like every other community." Tr. 638:11–16.

264.   Dr. Evans agrees that issues with healthcare access, education, property taxes, and gun safety applies equally to everybody, not just Black voters. Tr. 639:24–640:25.

265.   <u>Grant</u> and <u>Pendergrass</u> Plaintiffs offered the testimony of Jason Carter, a former state Senator and former candidate for Governor, as part of their review of their <u>Gingles</u> 1 plans.

266.   Mr. Carter gained knowledge of Georgia geography and population from his run for Governor, among other political activities he has engaged in over the years. Tr. 943:16–945:10, 946:2–948:20.

267.   Mr. Carter has been involved in Democratic politics and ran as a Democrat for Governor. Tr. 971:22–972:7.

268.    Mr. Carter believes that adding more majority-Black districts will mean adding more districts where Democrats can be elected. Tr. 972:9–19.

269.    Mr. Carter identified traffic interests as a shared interest of Black voters in illustrative Congressional District 6, but later agreed that traffic affects all voters, regardless of race. Tr. 973:24–974:3.

270.    Mr. Carter agreed that Cobb voters included in illustrative Congressional District 3 have more suburban issues than Harris County voters near Columbus, Georgia. Tr. 976:3–12.

271.    Mr. Carter agreed that the issues he described as common to the voters in illustrative Congressional District 6 are currently included in the area covered by enacted Congressional District 13. Tr. 978:21–979:1.

272.    Grant and Pendergrass Plaintiffs offered the testimony of Erick Allen, a former state representative and former candidate for Lt. Governor, as part of their review of their Gingles 1 plans.

273.    Mr. Allen gained his knowledge of Georgia geography and population from his run for Lt. Governor, among other political and business activities he has engaged in over the years. Tr. 997:9–999:15.

274.    Mr. Allen has worked to elect Democrats and wants to see more Democrats elected in Georgia. Tr. 1011:10–19.

275.    Mr. Allen agreed that majority-Black districts traditionally elect Democrats in Georgia. Tr. 1011:20–22.

276.    When Mr. Allen was elected to the state House, he was not elected in a majority-Black district, and he ran for statewide for Lt. Governor in 2020 because he believed he could win that office. Tr. 1012:2–20.

277.    Mr. Allen voted against the 2021 Congressional, state Senate, and state House plans during the special session. Tr. 1013:7–10.

278.    Mr. Allen believed the districts on the enacted plans were configured to counter Democratic trends in Cobb County. Tr. 1013:19–22.

279.    Mr. Allen recited a list of common interests that is shared by all voters when discussing needs of Black voters and voters in metro Atlanta. Tr. 1008:22–1010:20.

280.    All of the interests Mr. Allen identified as being unique to voters in illustrative Congressional District 6 are the same for voters already included in majority-Black enacted Congressional District 13. Tr. 1023:16–1024:16.

281.    Despite all of this testimony on various points, the Court finds the traditional principle of communities of interest is not met by the illustrative plans because Mr. Cooper could not consistently explain a process he followed and the lay witnesses offered only limited support for some of the decisions made independently by the mapdrawer.

## v.  Legal conclusions regarding first <u>Gingles</u> precondition.

282.  The Eleventh Circuit prohibits the separation of the first prong of liability under <u>Gingles</u> and the potential remedy. <u>Nipper</u>, 39 F.3d at 1530–31; <u>see also</u> <u>Burton</u>, 178 F.3d at 1199 ("We have repeatedly construed the first <u>Gingles</u> factor as requiring a plaintiff to demonstrate the existence of a proper remedy."); <u>accord</u> <u>Wright</u>, 979 F.3d at 1302. Whatever plan is used to demonstrate a violation of the first prong of <u>Gingles</u> must also be a remedy that can be imposed by the Court. <u>Nipper</u>, 39 F.3d at 1530–31. In short, if a plaintiff cannot show that the plan used to demonstrate the first prong can also be a proper remedy, then the plaintiff has not shown compliance with the first prong of <u>Gingles</u>. <u>Wright</u>, 979 F.3d at 1302.

283.  Plaintiffs' illustrative plan fails to cross the threshold for remedies that can be imposed by the Court.

284.  First, as discussed above, the Court finds that the illustrative plan is not designed consistent with traditional redistricting principles, meaning it is not reasonably compact. <u>Allen</u>, 143 S. Ct. 1503.

285.  Second, the boundaries of the majority-Black district on the illustrative plan is "unexplainable other than on the basis of race," which is unconstitutional. <u>Miller</u>, 515 U.S. at 910.

286.  In creating the illustrative plan on which Plaintiffs rely, Mr. Cooper testified to his focus on race in creating the plans because his purpose was adding

majority-Black districts. While that goal standing alone may not make a map improper for Section 2 purposes, Davis, 139 F.3d at 1425, the focus on race in every aspect was clear.

287.   Plaintiffs have thus failed to carry the burden to show that "race did not predominate the drawing of the Illustrative Plans." APA Doc. No. [268], p. 20 n.16; Grant Doc. No. [229], p. 31 n.23; Pendergrass Doc. No. [215], p. 28 n.17.

288.   Mr. Cooper elongated districts from heavily Black areas into heavily white areas to create new majority-Black districts, using displayed racial information on the screen to make decisions about district boundaries, while being unable to explain any reason for uniting those communities. Miller, 515 U.S. at 910. This technique was used in illustrative Congressional Districts 6 and 13.

289.   Mr. Cooper drew districts that were so close to 50% Black VAP that every move in the creation of a district would have a racial impact. Miller, 515 U.S. at 910. This technique was used in illustrative Congressional District 6.

290.   Mr. Cooper also relied on his view of the commonality of all Black voters in creating the plans, which is prohibited.

291.   Ultimately, it is clear that race "was the criterion" that "could not be compromised" and any "race-neutral considerations" were only considered after the majority-Black district was created. Bethune-Hill, 580 U.S. at 189.

292.    While Mr. Cooper indicated his race-consciousness in drawing redistricting plans, he was not able to adequately or consistently explain how he utilized "traditional districting principles such as maintaining communities of interest and traditional boundaries." LULAC, 548 U.S. at 433 (2006). The Voting Rights Act does not ask merely whether more majority–Black districts can be drawn—it asks whether reasonably compact majority–Black districts can be drawn if all other factors are also met. Shaw v. Hunt, 517 U.S. 899, 913 (1996).

293.    Mr. Cooper only asked if he could draw more majority–Black districts if he focused primarily on race. But "[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" Bush v. Vera, 517 U.S. 952, 979 (1996).

294.    Under Plaintiffs' theory there is no limiting principle—the General Assembly would have to keep drawing as many majority-Black districts as it could locate, even beyond those proposed in this case. But "[f]ailure to maximize cannot be the measure of § 2." De Grandy, 512 U.S. at 1017.

295.    Plaintiffs did not provide evidence that the legislature failed to consistently follow its own guidelines or even that the existing districts were packed, despite the claims in their Complaint. Plaintiffs cannot demonstrate a "strong basis in evidence" for why they have drawn their maps. Cooper, 581 U.S.

at 292. As a result, they have failed to show there is any compelling interest that supports their racial focus in the illustrative plans.

296.    Even in the most generous reading of Supreme Court precedent, Section 2 could allow race-conscious relief only after Plaintiffs have established that the redistricting plans "result[ed] in a denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a).

297.    Plaintiffs cannot racially gerrymander as a sword to show a Section 2 violation, then use that newly found Section 2 violation as a shield to protect their improper racial redistricting.

298.    Further, Mr. Cooper did not undertake any analysis of the geographic compactness of the minority <u>communities</u>, instead relying on the <u>district</u> he drew to support a finding of geographic compactness—indeed, when asked where the geographically compact minority community was located, the answer was consistently where the boundaries were of the district he had drawn.

299.    Plaintiffs must do more than just draw a district—they must demonstrate connections between the disparate geographic communities they unite that go beyond race in such a configuration the legislature could have drawn. <u>LULAC</u>, 548 U.S. at 433; <u>Vera</u>, 517 U.S. at 997. By relying solely on compactness scores of the districts, they miss the requirement of compactness of the underlying community.

300.    The Section 2 analysis of compactness is not centered on "the relative smoothness [and contours] of the district lines," but rather the compactness of the minority population itself. <u>LULAC</u>, 548 U.S. at 432–433. The inquiry, therefore, is whether "the minority group is geographically compact." <u>Id</u>. at 433 (quoting <u>Shaw</u>, 517 U.S. at 916).

301.    After reviewing the proposed new majority-Black district, it is clear that the district as drawn does not support a conclusion that the minority community is sufficiently numerous and geographically compact for purposes of the first prong of <u>Gingles</u>.

302.    Because Plaintiffs have not presented a remedy this Court can order, but instead have presented a map that fails to comply with traditional redistricting principles and is drawn primarily based on race, this Court finds Plaintiffs have failed to meet the first <u>Gingles</u> precondition for their plan.

### C.    Second and Third <u>Gingles</u> preconditions.

303.    The second <u>Gingles</u> precondition requires the Plaintiffs to show that "the minority group . . . is politically cohesive." <u>Gingles</u>, 478 U.S. at 51. The third <u>Gingles</u> precondition requires the Plaintiffs to show that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate." <u>Id</u>. Because these factors both relate to voting patterns, the Court considers them together.

i.      **Legal standard.**

304.    This Court has ruled on several occasions that "the second and third <u>Gingles</u> preconditions require only that Plaintiffs show that majority-voter political cohesion and racial bloc voting exists, not the reason for its existence." APA Doc. No. [268], pp. 38–39; Grant Doc. No. [229], pp. 49–50; Pendergrass Doc. No. [215], p. 48. And the Court has further emphasized that evaluating the reasons behind racial bloc voting and minority political cohesion is inappropriate at the <u>Gingles</u> preconditions phase. <u>Id</u>.

305.    The Court, therefore, for purposes of this prong, looks only to determine whether the statistical analysis provided by Plaintiffs demonstrates the necessary bloc voting patterns and saves its inquiry into causation and explanation for totality of circumstances.

ii.     **Evidence from Dr. Palmer.**

306.    Dr. Palmer only examined general elections and specifically excluded party from any part of his analysis. Tr. 2148:10–19.

307.    Dr. Palmer also did not assess causation or attempt to explain why voting patterns were occurring the way they were in his analysis. Tr. 423:14–20.

308.    While this Court accepts Dr. Palmer's analysis showing that white voters cohesively support a different candidate than the Black-preferred

candidate, the Court does not consider Dr. Palmer's analysis for any proposition beyond that with respect to his racially polarized voting analysis.

309.   Evidence submitted by Dr. Palmer establishes that in general elections, Black voters cohesively support a preferred candidate and white voters vote as a bloc to usually defeat that candidate. Tr. 2146:9–23.

### iii.    Evidence from Dr. Alford.

310.   Defendants offered Dr. John Alford as an expert on the second and third <u>Gingles</u> preconditions and Senate Factor Two. Tr. 2132:19–2133:1.

311.   Dr. Alford has been accepted as an expert in cases involving the Voting Rights Act for more than 30 years and has always been accepted as an expert, including in six cases since 2022 alone. Tr. 2131:19–2132:18.

312.   The Court had the opportunity to engage in an extended discussion with Dr. Alford and found his answers to be clear, concise, and thoughtful. The Court assigns great weight to his testimony and found it very assistive to the Court.

313.   Dr. Alford agrees with the methodology employed by both experts for purposes of conducting their bloc voting analysis in the general election contests examined. Tr. 2145:23–2146:1, 2215:17–25.

314.   However, the primary analysis provided by Dr. Alford shows that Black Republican voters and white Republican voters had the same preferred candidate in the Republican primary in 2022. Tr. 2208:14–2209:9, 2260:2–8.

> iv.   **Legal conclusions regarding second and third <u>Gingles</u> preconditions.**

315.   This Court has determined, based on its prior rulings of what is required to be shown with respect to the second and third <u>Gingles</u> preconditions, that Plaintiffs have satisfied the evidentiary requirements to establish the second and third preconditions in the general elections examined.

316.   The Court, however, does not find that the primary elections analyzed contain sufficient evidence to satisfy the second and third <u>Gingles</u> preconditions.

317.   As discussed below, the issue of polarized voting must also be considered at the totality of the circumstances phase. So, while this Court determines that Plaintiffs have met the standard required by its prior rulings, that is not dispositive to their claims on this issue.

> **D.   Totality of the circumstances.**

> i.   **Legal standard.**

318.   Only after Plaintiffs show the first three <u>Gingles</u> preconditions does the Court "consider[] whether, 'on the totality of circumstances,' minorities have

been denied an 'equal opportunity' to 'participate in the political process and to elect representatives of their choice.'" <u>Abrams v. Johnson</u>, 521 U.S. 74, 91 (1997) (quoting Section 2); <u>De Grandy</u>, 512 U.S. at 1011 (<u>Gingles</u> preconditions are not "sufficient in combination" to prove a violation of Section 2).

319.    Further, "[t]he inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process." <u>Chisom v. Roemer</u>, 501 U.S. 380, 397 (1991). Because "in a majoritarian system, numerical minorities lose elections." <u>Holder v. Hall</u>, 512 U.S. 874, 901 (1994) (Thomas, J., concurring).

320.    "[I]n the words of the Supreme Court, the district court is required to determine, after reviewing the 'totality of the circumstances' and, 'based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minority voters. This determination is peculiarly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms.'" <u>Wright</u>, 979 F.3d at 1288 (quoting <u>Gingles</u>, 478 U.S. at 79).

321.    The Senate factors are also limited in some ways because they "are more generalized indicators of the status of minority life in Georgia as opposed to the indicators of whether [the challenged maps] result[] in fewer opportunities for

minority voters." <u>Fair Fight Action, Inc. v. Raffensperger</u>, 634 F. Supp. 3d 1128, 1250 (N.D. Ga. 2022).

322. The Court is not limited to reviewing only the Senate factors because that list is "neither comprehensive nor exclusive." <u>Ga. State Conf. of the NAACP</u>, 775 F.3d at 1342.

323. Further, there is no requirement that any particular Senate factors be proved or a majority point one way or another. <u>Id</u>.

324. Ultimately, "the essential inquiry in a § 2 case is 'whether the political process is equally open to minority voters.'" <u>Id</u>.

325. Even if Plaintiffs had established the first three <u>Gingles</u> preconditions, their claims would still fail on the present record if the Court were to continue to the weigh the totality of the circumstances because the record before the Court does not indicate that the 2021 enacted redistricting plans present "an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choosing as compared to other members of the electorate." <u>Id</u>.

ii.    **Credibility determinations.**

b.  **Wright.**

326. Defendants offered the testimony of Ms. Gina Wright regarding the redistricting process and the enacted plans.

327.    Ms. Wright has worked for the Legislative and Congressional Reapportionment Office for almost 23 years creating maps for various levels of Georgia governments, including statewide plans for the General Assembly. Tr. 1600:11–21.

328.    Ms. Wright has drawn hundreds of maps that have been used in elections in Georgia. Tr. 1600:22–24.

329.    Ms. Wright has served as a technical expert for at least eight federal courts, drawing plans that were used as remedies. Tr. 1601:3–10; Alpha Phi Alpha, 587 F. Supp. 3d at 1248 (collecting cases).

330.    This Court previously found Ms. Wright credible on redistricting and demographics in Georgia, including her knowledge of communities of interest and political subdivisions in Georgia. Id. at 1249.

331.    The Court observed Ms. Wright's testimony on the stand and found her answers to be frank, honest, and extremely credible. She has extensive knowledge of Georgia and its people from her work on local redistricting plans. Id. at 1249–50. The Court assigns great weight to her testimony and found it assistive to the Court.

### c.  Collingwood.

332.    Dr. Collingwood was offered to give testimony on Senate Factor 5. Tr. 662:23-25, 672:13-16.

333.    Dr. Collingwood had never looked at Senate Factor 5 with regard to statewide redistricting before his assignment in these cases. Tr. 691:7-10.

334.    Dr. Collingwood had no opinion on the role of partisanship in voting patterns in Georgia. Tr. 691:11-14.

335.    Dr. Collingwood had no opinion on the enacted maps. Tr. 691:21-25.

336.    Dr. Collingwood did not visit Georgia as part of his preparation of his reports. Tr. 672:10-12, 693:8-10.

337.    While the Court accepts Dr. Collingwood's testimony on the numerical evaluations he performed, the Court finds the testimony to be of limited weight in considering the totality of the circumstances, especially given his lack of any review of the partisan nature of the issues in this case.

### d.  Jones.

338.    Dr. Jones was offered by Plaintiffs as an expert in a variety of political science areas, but the Court only accepted her testimony as an expert in historical review. Tr. 1157:22–1158:5, 11–12.

339.    Dr. Jones' testimony was infused with bias and incorrect information.

340.    Dr. Jones incorrectly stated in her report that she had been qualified as an expert in voter suppression in the <u>Fair Fight Action</u> litigation in 2022, the only other case she has testified as an expert, when in fact she had been qualified as an expert in historical review only. Tr. 1151:6–1152:6.

341.    In her first of two peer-reviewed articles entitled "When Yes Means No: GOP Congressional Strategy and Reauthorization of the Voting Rights Act in 2006," Dr. Jones concluded that Republican votes in favor of the VRA really means that they oppose the VRA. Tr. 1152:21–1153:6.

342.    In her article, Dr. Jones also concluded that Republican no votes on the renewal of the VRA and Republican "yes" votes to amend the VRA both actually meant Republicans were opposed to the Act. Tr. 1153:7–13.

343.    Dr. Jones' only other peer-reviewed article entitled "How to Win a Long Game: the Voting Rights Act, the Republican Party, and the Politics of Counter-Enforcement" reviews what she calls the Republican strategy to weaken the VRA. Tr. 1154:20–1155:11.

344.    Dr. Jones plans and conducts meetings at Morehouse College and has never hosted a Republican state official. Tr. 1247:15–19.

345.    Since 2018, Dr. Jones is a member of the Democratic National Committee Boiler Room, which answers questions on behalf of the Democratic Party from Democratic poll workers. Tr. 1247:20–1248:6.

346.    Dr. Jones has written numerous opinion editorials criticizing Georgia's voting law, Georgia's 2021 Senate Bill 202 ("SB 202"), asserting that it is a discriminatory voting law. Tr. 1250: 2–4, 17–20.

347.   Dr. Jones has opined in her editorial writings that the enacted 2021 redistricting plans are unfair. Tr. 1250:13–20.

348.   Dr. Jones' report and testimony also included incorrect information.

349.   Dr. Jones originally failed to name David Burgess as a statewide elected Black candidate in her report, which required correction. Tr. 1254:10–1255:4.

350.   Dr. Jones testified that Republicans had not elected Black candidates, ignoring the primary successes in 2022 of Herschel Walker and Fitz Johnson. Tr. 1255:21–1258:1.

351.   When Dr. Jones was considering statewide elected Black candidates, she excluded Sen. Raphael Warnock from that analysis. Tr. 1258:2–6.

352.   Despite stating in her report that Black-preferred candidates for Public Service Commission have lost, Dr. Jones admitted that Commissioner Burgess was a Black-preferred candidate who won statewide election. Tr. 1258:10–21.

353.   Despite making assertions about various government entities in her report, Dr. Jones did not investigate the makeup of the Gwinnett County Commission or the members of the Board of Elections in Lincoln County. Tr. 1260:10–13, 1261:6–16, 1263:5–9.

354.   Dr. Jones relied on secondary sources regarding the fake robocall from an individual impersonating Oprah Winfrey in 2018 to criticize Georgia Democratic gubernatorial candidate Stacey Abrams and never evaluated the findings of the Federal Communications Commission regarding that call. Tr. 1270:17–25; DX 59.

355.   Dr. Jones believes that, if Black voters had fair and equal access in Georgia, close to 50% of Georgia legislators would be Black individuals. Tr. 1276:11–15, 1278:15–20, 1279:10–12.

356.   Ultimately, the Court assigns little weight to Dr. Jones' historical review. While her explanation of history is helpful in places, it does not shed light on the totality of the circumstances this Court must evaluate.

### e.  Burton.

357.   Plaintiffs offered the testimony of Dr. Orville Burton regarding historical issues.

358.   Of the numerous times Dr. Burton has testified as an expert throughout his career, he has never testified on behalf any state defendant, state entity, or any Republican entity. Tr. 1420:6-17.

359.   Dr. Burton is not opining in this case on the legal question of whether the enacted plans violate the Voting Rights Act.  Tr. 1422:9-13; 1423:3-7.

360.   Dr. Burton has been retained numerous times by the NAACP, the American Civil Liberties Union, and the Lawyers' Committee for Civil Rights since 1980. Tr. 1423:20-25.

361.   Dr. Burton is serving as an expert for Plaintiffs in The New Georgia Project v. Raffensperger, Case No. 1:21-cv-01229, Consolidated Case No. 1:21-mi-55555 (In re SB 202) challenging SB 202. Tr. 1475:23-25.

362.   While Dr. Burton's provided some helpful information about historical issues, his testimony about current day issues is of limited value to the Court. Also given Dr. Burton's advocacy against Georgia policies in a variety of cases, the Court assigns very little weight to his testimony in considering the totality of the circumstances.

### f.  Germany.

363.   Defendants offered the testimony of Ryan Germany regarding the current state of Georgia election practices.

364.   Mr. Germany is a lawyer who previously served as General Counsel to the Secretary of State of Georgia from January 2014 through January 2023. Tr. 2262:11–17.

365.   As General Counsel during that time, Mr. Germany's job responsibilities were to provide legal support to the office along with other

attorneys in the office and litigation services particularly in election-related matters. Tr. 2263:20–24.

366.   In addition, Mr. Germany's role as General Counsel led him to participate in policy crafting in the Secretary's elections division as well as working with the General Assembly on election-related laws, including SB 202. Tr. 2262:25–2263:6, 2264:21–2265:2.

367.   Mr. Germany offered testimony in this trial as the 30(b)(6) witness for the Secretary of State's office. Tr. 2263:7–11.

368.   The Court finds Mr. Germany to be highly credible, based on both his knowledge and experience in elections, and gives substantial weight to his testimony.

### iii.   The Senate factors.

### b. Senate Factor One: History of discrimination.

369.   The first Senate factor considers evidence of historical discrimination in voting. Greater Birmingham Ministries v. Sec'y of Ala., 992 F.3d 1299, 1332 (11th Cir. 2021).

370.   In considering this factor, the Court recognizes Georgia's history of discrimination, but also recognizes that it cannot allow "old, outdated intentions of previous generations to taint [Georgia's] ability to enact voting legislation." Id.

371.    That is why the Court must consider the connection between historical discrimination and the challenged voting practices. See, e.g., League of Women Voters of Fla. Inc. v. Fla. Sec'y of State, 66 F.4th 905, 923 (11th Cir. 2023); accord League of Women Voters of Fla. Inc. v. Fla. Sec'y of State, No. 22-11143, 2023 U.S. App. LEXIS 25085, at *13 (11th Cir. Sep. 21, 2023) (Pryor, C.J., concurring in denial of rehearing en banc).

372.    And this Court must give the presumption of good faith to the legislature's districting efforts. Abbott, 138 S. Ct. at 2324.

373.    As discussed below, Plaintiffs have provided almost no evidence connecting the admitted history of Georgia's past voting practices with the current redistricting plans. Nor have Plaintiffs provided evidence of more recent discrimination—the vast majority of their expert reports focus on events prior to the adoption of the Voting Rights Act in 1965.

374.    Georgia's redistricting plans in 1971, 1981, 1991 and 2001 were drawn by Democrats.  Tr. 1471:6-9.

375.    At least one redistricting plan during those years was objected to by the Department of Justice under preclearance.  Tr. 1471:10-13.

376.    All three of the Republican drawn maps in 2011 were precleared by the Department of Justice on the first attempt.  Tr. 1471:14-20.

377.    The 2001 State Senate and State House plans drawn by Democrats were found unconstitutional by a three-judge court.  Tr. 1471:23-1472:2.

378.    The 2004 election in which Republicans took control of the state legislature was run on maps drawn by the federal court.  Tr. 1472:3-6.

379.    The Republican maps drawn in 2011 were never found to be illegal. Tr. 1472:16-17, 21-22.

380.    Dr. Burton does not opine that the Republican legislature in Georgia is racist.  Tr. 1474:2-4.

381.    As discussed below in the third Senate Factor, the only evidence of recent claimed discrimination Plaintiffs have provided regarding SB 202. But this Court does not find that SB 202 continues any past historical discrimination in a way that impacts the redistricting plans here.

382.    Unlike the case in Singleton v. Merrill, 582 F. Supp. 3d 924, 1020 (N.D. Ala. 2022), there have not been recent court findings of discriminatory intent in Georgia. See also League of Women Voters of Fla., 2023 U.S. App. LEXIS 25085, at *15-16 (Pryor, J., concurring in denial of rehearing en banc and discussing Allen's reliance on past history).

383.    Thus, the Court finds that, even though Georgia has a history of race discrimination, this factor does not weigh heavily in favor of Plaintiffs because of the lack of evidence of recent discrimination.

###### c. Senate Factor Two: The extent to which voting the state or political subdivision is racially polarized.

384.    The second Senate Factor reviews "the extent to which voting in the elections of the State or political subdivision is racially polarized." Wright, 979 F.3d at 1305 (quoting LULAC, 548 U.S. at 426).

385.    This is not merely a restatement of the proof of the second and third Gingles precondition, but is a broader evaluation of the issues of polarized voting in the state. Nipper, 39 F.3d at 1524; Solomon, 221 F.3d at 1225.

386.    Plaintiffs have only presented evidence that Black and white voters prefer different candidates, and otherwise say that race and partisanship are inseparable.

387.    For example, Dr. Burton opines that "[o]ne cannot as a scientific matter separate partisanship from race in Georgia" and states that has been true since Reconstruction. Tr. 1466:24–1467:3.

388.    Likewise, Dr. Jones concluded that "it's just not race. It's partisanship." Tr. 1205:4–8.

389.    These opinions amount to a concession that Senate Factor 2 is not met in this case because the Eleventh Circuit has instructed that courts cannot "conflat[e] discrimination on the basis of party affiliation with discrimination on the basis of race." League of Women Voters, 66 F.4th at 924. By admitting that they

are unable to separate partisanship from race, Drs. Burton and Jones conflate the two in precisely the way this Court cannot.

390.    In reviewing the data provided by Plaintiffs' expert, Dr. Palmer, Defendants' expert Dr. Alford agreed that there is strong cohesion among Black voters for a particular candidate in general elections and that white voters cohesively support a different candidate. Tr. 2146:2–17 (Pendergrass); Tr. 2196:15–23 (Grant)

391.    Dr. Alford concluded in the both the Pendergrass and Grant cases that the evidence presented does not show the existence of racial polarization in voting patterns observed. Tr. 2197:13–18.

392.    Dr. Alford not only sought to determine, as Plaintiffs' experts did, where the evidence showed an existence of race-based bloc voting patterns, but also to determine whether Plaintiffs' evidence demonstrates racial polarization as distinct from partisan polarization. Dr. Alford found the evidence "does tell us… **party** of the candidate is really important." Tr. 2181:6–10 (emphasis added).

393.    Noting the demographic and voter behavior changes that have occurred since the original passage of the Voting Rights Act in 1965, and its later amendment in 1982, Dr. Alford flatly declared that "[Georgia] is not Alabama. [Georgia] also is not Georgia. This is not Georgia in the 1960s; just, frankly, it's not." Tr. 2182:9–12.

394.    In fact, voter preferences and behavior have changed radically since the 1960s, when "the majority of Black voters in Georgia, if they got to vote, voted Democratic. But a substantial proportion… about 35 to 40 percent" vote Republican. But "that sentiment has evaporated over time." Tr. 2182:23–2183:3.

395.    In the 1960s, we observe that "the race of the candidate matters a lot. As the judges in <u>Gingles</u> note, the race of the candidate matters. It matters in the primary it matters in the general." <u>Id</u>.

396.    But in the contemporary Georgia data presented by Plaintiffs' experts, we observe that "race has no influence." Tr. 2184:20–21.

397.    "[W]hen you look at Dr. Palmer's analysis, he's got a table which says this is the black-preferred candidate and Blacks vote for them overwhelmingly… and white voters vote against them." Tr. 2186:7–12.

398.    "These tables [offered by Dr. Palmer]… don't address the issue of what the role of race is ultimately in the entire process. But what they show in these tables, for both experts, is not just the party as a bigger factor than race – to the extent we can diagnose the influence of a racial cue here from the candidates, it has no effect. It simply isn't a part of what's generating this partisan polarization." Tr. 2187:1–7.

399.   "[A]ny district that is a majority Democratic district will elect the preferred candidate of minorities. It's a performing district for minorities. Any Democratic district." Tr. 2187:22–25.

400.   Explaining the distinction between on the one hand, race as an explanation for bloc voting patterns, and on the other, party as the explanatory factor, Dr. Alford remarked that under the current observed voting behaviors of the electorate, "anything Republicans do to diminish Democratic districts in any way, by definition, will reduce the likelihood of candidates of choice of minorities being elected. And if that's because of the behavior of voters in the face of the race of candidates, then I think you've got to say that – where that plays enough of a role that it decides elections, where white Democrats in Georgia are not similarly situated to Black Democrats in Georgia, and white Republicans not similarly situated to Black Republicans, that's where the Voting Rights Act becomes operative and important and constitutional. [But] if those two groups are similarly situated, it's party politics." Tr. 2193:5–17.

401.   Based on the data provided by Dr. Palmer, this Court simply cannot conclude the polarization is caused by anything other than partisan politics: "[T]his is the endpoint. Georgia is the endpoint. This is where you can say… the Voting Rights Act has been successful enough," and that declining in this case to

find legally significant racially polarized voting means that the Voting Rights Act "could be [constitutionally] preserved." Tr. 2192:1–5 (Alford).

402.   While all experts agree that generally, racially contested elections featuring a Black candidate and at least one white candidate are the most probative elections to examine, that probative value cannot be understood in isolation. Tr. 2222:7–23.

403.   In fact, the increase in probative value of racially contested elections over single-race elections lies in "the ability to contrast them with the situations in which the Democratic candidate is white. In isolation, there's no variation and there's no probative value." Tr. 2223:4–8.

404.   Dr. Alford agrees that one does not need to establish proof of the cause of voter behavior in a scientific sense in order to establish racially polarized voting. Tr. 2225:23–2226:1.

405.   The extent of racially polarized voting in a jurisdiction is a separate and distinct inquiry from what is addressed by the second and third <u>Gingles</u> preconditions, which involves determining whether different races are cohesively supporting different candidates and whether the white majority usually votes as a bloc to defeat the minority preferred candidate.

406.   To determine the extent to which voting in the jurisdiction is racially polarized, this Court defines racially polarized voting in the context of a Section 2

claim. This is important because none of experts in this case shared precisely the same definition. <u>See</u> Tr. 863:14–17 (Handley); Tr. 424:9–425:22 (Palmer); 2255:9–2259:23 (Alford).

407.    Moreover, while the definitions used by the experts at trial are informative, how to define racially polarized voting is, at bottom, a legal definition, which this Court now turns to address.

408.    Around the time of consideration and passage of the 1982 amendments to the Voting Rights Act, the term "racially polarized voting" was fairly well understood and the subject of little debate.

409.    Indeed, the 1976 District Court decision in <u>Bolden v. Mobile</u>, which would eventually make its way to the Supreme Court and spark the call for amending Section 2, defined the term in two parts. First, the court stated that racial polarization occurs with "white voting for white and black for black if a white is opposed to a black, or if the race is between two white candidates and one candidate is identified with a favorable vote in the black wards, or identified with sponsoring particularized black needs." 423 F. Supp. 384, 388 (S.D. Ala. 1976). When these patterns are observed, "a white backlash occurs which usually results in the defeat of the black candidate or the white candidate identified with the blacks." <u>Id.</u>

410.    This definition would later be approved by the 5th Circuit when it affirmed the District Court opinion. See Bolden v. Mobile, 571 F.2d 238, 243 (5th Cir. 1978) (citing with approval the district court's finding that "[n]o black had achieved election to the city commission due, in part, to racially polarized voting of an acute nature.")

411.    The Supreme Court, in turn, did nothing to question the legitimacy of the trial court's definition of racially polarized voting. Mobile v. Bolden, 446 U.S. 55, 64 (1980).

412.    The result of the Supreme Court's decision led to the 1982 amendments to the VRA and the modification of Section 2 that effectively overturned the Supreme Court. Gingles, 478 U.S. at 35 ("[T]he amendment was largely a response to this Court's plurality opinion in Mobile v. Bolden, 446 U.S. 55 (1980)… to make clear that a violation [under Section 2] could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the "results test," applied by this Court in White v. Regester, 412 U.S. 755 (1973), and by other federal courts before Bolden…").

413.    But despite targeting the Supreme Court's decision in Bolden, nothing in the amendments nor the Senate Report explaining them suggests Congress understood the definition of "racial polarization" or "racially polarized voting" as

anything other than what had been firmly established by the courts up to that point (i.e., the definition employed by the <u>Bolden</u> district court).

414.   And retaining the "white backlash" component of the trial court test for racial polarization makes sense in the context of the amendments because it faithfully adheres to the Supreme Court's analysis in <u>Whitcomb v. Chavis</u>, 403 U.S. 124 (1971) which the Senate Report also relied on in its efforts to return to the pre-<u>Bolden</u> legal standard, S. Rep. at 21-24. <u>Whitcomb</u> required a finding of "invidious discrimination" that could be observed in voting patterns and the way they interact with electoral system such that "[minority] residents have less opportunity" to participate in the system than do their white counterparts. 403 U.S. at 149. If this pattern is **not** observed, then what appears to be the discriminatory "cancel[ing] out" of Black voting power is likely "a mere euphemism for political defeat at the polls." <u>Id</u>. at 153.

415.   Defining racially polarized voting in this way does not revive the intent test Congress sought to stamp out with the 1982 amendments. Rather, it simply anchors the results test in precedent and accomplishes what Justice O'Connor accuses the <u>Gingles</u> plurality opinion of failing to do: respecting "the balance struck by Congress in amending § 2" and preserving "the results test as described by this Court in <u>Whitcomb</u> and <u>White</u>." <u>Gingles</u>, 478 U.S. at 85 (O'Connor, J. concurring).

416.    Despite the continuing focus on racial polarization in Section 2 cases, the Report of the Committee from the Senate Report to the 1982 mentions racial polarization just two times. One time is when it approvingly cites the factors considered by the Bolden District Court. See Senate Report, p. 24 at n. 88. And the second time is when it is detailing the substance of Senate Factor 2. Id., p. 29. Neither instance suggests any departure from the meaning articulated by the Bolden district court.

417.    When Congress designed the amendment specifically to overturn the Supreme Court, it declined to alter or refine the definition of racial polarization utilized by the courts at the time. Thus, there is nothing to suggest a departure from the interpretive maxim that "[w]ords must be given the meaning they had when the text was adopted." Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 78 (2012).

418.    Moreover, the District Court in Gingles v. Edminsten, 590 F. Supp. 345 (E.D.N.C. 1984) (three-judge court), which would later become the seminal Supreme Court case interpreting Section 2, Thornburg v. Gingles, agreed with the definition of racially polarized voting established by the Bolden district court.

419.    In finding racial polarization, the Gingles trial court noted that in "none of the elections, **primary or general**, did a black candidate receive a majority of white votes cast." 590 F. Supp. at 368 (emphasis added).

420.    Moreover, "[o]n the average, 81.7% of white voters did not vote for any black candidate in the primary elections." Id.

421.    And, crucially, "approximately two-thirds of [Democratic] white voters did not vote for black candidates in general elections even after the candidate had won the Democratic primary and the only choice was to vote for a Republican or no one." Id.

422.    This observed behavior of white Democratic voters refusing to vote for the Black candidate (or the Black-preferred white candidate) even when the only other option was a "a Republican or no one," is precisely the "white backlash" that the Bolden district court identified as a critical component of **racial** polarization. If the polarization occurred as a result of something more benign, like partisanship, there would be no "white backlash" observed and you would see white Democratic voters would coalesce around the Black or Black-preferred Democrat in the general election.

423.    Finally, the Court notes that viewing racial polarization in this way in the wake of the plurality opinions in Gingles provides Senate Factor 2 with substantive meaning distinct from what the second and third Gingles preconditions already cover, which is part of the totality of circumstances inquiry the statute directs courts to undertake. 52 U.S.C. § 10301(b).

424. For purposes of determining liability under Section 2, this Court adopts the definition utilized by the <u>Bolden</u> district court and well-known to Congress at the time of consideration and adoption of the 1982 amendments. Not only must the data indicate that white voters vote cohesively in opposition to the Black-preferred candidate. But there also must be an observable "white backlash" where the statistical or anecdotal evidence indicates that white voters are casting aside partisan labels and motivations in order to oppose Black candidates or Black-preferred candidates.

425. Applying that definition to the evidence in the record, it is clear that Senate Factor 2 weighs heavily in favor Defendants.

426. First, while Plaintiffs have demonstrated that in general elections Black voters cohesively support candidates that a majority of white voters usually oppose, they have presented no credible evidence that such patterns are occurring "on account of race or color," as Section 2 requires. Since Senate Factor 2 concerns itself with the causes and explanations of purportedly racially polarized voting, the Plaintiffs have not met their burden on this factor. See <u>Alabama State Conf. of NAACP,</u> 612 F. Supp. 3d at 1305-06 (finding in favor of defendants on Senate Factor 2 where, among other things, "Plaintiffs' statistical evidence accounted only for the fact of racially polarized voting, not its cause"); <u>see also</u> <u>Greater</u>

Birmingham Min., 992 F.3d at 1330 ("the challenged law must have caused the denial or abridgement of the right to vote on account of race").

427.   Dr. Palmer testified that his analysis did not consider the explanation of voting patterns. Tr. 423:18–20. Accordingly, the Court disregards any testimony he gave when considering Senate Factor 2.

428.   Dr. Alford used the data provided by Dr. Palmer to conclude that race could not be causing or explaining the voting patterns observed. Indeed, to the extent race was identifiable in the data presented at all, it routinely had no observable effect on voter behavior. Instead, voter behavior followed, with remarkable stability across elections and across time, the partisan cue of the candidate. Tr. 2186:5–2187:7.

429.   There is no evidence that white Democrats refused to support the Black-preferred white candidate when the general election was held. Tr. 2208:1–13.

430.   There is no evidence that white Democrats refused to support the Black Democrat when the general election was held. Tr. 2208:1–13.

431.   Dr. Alford's data reveals similar voter behavior in the Republican primary analysis he conducted. DX 8.

432.   Indeed, white Republican voters and Black Republican voters had the same preferred candidate in Herschel Walker in the Republican primary. Tr. 2208:14–2209:9.

433.   Similarly, Fitz Johnson ran unopposed for the Public Service Commission and received more than one million votes in the Republican primary. Jud. Not., pp. 10–11.

434.   Finally, because Dr. Palmer only examined general elections, Plaintiffs are simply unable to establish any kind of "white backlash" in the data they provided.

435.   Accordingly, all Plaintiffs have failed their evidentiary burden to establish racially polarized voting for purposes of the Senate Factor 2 inquiry. "The 'ultimate burden' to prove that, under the totality of circumstances, the political process is not equally open to the minority group remains with the plaintiff." Alabama State Conf. of NAACP, 612 F. Supp. 3d at 1250 (citing Askew v. City of Rome, 127 F. 3d 1355, 1375 (11th Cir. 1997).

436.   This Court concludes the data provided by Dr. Palmer does not demonstrate racially polarized voting because "the evidence provided by plaintiffs shows that – importantly, show that the race of the candidates is no longer an issue driving the behavior, the polarized behavior of voters in Georgia." Tr. 2256:16–20.

437.   This is critical because this Court cannot determine that the challenged districts have "<u>caused</u> the denial or abridgement of the right to vote on account of race," <u>Greater Birmingham Min.</u>, 992 F.3d at 1330, on evidence of partisan polarization alone.

438.   Because Plaintiffs have only presented evidence consistent with partisan voting patterns in Georgia and nothing further, the Court determines that this factor weighs heavily in favor of Defendants.

### d.  Senate Factor Three: Voting practices in Georgia.

439.   Senate Factor Three reviews "the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting." <u>Wright</u>, 979 F.3d at 1295 (quoting <u>Gingles</u>, 478 U.S. at 44–45).

440.   While Plaintiffs presented some evidence on this point, they did not explain how these particular voting practices affect Black voters today, and as discussed below, attempted to conduct a mini-trial of SB 202, which is currently the subject of lawsuits in another Court in this district and which has not resulted in any finding of racial discrimination despite years of litigation.

441.   SB 202 expands the number of early voting days in Georgia. Tr. 1476:7–9.

442.    Georgia has no-excuse absentee voting.  Tr. 1476:10–13.

443.    Georgia experienced record turnout for the midterm election in 2022. Tr. 1480:3–6.

444.    Despite testimony regarding the impact of Georgia laws on Mayor Nancy Dennard, Dr. Burton did not investigate and was not aware that a white candidate named Judge Carlton Vines was also prosecuted for the same conduct at almost the same time.  Tr. 1483:24–1484:7; Fair Fight Action, 634 F. Supp. 3d at 1247.

445.    In his report, Dr. Burton discusses an investigation of the New Georgia Project in 2014 by then-Secretary of State Kemp but did not review the primary sources, namely, the State Election Board documentation concerning the hearing or the transcripts of those proceedings.  Tr. 1485:2–21; Fair Fight Action, 634 F. Supp. 3d at 1175–76.

446.    Dr. Burton relied only on secondary sources, such as newspaper articles, and was not aware that the New Georgia Project's contractors had violated election law and those claims were turned over to the Attorney General for prosecution.  Tr.  1484:24–1485:12.

447.    A performance review panel was convened of Fulton County's handling of its elections with the assistance of the Carter Center.  Tr. 1491:5–11.

448.    The review panel found that Fulton County had a longstanding history of election administration issues going back decades, undercutting Plaintiffs' claims that the focus on Fulton County was a result of race. Tr. 1491:14–18.

449.    In considering the current election practices in Georgia, the Court determines reviews the entirety of the landscape involving voting access. Fair Fight Action, 634 F. Supp. 3d at 1251.

450.    Voters in Georgia may register to vote in numerous ways, including by paper registration, online, and via automatic voter registration at the Department of Driver Services. Tr. 2263:12–20.

451.    Georgians that lack access to a computer or car can still register to vote via the Department of Driver Services without getting a driver's license, so it is not necessary for a voter to print any sort of form in order to register. Tr. 2263:21–2264:9.

452.    If a person lacks a photo ID and cannot afford one, the Department of Driver Services offers free, state-issued, identification cards for voting purposes. Tr. 2264:15–22.

453.    The provisions of SB 202 were largely crafted in response to the problems encountered in the 2020 election, which involved the use of new election equipment, dealing with lessons learned from the initial onset of the COVID-19

pandemic, and the first time nine-week general-election runoffs were necessary since the runoff law changed in 2014. Tr. 2265:3–11.

454.    The Office of the Secretary of State of Georgia received numerous complaints following the 2020 elections, which led to many provisions of SB 202. Tr. 2266:4–18.

455.    SB 202 changed the deadline to receive absentee ballot applications from counties from four days before the election to eleven days. This was due in part to the logistical challenges the four-day deadline proposed, particularly as ballot application requests spiked during the pandemic. Tr. 2271:9–2272:17.

456.    SB 202 also represented the first time the Georgia legislature mandated counties provide drop boxes as a means for absentee voters to turn in their ballots, because the emergency rule provision enacted by the State Election Board during the pandemic was the first time any drop boxes were permitted in Georgia elections. Tr. 2273:4–8.

457.    Many aspects of the emergency rules regarding drop boxes proved challenging or unworkable during the 2020 elections. Tr. 2273:16–19.

458.    The Secretary's Office found the video surveillance to be problematic for a number of reasons, including some counties' general failure to have it functional all the time it needed to be. Also burdensome was the fact that individual Georgians took security of the drop boxes into their own hands at times,

which created safety concerns for both election workers and voters who perceived their presence as a potential safety issue. Tr. 2275:2–19.

459.   Following the passage of SB 202, the voter intimidation complaints around drop boxes no longer occurred because the drop boxes were placed inside secure early voting locations and county headquarters. Additionally, Georgia moved from video surveillance to human surveillance, which led to less concerns of election tampering. Tr. 2275:20–2276:11.

460.   Georgia compares very favorably to other states in terms of voter registration rates. In 2016, Georgia became just the second state in the union to implement automatic voter registration and the results have been a resounding success, with voter registration rates improving from 78% of the eligible population registered in 2016 to 98% by 2020. Tr. 2277:25–2278:11.

461.   The state of Georgia makes it very easy to register to vote, and very easy to vote. Tr. 2281:1–7.

462.   In considering all of the foregoing issues, the Court determines that Georgia's voting practices do not enhance discrimination against Black voters. It is easy to register and to vote in Georgia, and SB 202 has not been the subject of any final finding of racial discrimination by any court. Further, this Court cannot determine on the evidence before it that SB 202 standing alone shows proof of continuing discrimination.

463. Furthermore, many of the past factors <u>Gingles</u> identified are not applicable in Georgia or have assisted Black voters, including the majority-vote requirement leading directly to the election of the Black-preferred candidate, Sen. Ossoff.

464. As a result, this Court determines that Senate Factor Three weighs heavily in favor of Defendants.

### e. Senate Factor Five:[7] Socioeconomic disparities.

465. Senate Factor Five considers disparities between Black and white voters and the impact on Black voter participation.

466. As this Court previously found,

> The Eleventh Circuit has 'recognized in binding precedent that "disproportionate educational, employment, income level, and living conditions arising from past discrimination tend to depress minority political participation."' <u>Wright</u>, 979 F.3d at 1294 (quoting <u>Marengo Cnty. Comm'n</u>, 731 F.2d at 1568). 'Where these conditions are shown, and where the level of black participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.' <u>Id</u>. (quoting <u>Marengo Cnty.</u>, 731 F.2d at 1568-69); <u>United States v. Dallas Cnty. Comm'n</u>, 739 F.2d 1529, 1537 (11th Cir. 1984) ('Once lower socio-economic status of [B]lacks has been shown, there is no need to show the causal link of this lower status on political participation.'))."

<u>Alpha Phi Alpha</u>, 587 F. Supp. 3d at 1317.

––––––––––––––––––––

[7] Senate Factor Four, access to a candidate slating process, is not utilized in Georgia and thus is not at issue in this case. <u>Alpha Phi Alpha</u>, 587 F. Supp. 3d at 1317.

467.   While Plaintiffs presented evidence of disparities primarily based on Census data, the Court determines that these disparities "are more generalized indicators of the status of minority life in Georgia." <u>Fair Fight Action</u>, 634 F. Supp. 3d at 1250.

468.   This Court further recognizes that the Eleventh Circuit does not require a causal link after showing of a disparity, but this Court will consider the amount of weight those disparities require given the lack of sufficient connection to the challenged plans. <u>Id</u>.

469.   The success of Black and Black-preferred candidates, discussed below, is also relevant to the weight given to this factor. And voter turnout also weighs heavily on the Court's consideration of this factor.

470.   Dr. Collingwood had no opinion on the role of partisanship in voting patterns in Georgia. Tr. 691:11–14.

471.   Dr. Collingwood conceded that, based on turnout in the 2012 presidential election and the 2018 gubernatorial election, where Black and white turnout was extremely similar, that the identity of the candidate can motivate Black voter turnout. Tr. 695:5–21.

472.   Dr. Collingwood found that in 2022, Black voter turnout exceeded white voter turnout in Clayton, Henry, and Rockdale Counties when using voting-age population as the denominator. Tr. 696:16–25.

473.   Dr. Collingwood looked at the association between education level and voter turnout for Black voters in 2020, but did not perform the same analysis for white voters, limiting the utility of his analysis. Tr. 697:21–698:25.

474.   Dr. Collingwood found "nearly identical" survey results for Black and white voters on 2 of 11 survey questions on political participation. Tr. 702:25–703:10. On the remaining questions, a similarly-small number of Black and white voters participated. Id.

475.   Plaintiffs' own testimony emphasizes their ability to participate in the political process in Georgia under this Senate factor.

476.   Plaintiff Annie Lois Grant has never been prohibited from participating in the political process on account of her race, nor has she ever been prohibited from participating in Georgia politics due to a lack of education, employment opportunities, or healthcare services. Grant Doc. No. [169] at 57:5–57:8, 65:13–23.[8]

477.   Plaintiff Jacqueline Artbuthnot has never been prohibited from participating in the political process on account of her race, nor has she ever been prohibited from participating in Georgia politics due to a lack of education,

---

[8] All deposition designations relied on are those admitted by the Court in the order found at APA Doc. No. [292]; Grant Doc. No. [254]; Pendergrass Doc. No. [243].

employment opportunities, or healthcare services. Grant Doc. No. [166] at 8:9–21, 10:21–11:6.

478. Plaintiff Jacquelyn Bush has never been prohibited from participating in the political process on account of her race, nor does she have any knowledge of Georgia government discriminating against Black voters. Grant Doc. No. [167] at 27:25–28:17. Plaintiff Bush is not sure if people of color are prohibited from participating in Georgia politics due to a lack of education, employment opportunities, or healthcare services. Id. at 29:14–23.

479. Plaintiff Mary Nell Conner has never been prohibited from participating in the political process on account of her race, nor has she ever been prohibited from participating in Georgia politics due to a lack of education, employment opportunities, or healthcare services. Grant Doc. No. [168] at 23:17–24:7, 25:3–26:24, 26:25–27:25.

480. Plaintiff Quentin T. Howell has never been prohibited from participating in the political process on account of his race, nor has he ever been prohibited from participating in Georgia politics due to a lack of education, employment opportunities, or healthcare services. Grant Doc. No. [170] at 69:1–69:7, 79:21–80:17.

481. Plaintiff Garrett Reynolds has never been prohibited from participating in the political process on account of his race, nor has he ever been

prohibited from participating in Georgia politics due to a lack of education, employment opportunities, or healthcare services. Grant Doc. No. [172] at 46:9–46:22, 49:7–18.

482. Plaintiff Eunice Sykes has never been prohibited from participating in the political process on account of her race, nor has she ever been prohibited from participating in Georgia politics due to a lack of education, employment opportunities, or healthcare services. Grant Doc. No. [174] at 39:20–40:2.

483. Plaintiff Elroy Tolbert has never been prohibited from participating in the political process on account of his race, nor has he ever been prohibited from participating in Georgia politics due to a lack of education, employment opportunities, or healthcare services. Grant Doc. No. [175] at 27:14–28:4, 28:9–29:9.

484. Plaintiff Dexter Wimbish has never been prohibited from participating in the political process on account of his race, nor has he ever been prohibited from participating in Georgia politics due to a lack of education, employment opportunities, or healthcare services. Grant Doc. No. [176] at 56:19–57:6, 60:9–60:19.

485. Plaintiff Triana Arnold James has never been prohibited from participating in the political process on account of her race, nor has she ever been prohibited from participating in Georgia politics due to a lack of education,

employment opportunities, or healthcare services. Grant Doc. No. [171] at 54:6–54:21, 57:11–59:4.

486.   Plaintiff Elbert Solomon has never been prohibited from participating in the political process on account of his race, nor has he ever been prohibited from participating in Georgia politics due to a lack of education, employment opportunities, or healthcare services. Grant Doc. No. [173] at 51:10–12, 60:23–61:7.

487.   As a result of the foregoing, while the Court does not require Plaintiffs to show a causal link under Eleventh Circuit precedent, it finds that this factor does not weigh heavily in favor of Plaintiffs. Black voters can and do participate in elections in Georgia and succeed in electing candidates of choice.

### f. Senate Factor Six: Racial appeals.

488.   Senate Factor Six considers "whether political campaigns in the area are characterized by subtle or overt racial appeals." Wright, 979 F.3d at 1296 (quoting Gingles, 478 U.S. at 45).

489.   There are two important pieces of this analysis: (1) the racial appeals have to characterize political campaigns and (2) the racial appeals have to be from campaigns "in the area." Id.

490.   Thus, Plaintiffs must do more than just present some evidence of racial appeals and they must do more than just present evidence of racial appeals

for campaigns that are not related to the challenged districts. See, e.g., Rose v. Raffensperger, 619 F. Supp. 3d 1241, 1266 (N.D. Ga. 2022).

491.   While Plaintiffs presented some evidence of racial appeals in statewide campaigns, they did not present any evidence of such appeals in legislative or Congressional elections.

492.   Dr. Jones described a Herschel Walker ad as a racial appeal to white voters, when that same ad includes a statement from President Biden claiming that an individual is not Black if they do not support him. Tr. 1199:12–24; APAX 266.

493.   Dr. Jones acknowledges that the Herschel Walker ad includes Democrats talking about racism. Tr. 1198:1–1199:10.

494.   Dr. Jones believes the parties are racially polarized, which is why she believes racial appeals are used today. Tr. 1199:25–1200:7.

495.   The 2018 fake robocall impersonating Oprah Winfrey to criticize Georgia Democratic gubernatorial candidate Stacey Abrams originated outside of Georgia and only resulted in 583 calls to individuals in Georgia. Tr. 1268:24–1271:18; DX 59.

496.   Dr. Jones agreed that racial appeals did not prevent Sen. Warnock from being elected. Tr. 1271:20–23.

497.   Thus, while Plaintiffs have presented some evidence of racial appeals, they have not presented evidence that those appeals characterize Georgia

elections, especially in the elections to offices they are challenging in this case. As a result, this factor weighs in favor of Defendants.

### g. Senate Factor Seven: Extent of election of Black officials.

498.    Senate Factor Seven "focuses on 'the extent to which members of the minority group have been elected to public office in the jurisdiction.'" Wright, 979 F.3d at 1295 (quoting LULAC, 548 U.S. at 426).

499.    This factor switches the Court's review from review of election of candidates preferred by Black voters to election of Black candidates. Id.

500.    While Plaintiffs have presented some evidence of lack of success historically, the Court recognizes a number of recent successes of Black candidates in Georgia.

501.    Dr. Jones only evaluated the success of Black candidates and not the success of Black-preferred candidates when analyzing access to the state's electoral system. Tr. 1275:4–11.

502.    Dr. Jones believes that, if Black voters had fair and equal access in Georgia, close to 50% of Georgia legislators would be Black individuals. Tr. 1276:11–15, 1278:15–20, 1279:10–12.

503.   Four Black individuals have been elected to statewide partisan office in Georgia: Michael Thurmond, Thurbert Baker, David Burgess, and Raphael Warnock. Stip. ¶ 361.

504.   Nine Black individuals have been elected to statewide nonpartisan office in Georgia. Stip. ¶ 362.

505.   Five Black individuals serve in Congress from Georgia's current Congressional districts. Stip. ¶ 359.

506.   The dataset underlying the tables Dr. Burton used in his analysis of the success of black candidates for statewide office in the South from 1989 through 2018, six of the eleven successes by Black candidates were from Georgia.  Tr. 1467:17-25, 1468:9-17.

507.   Scholars that Dr. Burton relied on in his report concluded that Georgia is a growth state in which Black candidates are now competitive and that the electoral prospects of Black statewide candidates in Georgia are promising.  Tr. 70:5-7, 12-13, 17-21.

508.   Scholars Dr. Burton relies on conclude that Black statewide candidates are now competitive in Georgia.  Tr. 1469:14-22.

509.   Dr. Burton reservedly agrees that Black statewide candidates are now competitive in Georgia and that the electoral prospects of Black statewide candidates in Georgia are promising.  Tr. 1468:18-1471:2.

510.   Mr. Allen was a Black candidate elected in a non-majority-Black district to the legislature. Tr. 1012:2–20.

511.   Congresswoman Lucy McBath is a Black woman who was elected from a majority-white district, including in an election when she defeated a white incumbent. Jud. Not., pp. 9–11; Stip. ¶ 167, APA Cooper Report Ex. F.

512.   Senator Raphael Warnock has won multiple statewide elections in Georgia, including in a race against another Black man in 2022. Jud. Not., p. 11.

513.   The general election Public Service Commission race that was cancelled in 2022 was between a Black Republican and a Black Democrat. Tr. 1258:10–21.

514.   Overall, the evidence presented on this factor weighs in favor of Defendants. In Georgia, Black officials have been elected to offices, which means this does not support a finding of vote dilution. Marengo Cnty. Comm'n, 731 F.2d at 1571. Instead of Black candidates facing barriers to participation, the evidence shows that Black candidates can and do succeed in Georgia elections.

## h. Senate Factor Eight: Responsiveness to particularized needs.

515.   Senate Factor Eight considers whether elected officials are responsive to the particularized needs of Black voters. A lack of responsiveness is "evidence

that minorities have insufficient political influence to ensure that their desires are considered by those in power." <u>Marengo Cnty. Comm'n</u>, 731 F.2d at 1572.

516.   Plaintiffs have relied on socioeconomic data in support of this factor, claiming that disparities between Black and white individuals demonstrates a lack of responsiveness because those needs would otherwise be met. But this is insufficient for this Senate factor. <u>Greater Birmingham Min.</u>, 992 F.3d at 1333–34. Further, Plaintiffs have only presented what they say are needs of the Black community based on partisanship or socioeconomic issues, not on issues unique to Black voters. <u>Rose</u>, 619 F. Supp. 3d at 1267 ("something more than an outsized effect correlated with race" is required).

517.   Plaintiffs relied on scores of members of Congress from Georgia on the NAACP's Civil Rights Federal Legislative Report card from 2017 to 2018 for lack of responsiveness to the needs of Black voters. Tr. 1491:23–1492:9; DX 107.

518.   But a review of that scorecard demonstrates that it includes a number of partisan priorities, including confirmations of Supreme Court Justices and cabinet officials and votes on partisan legislative priorities as counting against that members' civil rights record. Tr. 1492:20–1493:12, 1493:18–22. As a result, this card does not demonstrate unique needs of Black voters unrelated to partisanship to which elected officials have been unresponsive.

519.   Ms. Miller spoke of issues affecting Black voters like housing and economic issues, but agreed that those issues also affect white voters, too. Tr. 657:23–658:4.

520.   Mr. Allen testified about issues common to voters of all races, not just Black voters. Tr. 1014:16–1015:4, 1016:1–8, 1016:18–24, 1016:25–1017:8.

521.   Dr. Evans agrees that issues with healthcare access, education, property taxes, and gun safety applies equally to everybody, not just Black voters. Tr.  639:24-640:25.

522.   The individual Plaintiffs' own testimony underscores the partisan nature of the claims in this case, with each individual plaintiff identifying and supporting Democratic candidates instead of Republican candidates.

523.   Plaintiff Coakley Pendergrass generally supports Democratic candidates. Pendergrass Doc. No. [159] at 25:16–27:15, 28:15–28:20. [9]

524.   Plaintiff Triana Arnold James generally supports Democratic candidates. Pendergrass Doc. No. [160] at 38:20–39:2, 39:16–22.

525.   Plaintiff Ojuan Glaze generally supports Democratic candidates. Pendergrass Doc. No. [163] at 33:9–33:14, 34:2–25.

---

[9] All deposition designations relied on are those admitted by the Court in the order found at APA Doc. No. [292]; Grant Doc. No. [254]; Pendergrass Doc. No. [243].

526.   Plaintiff Elliott Hennington generally supports Democratic candidates. Pendergrass Doc. No. [164] at 36:23–37:9, 37:20–39:5.

527.   Plaintiff Robert Ray Richards generally supports Democratic candidates. Pendergrass Doc. No. [161] at 44:21–45:2.

528.   Plaintiff Jens Rueckert generally supports Democratic candidates. Pendergrass Doc. No. [162] at 29:7–13, 30:10–23.

529.   The Court finds the evidence on this factor weighs heavily in favor of Defendants because of Plaintiffs' complete lack of evidence of particularized needs of Black voters to which legislators and members of Congress have been unresponsive. Plaintiffs' evidence underscores the partisan nature of this case, with the primary complaints about issues Democrats have been unsuccessful in passing as opposed to needs unique to Black voters.

### i.   Senate Factor Nine: Justifications for enacted plans.

530.   The "final Senate Factor considers whether the policy underlying Georgia's use of the voting standard, practice, or procedure at issue is 'tenuous.'" Rose, 619 F. Supp. 3d at 1267 (quoting Senate Report at 29, 1982 USCCAN 207).

531.   Defendants presented extensive evidence regarding the drawing process of the enacted plan that supports a finding that the process used and justifications for the creation of the districts was not tenuous.

532.   A review of the enacted plan demonstrates an effort to comply with Section 2, a lack of any evidence of packing voters in districts, and a partisan focus on the mapdrawing process, which is permissible.

533.   "Under our cases, the States retain a flexibility that federal courts enforcing § 2 lack, both insofar as they may avoid strict scrutiny altogether by respecting their own traditional districting principles, and insofar as deference is due to their reasonable fears of, and to their reasonable efforts to avoid, § 2 liability." Bush v. Vera, 517 U.S. 952, 978 (1996).

534.   The Court now turns to a review of the unrebutted evidence regarding the creation of the enacted plan.

535.   The 2021 enacted state Congressional plan began with the creation of a map that largely balanced population that then could be modified based on input from legislators. Tr. 1665:2–1666:14.

536.   One of the major differences in the 2021 enacted Congressional plan from the 2011 enacted Congressional plan was the fact that Georgia did not gain a new Congressional district, unlike past redistricting cycles. Tr. 1667:10–1668:5.

537.   Changes to enacted Congressional District 6 added Cherokee County back into the district, as it had been on previous plans.



Tr. 1668:6–19; DX 185, p. 2.

538.   Political performance was an important consideration in the design of the 2021 enacted Congressional plan. Tr. 1668:20–23.

539.   Ms. Wright relied on information she heard from all of the public hearings in the creation of the 2021 enacted Congressional plan. Tr. 1668:24–1670:5.

540.   Congressional District 6 was electing a Democratic member of Congress on the 2011 configuration in 2020.



Tr. 1670:7–13; PPX 1, Ex. E.

541.   Congressional District 6 on its 2012 configuration was 58.11% Non-Hispanic White VAP and 14.46% AP Black VAP using the 2020 Census results. Stip. ¶ 167, PPX 1, Ex. F.

542.   Ms. Wright explained that, even though enacted Congressional District 6 on the 2011 configuration was almost the exact population size when the

2020 Census results were applied, it was going to be affected by changes in other districts. Tr. 1670:14–1671:4.

543.   There were partisan considerations in the design of 2021 enacted Congressional District 6. Tr. 1671:5–8.

544.   Ms. Wright explained that the four-way split of Cobb County in the 2021 enacted Congressional plan was because Cobb County was better able to handle a split of a congressional district than a smaller nearby county. Tr. 1671:14–1672:4.

545.   The inclusion of parts of West Cobb County into enacted Congressional District 14 was due to population and political considerations of putting a strongly Democratic area into District 14 instead of into District 11, which was more political competitive. Tr. 1673:6–1674:2.

546.   The boundary between enacted Congressional District 9 and 14 is because there is a mountain range in that area and you cannot drive between Murray Counties and Fannin and Gilmer Counties without crossing into Tennessee.



Tr. 1674:5–20; DX 185, p. 1.

547.    Thus, considering the entirety of the evidence regarding the justifications for the plan, the Court finds this factor weighs heavily in favor of Defendants because the justifications are not tenuous. The legislature engaged in an extensive process, with bipartisan input, worked to comply with Section 2 in an area where it has extensive authority to do so, and had partisan motives. In light of the requirement of presumption of legislative good faith, Abbott, 138 S. Ct.

116

at 2324, and the evidence presented, the Court finds the justifications for the enacted plans are not tenuous.

### j. Proportionality.

548.   This Court next considers issues related to proportionality, recognizing that "nothing in [§ 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." Greater Birmingham Min., 992 F.3d at 1334 (quoting Gingles, 478 U.S. at 43).

549.   But proportionality matters because it goes to the question of equal openness.

550.   "Plaintiffs challenging single-member districts may claim, not total submergence, but partial submergence; not the chance for some electoral success in place of none, but the chance for more success in place of some." De Grandy, 512 U.S. at 1012–13. As a result, this Court must assess whether there is already an equally open system or not.

551.   Consistent elective representation is also relevant as "facts beyond the ambit of the three Gingles factors" that can "loom correspondingly larger," requiring a detailed analysis. Id. at 1013.

552.   In De Grandy, the Supreme Court found proportionality as a result of "apparent[]" political effectiveness, based solely on an analysis of district makeups. Id. at 1014.

553.    But in this case, Defendants have presented evidence of <u>actual</u> political effectiveness across a number of elections.

554.    As discussed above, 100% of U.S. Senators in Georgia are Black-preferred candidates, 100% of the nominees from major parties for US Senate in 2022 were Black, 100% of Presidential election winners in Georgia in 2020 are Black-preferred candidates.

555.    Not only are Black-preferred candidates successful, but Black candidates are as well: 50% of U.S. Senators in Georgia are Black and 35.7% of Members of Congress from Georgia are Black and Black-preferred candidates.

556.    And Plaintiffs' own evidence shows that Black voters consistently prefer Democratic candidates. If, as Plaintiffs say, race and party are inseparable, then each election of a Democratic candidate is success for Black-preferred candidates.

557.    Using that metric, 43% of the state House of Representatives are Black-preferred candidates because they are Democrats, and 41% of the state Senate are Black-preferred candidates because they are Democrats.

558.    This factor weighs heavily in favor of Defendants, because evidence of the success of Black and Black-preferred candidates in Georgia at all levels of government, is significant in determining whether Black voters in Georgia "have less opportunity than other members of the electorate to participate in the political

process and to elect representatives of their choice." <u>Allen</u>, 599 U.S. at 25 (quoting

52 U.S.C. § 10301(b)).

### iv.   Legal conclusions regarding totality of the circumstances.

559.   "At bottom, the totality-of-circumstances inquiry asks whether a

neutral election standard, practice, or procedure, when 'interacting with social and

historical conditions,' works to deny a protected class the ability 'to elect their

candidate of choice on an equal basis with other voters.'" <u>Alabama State Conf. of</u>

<u>NAACP,</u> 612 F. Supp. 3d at 1253 (quoting <u>Voinovich v. Quilter,</u> 507 U.S. 146, 153

(1993)).

560.   The Court has weighed each Senate factor and determines that the

factors overwhelmingly demonstrate that Georgia's voting system and the

challenged redistricting plan does not demonstrate that any lack of success of

Black voters is "on account of race or color"—ultimately the votes of Black voters

in Georgia are not unequal to those of white voters. <u>Allen</u>, 599 U.S. at 25 (quoting

52 U.S.C. § 10301(b)).

### b.  Constitutional and temporal considerations regarding facts in Georgia.

561.   Although the Court has determined that the challenged map does not

render Black votes unequal to those votes of white voters in Georgia, the Court

addresses one other issue regarding why this finding is so important to uphold the purpose and effect of the VRA.

562.   The Constitution "restricts consideration of race and the VRA demands consideration of race." <u>Abbott v. Perez</u>, 138 S. Ct. 2305, 2315 (2018).

563.   This tension runs through VRA jurisprudence, with the Supreme Court regularly assuming without deciding that compliance with the VRA justifies race-based redistricting.

564.   At least one Justice has discussed this tension: "the authority to conduct race-based redistricting cannot extend indefinitely into the future." <u>Allen</u>, 599 U.S. at 45 (Kavanaugh, J., concurring in part).

565.   In other contexts, the Supreme Court determined that race-based programs had to have an end point. "To manage these concerns, <u>Grutter</u> imposed one final limit on race-based admissions programs. At some point, the Court held, they must end." <u>Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.</u>, 143 S. Ct. 2141, 2165 (2023).

566.   The Court's finding in this case demonstrates that no such limitation need be applied to the VRA, because the properly applied <u>Gingles</u> test is self-regulating.

567.   If the Court had found a violation of Section 2 on these facts, it would call into question the constitutionality of race-based redistricting because it would

be unclear what additional factors Georgia would have to meet to have its election system considered equally open.

568.   If the VRA requires Georgia to elect more Democratic candidates to be equally open or requires proportional representation (which it specifically denies in the text), then Section 2 may very well be unconstitutional.

569.   But a finding of equal openness on these facts demonstrates that Gingles addresses these concerns because this Court need not reach the constitutional issues when Gingles is properly applied.

570.   As the Supreme Court addressed in another VRA case,

> There is no denying, however, that the conditions that originally justified these measures no longer characterize voting in the covered jurisdictions. By 2009, 'the racial gap in voter registration and turnout [was] lower in the States originally covered by §5 than it [was] nationwide.' Northwest Austin Municipal Util. Dist. No. One v. Holder, 557 U.S. 193, 203-204, 129 S. Ct. 2504, 174 L. Ed. 2d 140 (2009). Since that time, Census Bureau data indicate that African-American voter turnout has come to exceed white voter turnout in five of the six States originally covered by §5, with a gap in the sixth State of less than one half of one percent. See Dept. of Commerce, Census Bureau, Reported Voting and Registration, by Sex, Race and Hispanic Origin, for States (Nov. 2012) (Table 4b).

Shelby County v. Holder, 570 U.S. 529, 535 (2013).

571.   Because this Court's decision upholding Georgia's Congressional redistricting plan is based on current data and current issues, it does not suffer the constitutional concerns at issue in Shelby County.

## CONCLUSION

572.    Having considered the totality of the circumstances after a searching local appraisal of the facts, this Court finds Plaintiffs have failed to carry their burden of demonstrating a lack of equal openness in Georgia's election system as a result of the challenged redistricting plan. For all the foregoing reasons, this Court finds **IN FAVOR** of Defendants and against Plaintiffs on all counts of Plaintiffs' Complaint.

573.    Pursuant to Federal Rule of Civil Procedure 58, the Clerk is **DIRECTED** to enter judgment and close this case.

This 25th day of September, 2023.

Respectfully submitted,

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

*Counsel for Defendants*

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned certifies that the foregoing

Proposed Findings of Fact and Conclusions of Law have been prepared in Book

Antiqua 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that, on September 23, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: September 23, 2024                    *Makeba Rutahindurwa*
                                             *Counsel for Plaintiffs-Appellants*